CT Corporation

**Service of Process Transmittal**
10/02/2014
CT Log Number 525802495

**TO:**   Craig Troutman, Esq.
Elavon, Inc.
7300 Chapman Highway
Knoxville, TN 37920

**RE:**   **Process Served in Tennessee**

**FOR:**   Elavon, Inc. (Domestic State: GA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | E & S Usa, Inc., etc., Pltf. vs. Elavon, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Return, Complaint, Affidavit, Exhibit(s) |
| **COURT/AGENCY:** | Shelby County Circuit Court - Thirtieth Judicial District, TN<br>Case # CI00392314 |
| **NATURE OF ACTION:** | Breach of contract |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Knoxville, TN |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/02/2014 at 11:00 |
| **JURISDICTION SERVED :** | Tennessee |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, not including the day of service |
| **ATTORNEY(S) / SENDER(S):** | Kevin A. Snider<br>Snider & Horner, PLLC<br>9056 Stone Walk Place<br>Corporate Gardens<br>Germantown, TN 38138<br>901-751-3777 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 771361002050<br>Email Notification, Craig Troutman craig.troutman@elavon.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 800 S. Gay Street<br>Suite 2021<br>Knoxville, TN 37929-9710 |
| **TELEPHONE:** | 216-802-2121 |

Page 1 of  1 / RR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**EXHIBIT A**



COPY

# IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE
## 140 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103
### FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
## SUMMONS IN A CIVIL ACTION

NO. _CT-00 3923-14_    AD DAMNUM $_____    AUTO ____ OTHER ____

E&S USA, INC.,

     Plaintiff(s),

vs.

ELAVON, INC.,

Defendant(s)

To the Defendant:    ELAVON INC.
                 c/o C.T. Corporation System
                 800 S. Gay Street, Sutie 2021
                 Knoxville, TN 37929

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your Answer to the Complaint on Kevin A. Snider of Snider & Horner, PLLC, Plaintiff's attorney, whose address is Corporate Gardens, 9056 Stone Walk Place, Germantown, Tennessee 38138 within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service. If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

TESTED AND ISSUED

_____9-15_____ 20_14_        JIMMY MOORE, Circuit Court Clerk

By _AEARG_ _____ D.C.

## TO THE DEFENDANT(S):
Pursuant to Tennessee Code Annotated Section 26-2-114, you are hereby given the following notice: Tennessee law provides a four thousand dollar ($4,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

## COST BOND
I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs not to exceed $500.00 in this court which may at any time be adjudged against the Plaintiff(s) in the event the said Plaintiff(s) shall not pay the same.

Witness my hand this _____ day of _____, 20_____.
Certification when applicable

I, JIMMY MOORE, Clerk of the Circuit Court, Shelby County, Tennessee      KEVIN A. SNIDER of Snider & Horner, PLLC
Certify this to be a true and accurate copy as filed this _____

JIMMY MOORE, Clerk  By

## RETURN ON SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____ OCT 0 2 2014 _____, 20___, at _9:00_ A M. a copy of the

summons and a copy of the Complaint to the following Defendant(s): _____ Elavon Inc. _____

LINDSEY ROWLAND

BILL OLDHAM, Sheriff

By _W C Bryant #B1864_, Deputy Sheriff

## PRIVATE PROCESS SERVER

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20_____, at _____ M. a copy of the

summons and a copy of the Complaint to the following Defendant(s): _____

_____

(Please Print the Following)

Private Process Server: _____   Company: _____

Address: _____   Phone: _____

Signature: _____

Other manner of service:

_____

I hereby certify that I have NOT served this Summons on the within named Defendant(s) _____
because he/she/it is (are) not to be found in this County after diligent search and inquiry for the following reasons:

_____

This _____ day of _____, 20_____   BILL OLDHAM, Sheriff

By _____, Deputy Sheriff

NO. _____   D. _____

IN THE CIRCUIT COURT
OF TENNESSEE
FOR THE THIRTIETH
JUDICIAL DISTRICT AT MEMPHIS

SUMMONS IN CIVIL ACTION

E&S USA, INC.
Plaintiff(s)

vs.

ELAVON, INC.
Defendant(s)

Came to hand _____

Attorney for the Plaintiff(s):
KEVIN A. SNIDER #018231
SNIDER & HORNER, PLLC
Corporate Gardens
9056 Stone Walk Place
Germantown, TN 38138
(901) 751-3777 – telephone
(901)759-0041 – facsimile

IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

E & S USA, INC., d/b/a
K&F BEAUTY SUPPLY

      Plaintiff,

VS.

      No. CT-003923-14
      Div. IX
      JURY DEMANDED

ELAVON, INC.,

      Defendant.

---

## COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, E & S USA, Inc., d/b/a K&F Beauty Supply, by and through its legal counsel of record, Kevin A. Snider of Snider & Horner, PLLC, and files his Complaint for Damages (hereinafter referred to as "the Complaint") and states to this Honorable Court as follows:

### JURISDICTION & VENUE

1. The Plaintiff, E & S USA, Inc., d/b/a K&F Beauty Supply (hereinafter referred to as "the Plaintiff"), is a corporation headquartered in and actively conducting business in Shelby County, Tennessee.

2. The Defendant, Elavon, Inc. (hereinafter referred to as "the Defendant") is an active, for profit corporation transacting business in Shelby County, Tennessee, and may be served with process through its registered agent, C T Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710.

3. Jurisdiction and Venue in the instant case are properly found in Shelby County, Tennessee, pursuant to T.C.A. § 20-4-101 and related sections.

## FACTUAL ALLEGATIONS

4. On or about January 8, 2014, the Plaintiff completed and signed an application and an agreement with the Defendant for said Defendant to provide credit card merchant services to said Plaintiff for five (5) merchant accounts with the following merchant account numbers: 8024582291, 8024582242, 8024574975, 8024582416, and 8024575014. The Plaintiff's New Merchant Application for its store location at 3439 N. Watkins Street, Memphis, TN 38127 is attached hereto as Exhibit A. The Plaintiff's New Merchant Application for its store location at 1330 Jackson Avenue, Memphis, TN 38107 is attached hereto as Exhibit B.

5. At that time, it was agreed that there would be a one point six percent (1.6%) rate with <u>no</u> authorization or transaction fees.

6. In reliance upon these representations, the Plaintiff entered into a merchant agreement with the Defendant.

7. Also at that time, the Defendant agreed to provide the Plaintiff with a copy of the full and final merchant agreement once said Defendant had completed it.

8. Over the past several months, the Plaintiff has been repeatedly requesting a copy of the merchant agreement which he finally received within the past week or two of July 10, 2014.

9. At that point in time, the Plaintiff noticed and first became aware of the merchant agreement being changed after it was executed by said Plaintiff in that the Defendant has been charging said Plaintiff an authorization or transaction fee of ten cents ($0.10) per transaction. Extensive documentation of the ten cent ($0.10) authorization or transaction fees for each of the Plaintiff's merchant accounts is collectively attached hereto as Exhibit C.

10. The Plaintiff never agreed to the Defendant's ten-cent transaction or authorization fee per transaction.

11. The disputed ten-cent ($0.10) transaction or authorization fee per transaction was written and/or forged into the parties' merchant agreement after it was signed and executed, which explains why it took several months for the Defendant to provide a copy of it to the Plaintiff.

12. The Defendant has refused and/or otherwise failed to immediately remove these transaction or authorization fees from the Plaintiff's merchant accounts and to refund all previous charges over the past several months from said fees.

13. On or about July 10, 2014, the Plaintiff issued its first formal demand to immediately remove these ten cent ($0.10) transaction or authorization fees from the Plaintiff's account and to refund all previous charges over the past several months from these fees. The Plaintiff's July 10, 2014 demand letter issued to the Defendant is attached hereto as Exhibit D.

14.  That same day, the Plaintiff's representative, Nereida Roque (hereinafter referred to as "N. Roque"), spoke to the Defendant's representative, Tangelia Nance (hereinafter referred to as "Ms. Nance"), on July 10, 2014 at or about 3:13 p.m. to inquire about why there were ten cent ($0.10) transaction or authorization fees on the copies of the credit machine applications that said Ms. Nance emailed to the Plaintiff.

15.  During N. Roque's conversation with Ms. Nance, said Ms. Nance herself stated and thus blatantly admitted that, at the time the Plaintiff completed and signed the new merchant applications, there was nothing written in the blank for transaction and/or authorization fees, which specifically confirms to the Plaintiff that this fraud did in fact occur.

16.  Ms. Nance also told N. Roque that, when said Ms. Nance turned in the applications, said Ms. Nance had to write and/or forge something in the boxes and that the Plaintiff therefore is supposed to be charged.  N. Roque's signed statement documenting her July 10, 2014 conversation with Ms. Nance is attached hereto as Exhibit E.

17.  The Plaintiff followed up its July 10, 2014 written demand with a follow up letter dated July 21, 2014, essentially (1) reiterating what was stated in the first demand letter, (2) pointing out that there was no response to said demand letter, and (3) adding a reference to a conversation that transpired between N. Roque on the Plaintiff's behalf and Ms. Nance on the Defendant's behalf, which confirms that the Defendant admitted to fraudulently adding a ten cent ($0.10) transaction or authorization fee per transaction to the Plaintiff's merchant accounts after the Plaintiff completed and signed all the paperwork associated with its merchant accounts.  The Plaintiff's July 21, 2014 follow up letter issued to the Defendant is attached hereto as Exhibit F.

18.  After receiving the Defendant's July 24, 2014 response letter buying time to evaluate the Plaintiff's correspondence, the Plaintiff in its August 7, 2014 letter issued to the Defendant emphasized said Plaintiff's daily accrual of damages as a result of the Defendant's delay in resolving this matter.  The Defendant's July 24, 2014 response letter issued to the Plaintiff is attached hereto as Exhibit G.  The Plaintiff's August 7, 2014 letter issued to the Defendant is attached hereto as Exhibit H.

19.  Also, on or about August 7, 2011, the Defendant issued a letter (1) informing the Plaintiff of a refund of charges with numbers drastically lower than what the Plaintiff should have been refunded, (2) questioning the validity of Mr. Khaled Eleiwa's Power of Attorney to sign the Plaintiff's documents on behalf of Mr. Rezeq Eleiwa, and (3) lastly reiterating to the Plaintiff that all five (5) merchant accounts will be closed on August 29, 2014.  The Defendant's second August 7, 2014 letter issued to the Plaintiff offering partial refunds and announcing the cancellation of the Plaintiff's five (5) merchant accounts with the Defendant is attached hereto as Exhibit I.

20.  The Defendant was not only informed of Mr. Khaled Eleiwa's Power of Attorney to sign the Plaintiff's documents on behalf of his father, Mr. Rezeq Eleiwa, but was also provided a copy of the Power of Attorney at the time the documents that are the subject of this litigation were signed.  A copy of the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq's Eleiwa's behalf that was provided to the Defendant's representative, Ms. Nance, at the time of contracting is attached hereto as Exhibit N.

21.  The Defendant, however, already shut down two (2) of the five (5) merchant accounts over the weekend immediately preceding August 11, 2014 supposedly upon request by the Plaintiff via email, which the Plaintiff vehemently disputes was ever sent to said Defendant.

22.  The Plaintiff requested a copy of the email that the Defendant alleges the Plaintiff sent to said Defendant requesting the closure of two (2) of the five (5) merchant accounts at issue, but the Defendant to date has not produced any such email.

23.  Fortunately, one of the two (2) merchant accounts was restarted as it was "closed in error" and subsequently reopened according to the Defendant, but it took approximately three (3) days to restart merchant account 8024582291 which has caused the Plaintiff to incur substantial damages as a result of not being able to process its store sales. The Defendant's August 11, 2014 letter documenting its statement that the Plaintiff's merchant account was "closed in error" and was subsequently reopened along with the Defendant's copy of the November 2013 Terms of Service that the Plaintiff had never seen before are collectively attached hereto as Exhibit J.

24. Ultimately, the Defendant unilaterally shut down and/or cancelled all five (5) merchant accounts on or about August 28, 2014 without giving the Plaintiff thirty (30) days notice on the basis that Mr. Khaled Eleiwa's Power of Attorney to operate the Plaintiff and sign documents on Mr. Rezeq Eleiwa's behalf for said Plaintiff "creates significant issues." The Defendant's August 19, 2014 letter announcing the closure of the subject five (5) merchant accounts based on the alleged lack of proof of Mr. Khaled Eleiwa's Power of Attorney to sign on behalf of Mr. Rezeq Eleiwa for the Plaintiff and/or to run the Plaintiff is attached hereto as Exhibit K.

25. Ms. Nance on the Defendant's behalf, however, know about the Power of Attorney giving authority to Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq Eleiwa's behalf and was provided a copy of it.

26. Moreover, Ms. Nance originally drafted the parties' contract in the name of Mr. Khaled Eleiwa and completely redrafted it to list his father, Mr. Rezeq Eleiwa, as the contracting representative for the Plaintiff given the Power of Attorney involved in this matter.

27.   The above-referenced process involving the disputed Power of Attorney and the redrafting of the parties' contract was witnessed by Sarahi Roque (hereinafter referred to as "S. Roque") and Eddie Thead (hereinafter referred to as "Mr. Thead").  S. Roque's signed statement documenting the redrafting of the parties' contract and providing Ms. Nance a copy of IDs and the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq Eleiwa's behalf is attached hereto as Exhibit L.  Mr. Thead's signed statement documenting the redrafting of the parties' contract and providing Ms. Nance a copy of IDs and the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq Eleiwa's behalf is attached hereto as Exhibit M.

28.   The Defendant's ongoing refusal and/or otherwise failure to resolve this matter with the Plaintiff concerning said Defendant's unauthorized transaction fees and unilateral cancellation of all five (5) of the Plaintiff's merchant accounts has caused the Plaintiff substantial damages by forcing the Plaintiff to contract with another merchant credit card account vendor, by harming the daily operation of the Plaintiff's stores, and by forcing the Plaintiff to proceed with this litigation in order to protect its finances, rights, and interests.

## FIRST CLAIM – BREACH OF CONTRACT

29. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

30. This claim is for breach of contract against the Defendant.

31. The Plaintiff originally entered into a merchant agreement with the Defendant for said Defendant to provide credit card merchant services to said Plaintiff for the above-listed five (5) merchant accounts.

32. The Plaintiff has duly performed all of the terms and conditions of the above-described merchant agreement with the Defendant to the extent that the Plaintiff continued his efforts in good faith to pay all contracted fees and to remain current on the full payment of its five (5) merchant accounts for the Defendant's merchant account services in order to meet deadlines and/or to avoid missed payments altogether.

33. The terms and conditions of the Plaintiff's merchant agreement with the Defendant required said Defendant to charge the Plaintiff a rate of one point six percent (1.6%), not a ten cent ($0.10) transaction or authorization fee per transaction, for the Defendant's merchant account services.

34. The Defendant breached the Plaintiff's merchant agreement in the following respects:

   A. By charging said Plaintiff an authorization or transaction fee of ten cents ($0.10) per transaction after the parties executed the subject merchant agreement; and/or

B. By writing and/or forging the disputed ten-cent ($0.10) transaction or authorization fee per transaction into the parties' merchant agreement after it was signed and executed as Ms. Nance on the Defendant's behalf which said Ms. Nance blatantly admitted to doing without the Plaintiff's consent; and/or

C. By refusing and/or otherwise failing to immediately remove these ten-cent ($0.10) transaction or authorization fees from the Plaintiff's merchant accounts; and/or

D. By refusing and/or otherwise failing to refund all previous unconsented to charges over the past several months from said transaction or authorization fees; and/or

E. By already shutting down two (2) of the five (5) merchant accounts over the weekend immediately preceding August 11, 2014 supposedly upon request by the Plaintiff via email which the Plaintiff did not make; and/or

F. By taking approximately three (3) days to restart merchant account 8024582291 which has caused the Plaintiff to incur substantial damages as a result of not being able to process its store sales; and/or

G. By unilaterally closing or cancelling all five (5) merchant accounts on or around August 29, 2014; and/or

H. By unilaterally closing or cancelling all five (5) of the Plaintiff's merchant accounts by August 29, 2014 without giving the Plaintiff thirty (30) days notice.

35.  As a sole, direct, and proximate cause of the Defendant's actions and/or omissions constituting a breach of contract, the Plaintiff has and continues to incur substantial damages.

## SECOND CLAIM – FRAUD AND/OR MISREPRESENTATION

36.  The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

37.  This claim is for fraud and/or misrepresentation against the Defendant.

38.  The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation when it represented to the Plaintiff that there would be a one point six percent (1.6%) rate with no authorization or transaction fees when, in fact, the Defendant has been charging said Plaintiff an authorization or transaction fee of ten cents ($0.10) per transaction.

39.  The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation when it represented to the Plaintiff that said Defendant would provide the Plaintiff with a copy of the full and final merchant agreement as the Plaintiff requested once said Defendant had completed it when, in fact, the Defendant delayed sending the Plaintiff a copy of the merchant agreement over the course of several months until a week or two of July 10, 2014.

40.  The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation when it wrote and/or forged the disputed ten-cent ($0.10) transaction or authorization fee per transaction into the parties' merchant agreement after it was signed and executed as Ms. Nance on the Defendant's behalf blatantly admitted to doing without the Plaintiff's consent.

41.  The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation by already shutting down two (2) of the Plaintiff's five (5) merchant accounts over the weekend immediately preceding August 11, 2014 supposedly upon request by the Plaintiff via email, which the Plaintiff vehemently disputes was ever sent to said Defendant.

42.  The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation by unilaterally shutting down all of the Plaintiff's merchant accounts on the basis that the Plaintiff allegedly refused and/or failed to provide proof of Mr. Khaled Eleiwa's Power of Attorney to sign on behalf of Mr. Rezeq Eleiwa for the Plaintiff when, in fact, the Plaintiff's two (2) witnesses and employees, S. Roque and Mr. Thead, provided Ms. Nance on the Defendant's behalf a copy of IDs and the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq Eleiwa's behalf at the time the parties' contract was being redrafted and prior to said contract's execution.

43. The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation when it falsely represented to the Plaintiff that its goods and/or services were of a particular standard, quality, or grade which they do not possess.

44. The Defendant and/or its employees, agents, representatives, or other individuals working on its behalf, engaged in fraud and/or misrepresentation when it falsely represented to the Plaintiff that this business transaction conferred or involved rights and remedies which it did not have or involve or which are prohibited by law.

45. The Defendant's actions were intentional, willful, malicious, and/or reckless and entitled the Plaintiff to punitive damages. The Defendant knew of the foregoing falsehoods and made them recklessly with the intent to deceive the Plaintiff and to induce the Plaintiff into entering into a merchant agreement and defending its finances, rights, and interests against its collection of unauthorized transaction fees from said Plaintiff.

46. Alternatively, the Defendant's actions and/or omissions were negligent in that it failed to exercise due care to work with the Plaintiff in good faith to honor the parties' merchant agreement, to fully reimburse the Plaintiff for the unauthorized ten cent ($0.10) transaction fees, and to keep the Plaintiff's five (5) merchant accounts opened. The Defendant should have reasonably foreseen that its herein-state actions and/or omissions of not honoring the parties' signed and executed agreement that provided for no ten cent ($0.10) authorization or transaction fee would harm or damage said Plaintiff financially.

47. As a sole, direct, and proximate cause of the Defendant's actions and/or omissions, the Plaintiff has and continues to incur substantial damages.

## THIRD CLAIM – VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT

48.  The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

49.  This claim is for violations of the Tennessee Consumer Protection Act of 1977 as stated in T.C.A. § 47-18-101, et seq. (hereinafter referred to as the "TCPA") by the Defendant and/or its agents, employees, representatives, and/or other individuals acting on its behalf.

50.  As a result of the above, inter alia, the Defendant committed one or more unfair and/or deceptive acts or practices in violation of the TCPA in one or more of the following ways:

A.  By charging said Plaintiff an authorization or transaction fee of ten cents ($0.10) per transaction after the parties executed the subject merchant agreement; and/or

B.  By writing and/or forging the disputed ten-cent ($0.10) transaction or authorization fee per transaction into the parties' merchant agreement after it was signed and executed as Ms. Nance on the Defendant's behalf blatantly admitted to doing without the Plaintiff's consent; and/or

C.  By refusing and/or otherwise failing to immediately remove these ten-cent ($0.10) transaction or authorization fees from the Plaintiff's merchant accounts; and/or

D.  By refusing and/or otherwise failing to refund all previous charges over the past several months from said transaction or authorization fees; and/or

E.  By already shutting down two (2) of the five (5) merchant accounts over the weekend immediately preceding August 11, 2014 as supposedly requested by the Plaintiff via email which said Plaintiff never made; and/or

F.  By taking approximately three (3) days to restart merchant account 8024582291 which has caused the Plaintiff to incur substantial damages as a result of not being able to process its store sales; and/or

G.  By unilaterally closing or cancelling all five (5) merchant accounts on or around August 29, 2014; and/or

H.  By unilaterally closing or cancelling all five (5) merchant accounts by August 29, 2014 without giving the Plaintiff thirty (30) days notice; and/or

I.  By falsely representing to the Plaintiff that there would be a one point six percent (1.6%) rate with no authorization or transaction fees when, in fact, the Defendant has been charging said Plaintiff an authorization or transaction fee of ten cents ($0.10) per transaction; and/or

J.  By falsely representing to the Plaintiff that the Defendant would provide the Plaintiff with a copy of the full and final merchant agreement as the Plaintiff requested once said Defendant had completed it when, in fact, the Defendant delayed sending the Plaintiff a copy of the merchant agreement over the course of several months until a week or two of July 10, 2014; and/or

K.  By shutting down all of the Plaintiff's merchant accounts on the basis that the Plaintiff allegedly refused and/or failed to provide proof of Mr. Khaled Eleiwa's Power of Attorney to sign on behalf of Mr. Rezeq Eleiwa for the Plaintiff when, in fact, the Plaintiff's two (2) witnesses and employees, S. Roque and Mr. Thead, provided Ms. Nance on the Defendant's behalf a copy of IDs and the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeq Eleiwa's behalf at the time the parties' contract was being redrafted and prior to said contract's execution; and/or

L.  By falsely representing to the Plaintiff that its goods and/or services were of a particular standard, quality, or grade which they do not possess; and/or

M.  By falsely representing to the Plaintiff that this business transaction conferred or involved rights and remedies which it did not have or involve or which are prohibited by law; and/or

N.  By other acts and/or omissions previously described above which are deceptive to the consumer or to any other person.

51.  It is patently unfair for the Defendant to have been allowed not to fulfill its duty of care and skill to work with the Plaintiff in good faith to honor the parties' merchant agreement, to fully reimburse the Plaintiff for all of the unauthorized ten cent ($0.10) transaction fees, and to keep the Plaintiff's five (5) merchant accounts opened.

52.  As a result of the Defendant's intentional, willful, and/or knowing violations of the TCPA, the Plaintiff has and continues to incur substantial damages, especially additional out of pocket expenses to fully pay for the unauthorized ten cent ($0.10) transaction fees as well as monies said Plaintiff has spent to acquire another merchant credit card vendor and to proceed forward with this litigation, and the Defendant is liable to the Plaintiff in the sum of three (3) times its actual damages, reasonable attorney fees, and costs of litigation.

## FOURTH CLAIM – MONEY HAD AND RECEIVED AND/OR UNJUST ENRICHMENT

53.  The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

54.  At all times pertinent herein and as a result of the Defendant's conduct as outlined above, the Defendant has been unjustly enriched.  More specifically, the Defendant took advantage of its position relative to the Plaintiff by receiving substantial money under such circumstances that in equity and good conscience said Defendant ought not to retain it and to which said Defendant has no claim at law or equity.  As a direct and proximate cause therein, the Defendant received thousands of dollars that it knew belonged to the Plaintiff and that said Defendant had not yet earned for itself and/or had been properly obtained since the Plaintiff was making a good faith effort to pay all the contracted fees and to remain current on the full payment of its five (5) merchant accounts for the Defendant's merchant account services in order to meet deadlines and/or to avoid missed payments altogether.

55. By reason of the foregoing, the Plaintiff was substantially damaged and seeks damages incurred due the Defendant's inappropriate efforts to collect authorization and/or transaction fees to which the Plaintiff did not agree to be charged to its merchant accounts; due to the Defendant's unilateral shut down or closure of all five (5) of the Plaintiff's merchant accounts by August 29, 2014 without giving said Plaintiff thirty (30) days notice and forcing the Plaintiff to acquire another merchant credit card vendor; and also due to said Defendant's violation of the parties' executed merchant agreement.

## FIFTH CLAIM – DETRIMENAL RELIANCE

56. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

57. The Plaintiff, in reasonable reliance on the above-mentioned merchant agreement and/or express representations of the Defendant, expended monies in paying all contracted fees associated with the five (5) merchant accounts. The Plaintiff's expenditures were to its detriment in that the Defendant unjustly denied and/or refused and/or otherwise failed to reimburse the Plaintiff for all funds lost to unauthorized transaction fees and the closure of the five (5) merchant accounts.

58. As a direct and proximate result, the Plaintiff has and continues to incur substantial damages.

## SIXTH CLAIM – OTHER RECKLESS AND/OR NEGLIGENT ACTIONS AND/OR OMISSIONS

59. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

60.  At all times relevant herein, the Defendant had a duty of care to exercise reasonable care and skill to work with the Plaintiff in good faith to honor the parties' merchant agreement as a result of unauthorized ten cent ($0.10) transaction fees being charged to the Plaintiff's merchant accounts, to fully reimburse the Plaintiff for the unauthorized ten cent ($0.10) transaction fees, and to keep the Plaintiff's five (5) merchant accounts opened.

61.  In taking the aforementioned actions and/or omissions and in failing to take the actions as the Plaintiff asserts should have been taken, the Defendant breached its duty of care and skill to the Plaintiff by refusing and/or otherwise failing to honor the parties' merchant agreement as a result of unauthorized ten cent ($0.10) transaction fees being charged to the Plaintiff's merchant accounts; by refusing and/or otherwise failing to fully reimburse the Plaintiff for the unauthorized ten cent ($0.10) transaction fees; and by refusing and/or otherwise failing to keep the Plaintiff's five (5) merchant accounts opened.

62.  As a direct and proximate result of the Defendant's other intentional, reckless, and/or negligent actions and/or omissions, the Plaintiff has and continues to incur substantial damages.

## JURY DEMAND

The Plaintiffs demand a jury trial on all issues which may be determined by a jury.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff prays:

1.  That proper service issue and be served upon the Defendant requiring it to answer the Complaint for Damages within the time allotted by the Tennessee Rules of Civil Procedure.

2.  That the Plaintiff be awarded a judgment against the Defendant in the minimum amount of $10,000.00 in compensatory damages or an amount to be more specifically determined at a later date.

3.  That the Plaintiff be awarded a judgment against the Defendant in the minimum amount of $30,000.00 in punitive damages or an amount to be more specifically determined at a later date.

4.  That the Plaintiff be awarded prejudgment interest at the maximum rate permitted by law against Defendant.

5.  That the Plaintiff be awarded reasonable attorney fees incurred in this matter and/or treble damages pursuant to the Plaintiff's claim for violations under the Tennessee Consumer Protection Act by the Defendant.

6.  That the Plaintiff be awarded discretionary costs as this Court deems appropriate.

7.  That the Plaintiff be awarded the court costs and other expenses of this action.

8.  For such other and further relief as to which the Plaintiff may be entitled by law.

9.  For a jury trial.

Respectfully submitted,

SNIDER & HORNER, PLLC


KEVIN A. SNIDER (B.P.R. #18231)
Attorney for the Plaintiff
Corporate Gardens
9056 Stone Walk Place
Germantown, TN 38138
(901) 751-3777

## **AFFIDAVIT**

STATE OF TENNESSEE
COUNTY OF SHELBY

I, Khaled Eleiwa, having been duly sworn, state as follows:

1. I, in my capacity as General Manager of the Plaintiff, E & S USA, Inc., d/b/a

K&F Beauty Supply, have reviewed the allegations of the Complaint for Damages and

they are true and correct to the best of my knowledge, information, and belief.

FURTHER AFFIANT SAYETH NOT.

KHALED ELEIWA

Sworn and subscribed to me on this 9th day of September, 2014.

NOTARY PUBLIC

My Commission Expires:

ANGIE G. DEVORE
STATE OF
TENNESSEE
NOTARY
PUBLIC
SHELBY COUNTY
MY COMMISSION EXPIRES
May 16, 2017

*- Page 22 of 22 -*



Exhibit
A

The Plaintiff's New Merchant Application for its
store location at 349 N. Watkins Street,
Memphis, TN 38127

# NEW MERCHANT APPLICATION

## MERCHANT INFORMATION

LEGAL/CORPORATE NAME: E & S USA, Inc.

DBA NAME *(IF DIFFERENT THAN ABOVE)*: K & F Beauty Supply | DBA PHONE #: 901-358-1700

CONTACT NAME: Khaled Eleiwa | DBA FAX #: 901-358-1900

DBA ADDRESS 1 (NO PO BOX): 3439 N. Watkins St. | CUSTOMER SERVICE PHONE #:

DBA ADDRESS 2: | PREVIOUS PROCESSOR:

CITY: Memphis | STATE: TN | ZIP CODE: 38127 | YEAR ESTABLISHED: 2009

EMAIL ADDRESS: Khaled 19771@yahoo.com | LENGTH OF CURRENT OWNERSHIP:        YEARS,        MONTHS

## 2 MAILING ADDRESS *(IF DIFFERENT THAN ABOVE)*

MAILING NAME: | MAILING PHONE #:

MAILING CONTACT: | MAILING FAX #:

MAILING ADDRESS: | CITY: | STATE: | ZIP CODE:

## 3 PRINCIPAL 1 INFORMATION (OWNER/PARTNER/OFFICER)

☑ OWNER/PARTNER: PERCENTAGE OF OWNERSHIP 100 % OR ☐ OFFICER: TITLE: President

FIRST NAME: Rezeo | MI: | LAST NAME: Eleiwa

HOME ADDRESS: 8114 Windersville Dr. | DOB: 2/1/1944

CITY: Bartlett | STATE: TN | ZIP CODE: 38133 | HOME PHONE #: 901-870-1974

PREVIOUS ADDRESS IF CURRENT ADDRESS IS LESS THAN 2 YEARS:

HOME ADDRESS: | CITY: | STATE: | ZIP CODE:

## 4 PRINCIPAL 2 INFORMATION

☐ OWNER/PARTNER: PERCENTAGE OF OWNERSHIP        % OR ☐ OFFICER: TITLE:

FIRST NAME: | MI: | LAST NAME:

HOME ADDRESS: | DOB:

CITY: | STATE: | ZIP CODE: | HOME PHONE #:

## OTHER MERCHANT INFORMATION

AVERAGE SALE AMOUNT: $ 20.00 | DESCRIPTION OF PRODUCT OR SERVICES OFFERED: Beauty Supplies - Salon Services

TOTAL MONTHLY VISA/MC/DISC/UNIONPAY SALES: $ 1000.00 | MCC: 7230

CARD PRESENT (SWIPED) 100 % | WHEN DOES THE CUSTOMER RECEIVE THE PRODUCT OR SERVICE?

CARD PRESENT (NOT SWIPED)        % | ☑ SAME DAY   ☐ IF NOT SAME DAY,      # OF DAYS (INCLUDE SHIPPING TIME FRAME)

MAIL ORDER        % | IS ANY PRODUCT DELIVERY OVER 1 YEAR?   ☐ YES   ☐ NO

TELEPHONE ORDER        % | FOR INTERNET TRANSACTIONS:

INTERNET        % | LIST THE PRODUCT WEB SITE:

TOTAL        = 100% | "CONTACT US" EMAIL ADDRESS:

DO YOU OPERATE SEASONALLY: ☐ YES ☐ NO   IF YES, PLEASE CHECK MONTHS CLOSED:

☐ JANUARY | ☐ FEBRUARY | ☐ MARCH | ☐ APRIL | ☐ MAY | ☐ JUNE
☐ JULY | ☐ AUGUST | ☐ SEPTEMBER | ☐ OCTOBER | ☐ NOVEMBER | ☐ DECEMBER

---

### FOR INTERNAL USE ONLY

☐ NEW LOCATION   ☐ ADDITIONAL LOCATION   EXISTING MID: | CHAIN #: | LOCATION        OF

PORTFOLIO CODE: 16RGH1 | FI: 0056 | AGENT: 0030 | BANK: 069053

CLIENT GROUP #: 96 | ENTITY: 43008 | REP #: 30588 | AWS: 2392381

| STATEMENTS | SCREENING | RESIDUALS | CHARGEBACKS |
|---|---|---|---|
| ☑ DBA OR ☐ MAILING OR ☐ W-9 | ☐ SSA OR ☐ MAILING OR ☐ W-9 OR ☐ SEE SPECIAL INSTRUCTIONS | ☐ MAIL TO: ☐ DBA ☐ MAILING OR ☐ FAX TO: ☐ SSA ☐ MAILING ☐ ONLINE CASE MANAGEMENT (OCM) | ☐ MAIL TO: ☐ DBA ☐ MAILING OR ☐ FAX TO: ☐ SSA ☐ MAILING ☐ ONLINE CASE MANAGEMENT (OCM) |

AUTO SEND: ☐ YES ☐ NO (CHAIN MERCHANTS ONLY – MUST INCLUDES CHAIN SET UP FORM)

Merchant ID 8024582291        BEFORE

## CARD ACCEPTANCE (PLEASE CHECK EACH CARD YOU WISH TO ACCEPT)

☐ ALL VISA/MasterCard/UnionPay/Discover Cards (US, DI)

☐ VISA Credit ☐ VISA Debit ☑ MasterCard Credit ☐ MasterCard Debit ☐ Discover (US, DI) ☐ UnionPay

| PRICING CATEGORY | | |
|---|---|---|
| ☑ RETAIL | ☐ LODGING | ☐ MO/TO / INTERNET |
| ☐ RESTAURANT | ☐ SUPERMARKET | ☐ ARU |

### PRICING INFORMATION

☐ AUTH FEE (DEBIT/ATM, VISA/UNIONPAY/AMEX/DISC MISC)   $

☐ TIERED*

| | RATE | PER ITEM |
|---|---|---|
| QUALIFIED | 1.60% | $ |
| MID QUALIFIED | 2.30% | $ |
| NON QUALIFIED | 2.89% | $ |

OPT. ☐ CHECK CARD ☐ SPRINT ☐ QPS/SMALL TKT

| | % | $ |
|---|---|---|
| OPT. REWARDS TIER | 1.59 % | $ |
| OPT. COMMERCIAL CARD TIER | 1.90 % | $ |

☐ ENHANCED IC PLUS*

| | % | $ |
|---|---|---|
| CHECK CARD QUALIFIED | % | $ |
| QUALIFIED | % | $ |
| REWARDS QUALIFIED | % | $ |
| MID QUALIFIED | % | $ |
| COMMERCIAL NON QUALIFIED | % | $ |
| NON QUALIFIED | % | $ |

☐ IC PLUS*

| | % | $ |
|---|---|---|

*RATES/CARE FOR ALL CARD ACCEPTANCE TYPES SELECTED. ALL CARD BRAND ASSESSMENTS WILL BE PASSED THROUGH AT COST.

| ☐ DIFFERENTIAL PLUS* | RATE | PER ITEM |
|---|---|---|
| VISA – QUAL | % | $ |
| MasterCard – QUAL | % | $ |
| DISCOVER – QUAL | % | $ |
| UnionPay – QUAL | % | $ |
| NON-QUAL | % | — |

PRICING PROGRAM (REQUIRED FOR IDP)

| OTHER AUTHORIZATIONS (PER OCCURRENCE) | PER AUTH |
|---|---|
| VOICE - ARU (VOUCHTONE) | $0.75 |
| VOICE - OPERATOR ASSISTED | $0.90 |
| VOICE - AVS | $0.90 |
| VOICE - BANK REFERRAL | $4.00 |
| DIAL COMMUNICATION | $0.024 |
| OTHER: | $ |
| OTHER: | % |
| PIN DEBIT: | |

| RATE | |
|---|---|
| (PLUS NETWORK SWITCH FEE) | $ |
| MONT. PROGRAM / AUTH PROGRAM/ASSOC | (PER PIN) |
| IC PLUS/ASSOC | $ P 10 |
| MONT. PROGRAM/AUTH/AUTH PROGRAM/ASSOC | (PER AUTH) |

| FEES | |
|---|---|
| ONE-TIME FEE TYPE: | |
| APPLICATION FEE | $100 |
| INSTALLATION / TRAINING | $200 |
| RUSH SHIPMENT | $ |
| OTHER | $ |
| MONTHLY FEE TYPE: | |
| SUPPORT FEE | $10 |
| MERCHANT CLUB/NET | $ |
| SRS FEE | $ |
| STATEMENT ☐ ELECTRONIC OR ☐ PAPER | |
| STATEMENT MAILING FEE (PRINTED STATEMENT IS USED) | $5 |
| MONTHLY MINIMUM | $35 |
| PCI SECURITY PROGRAM | $7 |
| OTHER: | $ |
| OTHER | $ |
| PER OCCURRENCE FEE TYPE: | |
| CHARGEBACK FEE | $25 |
| RETURN ITEM (NSF) FEE | $20 |
| OTHER | $ |

### AMERICAN EXPRESS

☐ ONE-PAY   ☐ OPT     MONTHLY VOLUME:        AMEX RATE:      %   $          CARD NOT PRESENT DOWNGRADE:   -0.30 %

### BANK ACCOUNT (CHECKING ACCOUNTS ONLY)

DEPOSIT BANK NAME: REGIONS          ABA/ROUTING #: 06

BILLING BANK NAME (IF DIFFERENT):          ABA/ROUTING #                    1023          DDA ACCOUNT #

### POINT OF SALE (EQUIPMENT OR SOFTWARE)

NETWORK: ☑ ELAVON   ☐ OTHER

VAR SERVICE PROVIDER (HOSTED):     VAR VENDOR (DISTRIBUTED):        # OF TIDS (VAR)

PURCHASE OR LEASE     VAR PRODUCT:      VAR VERSION     GATEWAY (OPTIONAL)     AGGREGATOR.

| QTY | POS DESCRIPTION | ITEM CODE | PURCHASE PRICE PER UNIT | LEASE TERM MONTHLY | LEASE MONTHLY RATE PER UNIT | SOFTWARE/WIRELESS WIRELESS SETUP PER UNIT | MONTHLY FEE PER UNIT | PER AUTH FEE |
|---|---|---|---|---|---|---|---|---|
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |

### MERCHANT OWNS

| QTY | POS DESCRIPTION | ITEM CODE | REPROGRAM FEE PER UNIT | TERMINAL PIN PAD ENCRYPTION | WIRELESS SETUP PER UNIT | SOFTWARE/WIRELESS MONTHLY FEE PER UNIT | PER AUTH FEE |
|---|---|---|---|---|---|---|---|
| 1 | Hypercom | T7 Plus | $25 | ☐ | $ | $ | $ |
| 1 | Hypercom Pin Pad | Model 99 | $ | ☐ | $ | $ | $ |
| | | | $ | ☐ | $ | $ | $ |

### EXCHANGE/SPECIAL PROGRAMS

| QTY | POS DESCRIPTION | ITEM CODE | PRICE PER UNIT |
|---|---|---|---|
| | | | |

EQUIPMENT BACK FROM MERCHANT

**PLEASE NOTE THAT ALL LEASES MUST COMPLETE THE SECTION IMMEDIATELY BELOW. INITIALS ARE REQUIRED.     ALL APPLICABLE STATE AND LOCAL TAXES WILL BE APPLIED   ☐ SALES TAX EXEMPT

5   X___   THE LEASE IS A NON CANCELLABLE LEASE FOR THE FULL TERM OF     MOS. TOTAL MONTHLY PAYMENT OF $     PLUS TAXES IF APPLICABLE.

### AUTHORIZATION FOR AUTOMATIC WITHDRAWAL OF MONTHLY PAYMENTS

Merchant hereby authorizes Elavon, through its Leasing Division (Leasing Division ("Lessor") to electronically withdraw Merchant's monthly lease payment and any amounts, including any and all taxes or other charges owed in connection with the lease as applicable, by debiting those entries to Merchant's account at the financial institution ("Bank") indicated herein for such amount until and final installment is met by Merchant from time to time. A lease payment (whether paid by debit or other means) that is not honored by Bank for any reason will be subject to a returned item service fee imposed by Lessor. This authorization shall remain in effect until Lessor has received written notice from Merchant of its termination.

BANK NAME: REGIONS          ABA/ROUTING #: 06

2

USA-ALL-ELV-0413

## OTHER CARD TYPES EXISTING

| | SE# | | | SE# | | AUTH FEE |
|---|---|---|---|---|---|---|
| AMEX | *Cash only* | (10 DIGITS) $ | OTHER: | | | $ |
| EBT | OOO OOOO | (7 DIGITS) $ .10 | OTHER: | | | $ |

## REPORT TOOLS

☐ MCP ONLY   OR   ☐ MCP WITH OCM   MONTHLY FEE $   SET UP FEE $   # USERS   SET UP TYPE (CHECK ONE) ☐ MID ☐ CHN ☐ ENT

☐ ACS   MONTHLY FEE $   SET UP FEE $   REMOTE ID

## ECS PRODUCT SELECTION AND PRICING

PROCESSING OPTIONS: ☐ POP (POS IMAGE)   ☐ ARC (POS IMAGE)   ☐ BOC (☐ POS IMAGE OR ☐ CASH OFFICE IMAGE)

1. ANNUAL CHECK VOLUME: $   2. AVERAGE CHECK AMOUNT: $   3. MAXIMUM CHECK AMOUNT: $

ECS MONTHLY MINIMUM: $

☐ CONVERSION WITH GUARANTEE

GUARANTEE RATE:   %   PER TRANSACTION: $

☐ CONVERSION WITH VERIFICATION   ☐ COLLECTIONS

PER TRANSACTION: $   PER RETURN TRANSACTION: $

☐ CONVERSION ONLY   ☐ COLLECTIONS

PER TRANSACTION: $   PER RETURN TRANSACTION: $

PLEASE CHECK BOX FOR EACH ADDITIONAL SERVICE OPTION

☐ NSF SERVICE FEE PROCESSING @ $2.00 PER NSF ITEM.

NOT APPLICABLE FOR POP GUARANTEE AND ALL ARC PRODUCTS

☐ ENQUIRE REPORTING ACCESS:

# USERS   @ $ 29.95 EACH PER MONTH

☐ TURN OFF RETURN MEMO ADVICES

## EGC CARDS

CARD STYLE   CARD QUANTITY   PRICE
☐ BASIC   $
☐ STANDARD   $
☐ CUSTOM   $

☐ SHARING CARDS   EXISTING MID:

MAX CARD VALUE $   (DEFAULT $500)

## EGC PRICING

☐ TRANSACTION PRICING: $   PER TRANSACTION AND $   PER MONTH.
OR
☐ MONTHLY PRICING: $   PER MONTH
(INCLUDES   TRANSACTIONS PER LOCATION ANNUALLY. ADDITIONAL TRANSACTION BILLED $0.29 PER
TRANSACTION)

## EGC CARRIERS

☐ CARD CARRIERS (ENTER TOTAL CARDS)

#   OF STYLE
#   OF STYLE   $   X
#   OF STYLE
(MULTIPLES OF 100 ONLY)

## EGC SERVICE FEES

☐ SERVICE FEES (CARDHOLDER CHARGED ON UNUSED BALANCES)
- CUSTOM CARDS ARE REQUIRED
- FEE MERCHANT CHARGED PER TRANSACTION $ 0.12
- APPLY SAME TO ALL STATES? ☑ Y ☐ N (IF NO, COMPLETE FOR EACH STATE)
- FEE AMOUNT: $
APPLIED: ☐ MONTHLY ☐ QUARTERLY ☐ ANNUALLY
BEGINNING:   MONTHS AFTER LAST TRANSACTION DATE (CANNOT BE LESS THAN 12 MOS)
LOCK BALANCES AFTER:   MONTHS OF NON-USE (DEFAULT 72 MONTHS, CANNOT BE LESS THAN 60 MONTHS)

## EGC OPTIONS

☐ MONTHLY ONLINE ADMIN - #   USERS   $
☐ GRAPHIC DESIGN SERVICE   $
☐ CUSTOM CARD UPGRADE   $

☐ MISC FEE -   $
☐ MISC FEE -   $

## EGC NETWORK

☐ ELAVON

☐ GIVEX

## EGC STANDARD CARD ORDER DETAILS

CARD STYLE:   TEXT COLOR:

JUSTIFICATION: ☐ LEFT ☐ CENTER ☐ RIGHT ☐ AS SUBMITTED

IMPRINT:   ☐ LOGO (TO AVOID DELAY, PLEASE SUBMIT ARTWORK TO: EGCARTWORK@ELAVON.COM) OR ☐ TEXT (IMPRINTING DETAILS MUST BE ENTERED BELOW)
• FONT (SELECT ONE): ☐ Arial ☐ *Brush Script* ☐ Times New Roman
• TEXT CASE (SELECT ONE): ☐ Title Case ☐ UPPER CASE ☐ lower case ☐ As submitted

## EGC NOTES

## BILLER DIRECT SERVICES

☐ BILL PAYMENT PORTAL   ☐ ENTERPRISE BILLING SOLUTION

## CHECK SERVICE COMPANY

NAME:   SERVICE #:   PRIMARY PHONE #:   SECONDARY PHONE #:

## CURRENCY EXCHANGE

☐ DYNAMIC CURRENCY CONVERSION (DCC) – REBATE: 0.75%   DCC ANNUAL REGISTRATION FEE: $25.00

OR ☐ MULTI-CURRENCY

## MONEY MANAGER

☐ MONEY MANAGER   VENDOR:

☐ WORKING CAPITAL   VENDOR:

USA-ALL-ELV-0413

**SUBSTITUTE FORM W-9**

☐ SOLE PROPRIETOR ☐ PUBLIC CORP ☐ CLOSELY HELD CORP ☐ SUB S CORP ☐ GOVERNMENT ☐ GENERAL PARTNERSHIP
☐ LIMITED PARTNERSHIP ☐ TAX EXEMPT ORGANIZATION (INCLUDE DOCUMENTS THAT SUPPORT EXEMPT STATUS) ☐ OTHER (ASSN/ESTATE/TRUST)
☑ LIMITED LIABILITY COMPANY – TAX CLASSIFICATION (D=DISREGARDED ENTITY C=CORPORATION P=PARTNERSHIP): (IF LLC, PLEASE INDICATE D, C OR P)

NAME*: E & S USA, INC.

*NAME (OF BUSINESS) AS SHOWN ON YOUR BUSINESS INCOME TAX RETURNS. FOR SOLE PROPRIETORS, THIS SHOULD ALWAYS BE THE OWNER'S NAME

| | | | |
|---|---|---|---|
| ADDRESS: 3439 N. Watkins | | TIN (EMPLOYER ID #): 68 | |
| CITY: Memphis | STATE: TN | ZIP CODE: 38127 | OR TIN (SOCIAL SECURITY #): |

## 6 MERCHANT REPRESENTATIONS AND CERTIFICATIONS

Merchant Representations and Certifications. By signing below, the applicant merchant ("Merchant") and its representative(s) represent and warrant to Elavon, Inc. ("Elavon" or "Member" as applicable), with offices at 7300 Chapman Highway, Knoxville, TN 37920 (collectively, "we" or "us") that (i) all information provided in this merchant application ("Merchant Application") is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant; and (ii) the persons signing this Merchant Application are duly authorized to bind Merchant to all provisions of this Merchant Application and the Agreement. Further, by signing below, if leasing equipment, Merchant and its representative(s) agree that the Leased Equipment is subject to the terms and conditions set forth in the Terms of Service ("TOS") and have had an opportunity to review such terms. The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of a Transaction Receipt or other evidence of a Transaction to us, shall be the Merchant's acceptance of and agreement to the terms and conditions contained in the Agreement including, without limitation, this Merchant Application, the TOS and the Merchant Operating Guide ("MOG") incorporated herein by this reference and located at our website at https://www.merchantconnect.com/CWRWeb/pdf/TOS_ENG.pdf and https://www.merchantconnect.com/CWRWeb/pdf/MOG_Eng.pdf, respectively. If Merchant does not have access to view the TOS or MOG at our website please contact our customer service center. Notwithstanding any such non-receipt of the TOS or MOG, Merchant agrees to comply with the Agreement, and all applicable laws, rules, and regulations including the rules and regulations of the Payment Networks, and understands that failure to comply will result in termination of processing services. Capitalized terms shall, unless otherwise defined in this Merchant Application, have the same meaning ascribed to them in the TOS and MOG.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. This means we will ask for certain information and identifying documents to allow us to identify you. Merchant and its representative(s) authorize us prior to our acceptance of this Merchant Application and from time to time thereafter, to investigate the individual and business history and background of Merchant, each such representative and any other officers, partners, proprietors, and/or owners of Merchant, and to obtain credit reports or other background investigation reports on each of them that we consider necessary to review the acceptance and continuation of this Merchant Application. Merchant also authorizes any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to us.

This Merchant Application may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same Merchant Application. Delivery of executed counterparts of this Merchant Application may be accomplished by a facsimile transmission, and a signed facsimile or copy of this Merchant Application shall constitute a signed original.

If leasing equipment, Merchant agrees to pay "Lessor" an annual fee in an amount not to exceed $50.00 for the administration, billing and tracking of certain taxes and charges related to the Leased Equipment. Merchant understands that if proof of insurance is not provided, an additional monthly amount will be charged to cover insurance, that leasing equipment may be more expensive than purchasing the same equipment outright. Finally, Merchant understands the lease is a NON-CANCELLABLE commercial equipment lease and will be required to make monthly payments disclosed.

Merchant understands that an authorization code is not a guarantee of acceptance or payment of a Transaction. Receipt of an authorization code does not mean that merchant will not receive a Chargeback for that Transaction.

All merchants must comply with the requirements of the Payment Card Industry Data Security Standards ("PCI DSS"). Elavon requires Level 4 merchants (determined based on Transaction volume) to validate PCI DSS compliance on an annual basis, with initial validation to occur no later than ninety (90) days after account approval. Any merchant that has not validated PCI DSS compliance within ninety (90) days of account approval, or in subsequent years on or before the anniversary date of account approval, will be charged a monthly non-compliance fee of $34.95 until Elavon is provided with validation of compliance. Merchant may be eligible for Data Breach Coverage following account approval and PCI DSS compliance validation. See the PCI Compliance Program Overview for coverage details and conditions.

Under penalties of perjury, Merchant certifies that:
1. The number shown on this Merchant Application is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person. For federal tax purposes, you are considered a U.S. person if you are: an individual who is a U.S. citizen, or U.S. resident alien, a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, an estate (other than a foreign estate), or a domestic trust (as defined in Regulations section 301.7701-7).*

American Express Acceptance Agreement - By signing below, I represent that I have read and am authorized to sign and submit this application for the above entity which agrees to be bound by the American Express® Card Acceptance Agreement ("Agreement"), and that all information provided herein is true, complete, and accurate. I authorize Elavon and American Express Travel Related Services Company, Inc. ("AXP") and AXP's agents and Affiliates, as defined in the AXP agreement, to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies, and disclose such information to their agent, subcontractors, Affiliates and other parties for any purpose permitted by law. I authorize and direct Elavon and AXP and AXP agents and Affiliates to inform me directly, or through the entity above, of reports about me that they have requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I also authorize AXP to use the reports from consumer reporting agencies for marketing and administrative purposes. I understand that upon AXP's approval of the application, the entity will be provided with the Agreement and materials welcoming it either to AXP's program for Elavon to perform services for AXP or to AXP's standard Card acceptance program which has different servicing terms (e.g. different speeds of pay). I understand that if the entity does not qualify for the Elavon servicing program that the entity may be enrolled in American Express's standard Card acceptance program, and the entity may terminate the Agreement. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Agreement.

*The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| | | | |
|---|---|---|---|
| SIGNATURE: X [signature] | PRINTED NAME: Rezeq Eleiwa | TITLE: President | DATE: 1/8/14 |
| SIGNATURE: X | PRINTED NAME: | TITLE: | DATE: |

## 7 PERSONAL GUARANTY

As a primary inducement to us to accept this Merchant Application, the undersigned Guarantor(s), by signing the Merchant Application, jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to us (including, without limitation, Chargebacks and obligations in connection with Leased Equipment, if applicable) pursuant to the Merchant Application and Agreement, as may be amended from time to time, with or without notice. Guarantor(s) understand further that we may proceed directly against Guarantor(s) without first exhausting our remedies against any other person or entity responsible therefore to them or any security held by us or Merchant. This guaranty will not be discharged or affected by the death of the Guarantors, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any of our successors. Guarantor(s) understand that the inducement to us to accept this Merchant Application is consideration for the guaranty and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guaranty. The undersigned hereby directs any consumer reporting agency to furnish a consumer credit report that relates personally to the undersigned upon the request of Elavon or any of its designees, successors or assigns and agrees that all parties involved are in compliance with the Fair Credit Reporting Act. If leasing equipment, Merchant understands they are personally responsible for making all monthly payments due under the lease and that any failure to pay all amounts when due may result in additional charges, potential damage to my credit rating and/or legal action against me to collect both past and future payments owed under the lease.

| | | | |
|---|---|---|---|
| SIGNATURE: X [signature] | PRINTED NAME: Rezeq Eleiwa | SSN#: President | DATE: 1/8/14 |
| SIGNATURE: X | PRINTED NAME: | SSN#: | DATE: |

**SUBMITTED BY (INTERNAL USE ONLY)**

To the best of my knowledge, I certify that the information provided in this Merchant Application was provided by the Merchant and is true, complete and accurate. I further certify that the signatures were provided by the Merchant's owner(s) or officer(s), as appropriate.

| | | | |
|---|---|---|---|
| SALES REP SIGNATURE: X [signature] | PRINTED NAME: Tangelia Nance | REP ID #: 30588 | DATE: 1-8-14 |
| REP PHONE #: (901) 517-4444 | REP EMAIL: Tangelia.nance@elavon.com | | |

**FOR INTERNAL USE ONLY**

| | | |
|---|---|---|
| ACCEPTED BY ELAVON, INC.: | DATE: | v. USA-ALL-ELV-0413 |

## SUBSTITUTE FORM W-9

☐ SOLE PROPRIETOR  ☐ PUBLIC CORP  ☐ CLOSELY HELD CORP  ☐ SUB S CORP  ☐ GOVERNMENT  ☐ GENERAL PARTNERSHIP

☐ LIMITED PARTNERSHIP  ☐ TAX EXEMPT ORGANIZATION (INCLUDE DOCUMENTS THAT SUPPORT EXEMPT STATUS)  ☐ OTHER (ASSN/ESTATE/TRUST)

☑ LIMITED LIABILITY COMPANY – TAX CLASSIFICATION (D=DISREGARDED ENTITY; C=CORPORATION, P=PARTNERSHIP):___ (IF LLC, PLEASE INDICATE D, C OR P)

NAME*: **F & S USA, INC.**

*NAME (OF BUSINESS) AS SHOWN ON YOUR BUSINESS INCOME TAX RETURNS. FOR SOLE PROPRIETORS, THIS SHOULD ALWAYS BE THE OWNER'S N

ADDRESS: **3439 N. Watkins**

CITY: **Memphis**  STATE: **TN**  ZIP CODE: **38127**   OR   TIN (EMPLOYER ID #): **768**

TIN (SOCIAL SECURITY #):

## MERCHANT REPRESENTATIONS AND CERTIFICATIONS

[dense fine print — merchant representations and certifications]

| SIGNATURE: X | PRINTED NAME: **Reza@Eleiwa** | TITLE: **President** | DATE: **1/8/14** |
|---|---|---|---|
| SIGNATURE: X | PRINTED NAME: | TITLE: | DATE: |

## PERSONAL GUARANTY

[fine print guaranty text]

| SIGNATURE: X | PRINTED NAME: **Reza@Eleiwa** | SSN#: **President** | DATE: **1/8/14** |
|---|---|---|---|
| SIGNATURE: X | PRINTED NAME: | SSN#: | DATE: |

SUBMITTED BY:

| SALES REP SIGNATURE: X | REP ID #: 30588 | DATE: 1-8-14 |
|---|---|---|

REP PHONE #: (881) 597-4444   REP EMAIL: Tangella.nance@elavon.com

FOR INTERNAL USE ONLY

ACCEPTED BY ELAVON, INC.   DATE:   v. USA-ALL-ELV-0413



Exhibit
B

The Plaintiff's New Merchant Application
for its store location at 1330 Jackson Avenue,
Memphis, TN 38107

# NEW MERCHANT APPLICATION

## 1 MERCHANT INFORMATION

LEGAL/CORPORATE NAME: E & S USA, INC.

DBA NAME (IF DIFFERENT THAN ABOVE): K & F Beauty Supply    DBA PHONE #: 901-722-4141

CONTACT NAME: Khaled Eleiwa    DBA FAX #:

DBA ADDRESS 1 (NO PO BOX): 1330 Jackson Ave    CUSTOMER SERVICE PHONE #:

DBA ADDRESS 2:    PREVIOUS PROCESSOR:

CITY: Memphis    STATE: TN    ZIP CODE: 38107    YEAR ESTABLISHED:

EMAIL ADDRESS: Khaled1977@yahoo.com    LENGTH OF CURRENT OWNERSHIP: 15 YEARS,    MONTHS

## 2 MAILING ADDRESS (IF DIFFERENT THAN ABOVE)

MAILING NAME:    MAILING PHONE #:

MAILING CONTACT:    MAILING FAX #:

MAILING ADDRESS:    CITY:    STATE:    ZIP CODE:

## 3 PRINCIPAL 1 INFORMATION (OWNER/PARTNER/OFFICER)

☑ OWNER/PARTNER: PERCENTAGE OF OWNERSHIP 100 % OR ☐ OFFICER: TITLE:

FIRST NAME: Rezeq    MI:    LAST NAME: Eleiwa

HOME ADDRESS: 8114 Windersville Dr.    DOB: 2/1/1944    HOME PHONE #: 901-870-1974

CITY: Memphis    STATE: TN    ZIP CODE: 38133

PREVIOUS ADDRESS IF CURRENT ADDRESS IS LESS THAN 2 YEARS

HOME ADDRESS:    CITY:    STATE:    ZIP CODE:

## PRINCIPAL 2 INFORMATION

☐ OWNER/PARTNER: PERCENTAGE OF OWNERSHIP ____ % OR ☐ OFFICER: TITLE:

FIRST NAME:    MI:    LAST NAME:

HOME ADDRESS:    DOB:

CITY:    STATE:    ZIP CODE:    HOME PHONE #:

## OTHER MERCHANT INFORMATION

AVERAGE SALE AMOUNT: $ 20."    DESCRIPTION OF PRODUCT OR SERVICES OFFERED: Beauty Supply

TOTAL MONTHLY VISA/MC/DISC/UNIONPAY SALES: $ 10,000.    MCC: 7230

CARD PRESENT (SWIPED): 100 %    WHEN DOES THE CUSTOMER RECEIVE THE PRODUCT OR SERVICE?

CARD PRESENT (NOT SWIPED): ____ %    ☐ SAME DAY    ☐ IF NOT SAME DAY, ____ # OF DAYS (INCLUDE SHIPPING TIME FRAME)

MAIL ORDER: ____ %    IS ANY PRODUCT/DELIVERY OVER 1 YEAR?    ☐ YES    ☐ NO

TELEPHONE ORDER: ____ %    FOR INTERNET TRANSACTIONS:

INTERNET: ____ %    LIST THE PRODUCT WEB SITE:

TOTAL = 100%    "CONTACT US" EMAIL ADDRESS:

DO YOU OPERATE SEASONALLY? ☐ YES ☑ NO    IF YES, PLEASE CHECK MONTHS CLOSED:
☐ JANUARY    ☐ FEBRUARY    ☐ MARCH    ☐ APRIL    ☐ MAY    ☐ JUNE
☐ JULY    ☐ AUGUST    ☐ SEPTEMBER    ☐ OCTOBER    ☐ NOVEMBER    ☐ DECEMBER

---

### FOR INTERNAL USE ONLY

☐ NEW LOCATION    ☐ ADDITIONAL LOCATION    EXISTING MID:    CHAIN #:    LOCATION ____ OF ____

PORTFOLIO CODE: 16RGN1    FI: 0056    AGENT: 0030    BANK: 069053

CLIENT GROUP #: 16    ENTITY: 43008    REP #: 30588    AWB: 2392407

| STATEMENTS | SHIPPER | | RETRIEVALS | | CHARGEBACKS | |
|---|---|---|---|---|---|---|
| ☐ DBA OR ☐ MAILING OR ☐ W-9 | ☐ DBA OR ☐ MAILING OR ☐ W-9 OR ☐ USER SPECIAL INSTRUCTIONS | | ☐ MAIL TO: ☐ DBA ☐ MAILING OR ☐ FAX TO: ☐ DBA ☐ MAILING OR ☐ ONLINE CASE MANAGEMENT (OCM) | | ☐ MAIL TO: ☐ DBA ☐ MAILING OR ☐ FAX TO: ☐ DBA ☐ MAILING OR ☐ ONLINE CASE MANAGEMENT (OCM) | |

AUTO SEND: ☐ YES ☐ NO (CHAIN MERCHANTS ONLY – MUST INCLUDE CHAIN SET UP FORM)

USA-ALL-ELV-0413

## CARD ACCEPTANCE (PLEASE CHECK EACH CARD YOU WISH TO ACCEPT.)

- [ ] ALL VISA/MASTERCARD/UnionPay/DISCOVER CARDS (JCB, DI)
- [ ] VISA CREDIT [x] VISA DEBIT [x] MASTERCARD CREDIT [x] MASTERCARD DEBIT [ ] DISCOVER (JCB, DI) [ ] UNIONPAY

DISCOVER  VISA

## PRICING CATEGORY
[x] RETAIL   [ ] LODGING   [ ] MO/TO / INTERNET
[ ] RESTAURANT   [ ] SUPERMARKET   [ ] ARU

## PRICING INFORMATION

- [ ] AUTH FEE (CHARGED ON ALL VISA/MASTERCARD/AUTHORIZATIONS) $ .10
- [ ] TIERED*

| | RATE | PER ITEM |
|---|---|---|
| QUALIFIED | 1.60% | $ |
| MID QUALIFIED | 2.30% | $ |
| NON QUALIFIED | 2.84% | $ |

OPT. [ ] CHECK CARD [ ] SPRINT [ ] QPS/SMALL TKT .65¢ 1.10  1.57%  $

- OPT. REWARDS TIER 1.59 % $
- OPT. COMMERCIAL CARD TIER 1.90 % $

- [ ] ENHANCED IC PLUS*

| | | RATE | PER ITEM |
|---|---|---|---|
| CHECK CARD QUALIFIED | | % | $ |
| QUALIFIED | | % | $ |
| REWARDS QUALIFIED | | % | $ |
| MID QUALIFIED | | % | $ |
| COMMERCIAL NON QUALIFIED | | % | $ |
| NON QUALIFIED | | % | $ |

- [ ] IC PLUS* % $

*RATES ARE FOR ALL CARD ACCEPTANCE TYPES SELECTED. ALL CARD BRAND ASSESSMENTS WILL BE PASSED THROUGH AT COST.

| | [ ] DIFFERENTIAL PLUS* RATE | PER ITEM |
|---|---|---|
| VISA - QUAL | % | $ |
| MASTERCARD – QUAL | % | $ |
| DISCOVER – QUAL | % | $ |
| UNIONPAY – QUAL | % | $ |
| NON-QUAL | % | $ |

PRICING PROGRAM (REQUIRED FOR IDP):

| OTHER AUTHORIZATIONS (PER OCCURRENCE): | PER AUTH |
|---|---|
| VOICE - ARU (TOUCHTONE) | $ 0.75 |
| VOICE - OPERATOR ASSISTED | $ 0.90 |
| VOICE - AVS | $ 0.90 |
| VOICE - BANK REFERRAL | $ 4.00 |
| DIAL COMMUNICATION | $0.024 |
| OTHER: | $ |
| OTHER: | $ |

PIN DEBIT:

| RATE (PLUS NETWORK SWITCH FEE) MONT, PROMPTS / AUTH FROM OSM EDOC | $ (PER ITEM) |
|---|---|
| IC PLUS/ASSOC MONT, PRESS-A-CARD/AUTH FROM 0410130 | $ .10 (PER AUTH) |

## FEES

| ONE TIME FEE TYPE: | |
|---|---|
| APPLICATION FEE | $ 100 |
| INSTALLATION/TRAINING | $ 200 |
| RUSH SHIPMENT | $ |
| OTHER: | $ |
| MONTHLY FEE TYPE: | |
| SUPPORT FEE | $ 10 |
| MERCHANTCONNECT | $ |
| SRS FEE | $ |
| STATEMENT: [ ] ELECTRONIC OR [ ] PAPER | |
| STATEMENT MAILING FEE (FOR PAPER STATEMENTS ONLY) | $ 5 |
| MONTHLY MINIMUM | $ 35 |
| PCI SECURITY PROGRAM | $ 7 |
| OTHER: | $ |
| OTHER: | $ |
| PER OCCURRENCE FEE TYPE: | |
| CHARGEBACK FEE | $ 25 |
| RETURN ITEM (NSF) FEE | $ 20 |
| OTHER: | $ |

## AMERICAN EXPRESS

[ ] ONEPOINT  CAP #   MONTHLY VOLUME $   AMEX RATE %  $   CARD NOT PRESENT DOWNGRADE: 0.30 %

## BANK ACCOUNT (CHECKING ACCOUNTS ONLY)

| DEPOSIT BANK NAME: Regions | ABA/ROUTING #: 062 | DDA ACCOUNT #: 23 |
|---|---|---|
| BILLING BANK NAME (IF DIFFERENT): | ABA/ROUTING #: | DDA ACCOUNT #: |

## POINT OF SALE (EQUIPMENT OR SOFTWARE)

NETWORK: [x] ELAVON   [ ] OTHER      # OF TIDS (VAR):

| VAR SERVICE PROVIDER (HOSTED): | | GATEWAY (OPTIONAL): |
|---|---|---|
| VAR VENDOR (DISTRIBUTED): | | AGGREGATOR: |
| VAR PRODUCT: | VAR VERSION: | |

### PURCHASE OR LEASE

| | | | PURCHASE | LEASE** | | SOFTWARE/WIRELESS | | |
|---|---|---|---|---|---|---|---|---|
| QTY | POS DESCRIPTION | ITEM CODE | PRICE PER UNIT | TERM MONTHLY | MONTHLY RATE PER UNIT | WIRELESS SETUP PER UNIT | MONTHLY FEE PER UNIT | PER AUTH FEE |
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |
| | | | $ | | $ | $ | $ | $ |

### MERCHANT OWNS

| | | | | | SOFTWARE/WIRELESS | | |
|---|---|---|---|---|---|---|---|
| QTY | POS DESCRIPTION | ITEM CODE | REPROGRAM FEE PER UNIT | TERMINAL PIN PAD ENCRYPTION | WIRELESS SETUP PER UNIT | MONTHLY FEE PER UNIT | PER AUTH FEE |
| 1 | Hypercom | T7Plus | $25.00 | [ ] | $ | $ | $ |
| 1 | Hypercom Pin Pad | Model 99 | $ | [ ] | $ | $ | $ |
| | | P1300 ea | $ 1.00 | [ ] | $ | $ | $ |

### EXCHANGE/SPECIAL PROGRAMS

| QTY | POS DESCRIPTION | ITEM CODE | PRICE PER UNIT | EQUIPMENT BACK FROM MERCHANT |
|---|---|---|---|---|
| | | | $ | USED |

**PLEASE NOTE THAT ALL LEASES MUST COMPLETE THE SECTION IMMEDIATELY BELOW, INITIALS ARE REQUIRED.   ALL APPLICABLE STATE AND LOCAL TAXES WILL BE APPLIED.   [ ] SALES TAX EXEMPT

X ___ THE LEASE IS A NON CANCELLABLE LEASE FOR THE FULL TERM OF   MOS. TOTAL MONTHLY PAYMENT OF $.   PLUS TAXES, IF APPLICABLE.

### AUTHORIZATION FOR AUTOMATIC WITHDRAWAL OF MONTHLY PAYMENTS

Merchant hereby authorizes Elavon, through its Lessor Leasing division ("Lessor"), to automatically withdraw Merchant's monthly lease payment and any amounts, including any and all taxes or other charges, owed in accordance with the lease, as applicable, by initiating debit entries to Merchant's account at the financial institution ("Bank") indicated hereon or such other financial institution used by Merchant from time to time. A lease payment (whether paid by debit or other means) that is not honored by Bank for any reason will be subject to a returned item service fee imposed by Lessor. This authorization shall remain in effect until Lessor has received written notice from Merchant of its termination.

| BANK NAME: Regions | ABA/ROUTING #: 06 | DDA ACCOUNT #: |
|---|---|---|

JSA- ...0413

## OTHER CARD TYPES EXISTING

| | SE # | AUTH FEE | | SE # | AUTH FEE |
|---|---|---|---|---|---|
| AMEX | *Cash only* 0000000 (10 DIGITS) | $ | OTHER: | | $ |
| EBT | (7 DIGITS) | $ , i O | OTHER: | | $ |

## REPORT TOOLS

☐ MCP ONLY   **OR**   ☐ MCP WITH OCM   MONTHLY FEE $          SET UP FEE $          # USERS          SET UP TYPE (CHECK ONE) ☐ MID ☐ CHN ☐ ENT

☐ ACS          MONTHLY FEE $          SET UP FEE $          REMOTE ID

## ECS PRODUCT SELECTION AND PRICING

PROCESSING OPTIONS: ☐ POP (POS IMAGE)          ☐ ARC (POS IMAGE)          ☐ BOC ( ☐ POS IMAGE OR ☐ CASH OFFICE IMAGE)

| 1. ANNUAL CHECK VOLUME: $ | 2. AVERAGE CHECK AMOUNT: $ | 3. MAXIMUM CHECK AMOUNT: $ |
|---|---|---|

ECS MONTHLY MINIMUM $

☐ CONVERSION WITH GUARANTEE

GUARANTEE RATE:          %          PER TRANSACTION: $

☐ CONVERSION WITH VERIFICATION          ☐ COLLECTIONS

PER TRANSACTION: $          PER RETURN TRANSACTION: $

☐ CONVERSION ONLY          ☐ COLLECTIONS

PER TRANSACTION: $          PER RETURN TRANSACTION: $

PLEASE CHECK BOX FOR EACH ADDITIONAL SERVICE OPTION

☐ NSF SERVICE FEE PROCESSING @ $2.00 PER NSF ITEM.

NOT APPLICABLE FOR POP GUARANTEE AND ALL ARC PRODUCTS

☐ ENQUIRE REPORTING ACCESS:

# USERS:          @ $ 29.95 EACH PER MONTH

☐ TURN OFF RETURN MEMO ADVICES

## EGC CARDS

| CARD STYLE | CARD QUANTITY | PRICE |
|---|---|---|
| ☐ BASIC | | $ |
| ☐ STANDARD | | $ |
| ☐ CUSTOM | | $ |

☐ SHARING CARDS   EXISTING MID:

MAX CARD VALUE $          (DEFAULT $500)

## EGC PRICING

☐ TRANSACTION PRICING: $          PER TRANSACTION AND $          PER MONTH.

OR

☐ MONTHLY PRICING: $          PER MONTH

(INCLUDES          TRANSACTIONS PER LOCATION ANNUALLY. ADDITIONAL TRANSACTION BILLED $0.29 PER TRANSACTION)

## EGC CARRIERS

☐ CARD CARRIERS (ENTER TOTAL CARDS)

#          OF STYLE

#          OF STYLE          $          X

#          OF STYLE

(MULTIPLES OF 100 ONLY)

## EGC SERVICE FEES

☐ SERVICE FEES (CARDHOLDER CHARGED ON UNUSED BALANCES)
- CUSTOM CARDS ARE REQUIRED
- FEE MERCHANT CHARGED PER TRANSACTION $ 0.12
- APPLY SAME TO ALL STATES? ☑ Y ☐ N (IF NO, COMPLETE FOR EACH STATE)

FEE AMOUNT: $

APPLIED: ☐ MONTHLY ☐ QUARTERLY ☐ ANNUALLY

BEGINNING:          MONTHS AFTER LAST TRANSACTION DATE (CANNOT BE LESS THAN 12 MOS)

LOCK BALANCES AFTER:          MONTHS OF NON-USE (DEFAULT 72 MONTHS, CANNOT BE LESS THAN 60 MONTHS)

## EGC OPTIONS

☐ MONTHLY ONLINE ADMIN - #          USERS          $

☐ GRAPHIC DESIGN SERVICE          $

☐ CUSTOM CARD UPGRADE          $

☐ MISC FEE -          $

☐ MISC FEE -          $

## EGC NETWORK

☐ ELAVON

☐ GIVEX

## EGC STANDARD CARD ORDER DETAILS

| CARD STYLE: | TEXT COLOR: |
|---|---|

JUSTIFICATION: ☐ LEFT ☐ CENTER ☐ RIGHT ☐ AS SUBMITTED

IMPRINT:   ☐ LOGO (TO AVOID DELAY, PLEASE SUBMIT ARTWORK TO: EGCARTWORK@ELAVON.COM) OR ☐ TEXT (IMPRINTING DETAILS MUST BE ENTERED BELOW)
   • FONT (SELECT ONE): ☐ Arial ☐ Serif Script ☐ Times New Roman
   • Text Case (select ONE): ☐ Title Case ☐ UPPER CASE ☐ lower case ☐ As submitted

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

## EGC NOTES

## BILLER DIRECT SERVICES

☐ BILL PAYMENT PORTAL          ☐ ENTERPRISE BILLING SOLUTION

## CHECK SERVICE COMPANY

| NAME: | SERVICE #: | PRIMARY PHONE #: | SECONDARY PHONE #: |
|---|---|---|---|

## CURRENCY EXCHANGE

☐ DYNAMIC CURRENCY CONVERSION (DCC) – REBATE: 0.75%   DCC ANNUAL REGISTRATION FEE: $25.00

**OR** ☐ MULTI-CURRENCY

## MONEY MANAGER

☐ MONEY MANAGER   VENDOR:

☐ WORKING CAPITAL   VENDOR:

3

**SUBSTITUTE FORM W-9**

☐ SOLE PROPRIETOR ☐ PUBLIC CORP ☐ CLOSELY HELD CORP ☐ SUB S CORP ☐ GOVERNMENT ☐ GENERAL PARTNERSHIP

☐ LIMITED PARTNERSHIP ☐ TAX EXEMPT ORGANIZATION (INCLUDE DOCUMENTS THAT SUPPORT EXEMPT STATUS) ☐ OTHER (ASSN/ESTATE/TRUST)

☑ LIMITED LIABILITY COMPANY – TAX CLASSIFICATION (D=DISREGARDED ENTITY, (C=CORPORATION,) P=PARTNERSHIP): (IF LLC, PLEASE INDICATE D, C OR P)

NAME*: E & S U S A INC.

*NAME (OF BUSINESS) AS SHOWN ON YOUR BUSINESS INCOME TAX RETURNS. FOR SOLE PROPRIETORS, THIS SHOULD ALWAYS BE THE OWNER'S NAME

| | | | |
|---|---|---|---|
| ADDRESS: 1330 Jackson Ave | | OR | TIN (EMPLOYER ID #): |
| CITY: Memphis | STATE: TN | ZIP CODE: 38107 | TIN (SOCIAL SECURITY #) |

## 6 MERCHANT REPRESENTATIONS AND CERTIFICATIONS

Merchant Representations and Certifications. By signing below, the applicant merchant ("Merchant") and its representative(s) represent and warrant to Elavon, Inc. ("Elavon" or "Member" as applicable), with offices at 7300 Chapman Highway, Knoxville, TN 37920 (collectively, "we" or "us") that (i) all information provided in this merchant application ("Merchant Application") is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant; and (ii) the persons signing this Merchant Application are duly authorized to bind Merchant to all provisions of this Merchant Application and the Agreement. Further, by signing below, if leasing equipment, Merchant and its representative(s) agree that the Leased Equipment is subject to the terms and conditions set forth in the Terms of Service ("TOS") and have had an opportunity to review such terms. The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of a Transaction Receipt or other evidence of a Transaction to us, shall be the Merchant's acceptance of and agreement to the terms and conditions contained in the Agreement including, without limitation, this Merchant Application, the TOS and the Merchant Operating Guide ("MOG") incorporated herein by this reference and located at our website at https://www.merchantconnect.com/CWRWeb/pdf/TOS_ENG.pdf and https://www.merchantconnect.com/CWRWeb/pdf/MOG_Eng.pdf, respectively. If Merchant does not have access to view the TOS or MOG at our website please contact our customer service center. Notwithstanding any such non-receipt of the TOS or MOG, Merchant agrees to comply with the Agreement, and all applicable laws, rules, and regulations including the rules and regulations of the Payment Networks, and understands that failure to comply will result in termination of processing services. Capitalized terms shall, unless otherwise defined in this Merchant Application, have the same meaning ascribed to them in the TOS and MOG.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. This means we will ask for certain information and identifying documents to allow us to identify you. Merchant and its representative(s) authorize us prior to our acceptance of this Merchant Application and from time to time thereafter, to investigate the individual and business history and background of Merchant, each such representative and any other officers, partners, proprietors, and/or owners of Merchant, and to obtain credit reports or other background investigation reports on each of them that we consider necessary to review the acceptance and continuation of this Merchant Application. Merchant also authorizes any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to us.

This Merchant Application may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same Merchant Application. Delivery of executed counterparts of this Merchant Application may be accomplished by a facsimile transmission, and a signed facsimile or copy of this Merchant Application shall constitute a signed original.

If leasing equipment, Merchant agrees to pay "Lessor" an annual fee in an amount not to exceed $50.00 for the administration, billing and tracking of certain taxes and charges related to the Leased Equipment. Merchant understands that if proof of insurance is not provided, an additional monthly amount will be charged to cover insurance, that leasing equipment may be more expensive than purchasing the same equipment outright. Finally, Merchant understands the lease is a NON-CANCELLABLE commercial equipment lease and will be required to make monthly payments disclosed.

Merchant understands that an authorization code is not a guarantee of acceptance or payment of a Transaction. Receipt of an authorization code does not mean that merchant will not receive a Chargeback for that Transaction.

All merchants must comply with the requirements of the Payment Card Industry Data Security Standards ("PCI DSS"). Elavon requires Level 4 merchants (determined based on Transaction volume) to validate PCI DSS compliance on an annual basis, with initial validation to occur no later than ninety (90) days after account approval. Any merchant that has not validated PCI DSS compliance within ninety (90) days of account approval, or in subsequent years on or before the anniversary date of account approval, will be charged a monthly non-compliance fee of $34.95 until Elavon is provided with validation of compliance. Merchant may be eligible for Data Breach Coverage following account approval and PCI DSS compliance validation. See the PCI Compliance Program Overview for coverage details and conditions.

**Under penalties of perjury, Merchant certifies that:**

**1. The number shown on this Merchant Application is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and**

**2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and**

**3. I am a U.S. citizen or other U.S. person. For federal tax purposes, you are considered a U.S. person if you are: an individual who is a U.S. citizen, or U.S. resident alien, a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, an estate (other than a foreign estate), or a domestic trust (as defined in Regulations section 301.7701-7)."**

<u>American Express Acceptance Agreement</u> - By signing below, I represent that I have read and am authorized to sign and submit this application for the above entity which agrees to be bound by the American Express® Card Acceptance Agreement ("Agreement"), and that all information provided herein is true, complete, and accurate. I authorize Elavon and American Express Travel Related Services Company, Inc. ("AXP") and AXP's agents and Affiliates, as defined in the AXP agreement, to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies, and disclose such information to their agent, subcontractors, Affiliates and other parties for any purpose permitted by law. I authorize and direct Elavon and AXP and AXP agents and Affiliates to inform me directly, or through the entity above, of reports about me that they have requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I also authorize AXP to use the reports from consumer reporting agencies for marketing and administrative purposes. I understand that upon AXP's approval of the application, the entity will be provided with the Agreement and materials welcoming it either to AXP's program for Elavon to perform services for AXP or to AXP's standard Card acceptance program which has different servicing terms (e.g. different speeds of pay). I understand that if the entity does not qualify for the Elavon servicing program that the entity may be enrolled in American Express's standard Card acceptance program, and the entity may terminate the Agreement. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Agreement.

*The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| | | | |
|---|---|---|---|
| SIGNATURE: X [signature] | PRINTED NAME: Rezeq Eleiwa | TITLE: President | DATE: 1/8/14 |
| SIGNATURE: X | PRINTED NAME: | TITLE: | DATE: |

## 7 PERSONAL GUARANTY

As a primary inducement to us to accept this Merchant Application, the undersigned Guarantor(s), by signing the Merchant Application, jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to us (including, without limitation, Chargebacks and obligations in connection with Leased Equipment, if applicable) pursuant to the Merchant Application and Agreement, as may be amended from time to time, with or without notice. Guarantor(s) understand further that we may proceed directly against Guarantor(s) without first exhausting our remedies against any other person or entity responsible therefore to them or any security held by us or Merchant. This guarantee will not be discharged or affected by the death of the Guarantors, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any of our successors. Guarantor(s) understand that the inducement to us to accept this Merchant Application is consideration for the guaranty and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guaranty. The undersigned hereby directs any consumer reporting agency to furnish a consumer credit report that relates personally to the undersigned upon the request of Elavon or any of its designees, successors or assigns and agrees that all parties involved are in compliance with the Fair Credit Reporting Act. If leasing equipment, Merchant understands they are personally responsible for making all monthly payments due under the lease and that any failure to pay all amounts when due may result in additional charges, potential damage to my credit rating and/or legal action against me to collect both past and future payments owed under the lease.

| | | | |
|---|---|---|---|
| SIGNATURE: X [signature] | PRINTED NAME: Rezeq Eleiwa | SSN# | DATE: 1/8/14 |
| SIGNATURE: X | PRINTED NAME: | SSN# | DATE: |

**SUBMITTED BY (INTERNAL USE ONLY)**

To the best of my knowledge, I certify that the information provided in this Merchant Application was provided by the Merchant and is true, complete and accurate. I further certify that the signatures were provided by the Merchant's owner(s) or officer(s), as appropriate.

| | | | |
|---|---|---|---|
| SALES REP SIGNATURE: X | PRINTED NAME: Tangelia Nance | REP ID #: 30588 | DATE: 1-8-14 |
| REP PHONE #: (901) 517-4444 | REP EMAIL: Tangelia.nance@elavon.com | | |

**FOR INTERNAL USE ONLY**

| | | |
|---|---|---|
| ACCEPTED BY ELAVON, INC.: | DATE: | V. USA-ALL-ELV-0413 |

Exhibit
C

Extensive documentation of the ten cent ($0.10)
authorization or transaction fees for each
of the Plaintiff's merchant accounts

Authorization Fees

**K&F Beauty Supply**
**1330 Jackson Ave**
**Memphis, TN 38107**   **Merchant# 8024582291**

| | |
|---|---|
| Feb/2014 | 93.95 |
| March/2014 | 114.08 |
| April/2014 | 99.93 |
| May/2014 | 107.46 |
| June/2014 | 90.24 |
| Total: | 505.66 |

**K&F Beauty Supply**

**1330 Jackson Ave**

**Memphis, TN 38107**     Merchant# 8024582291

| | |
|---|---|
| Feb/2014 | 1.61 |
| March/2014 | 3.08 |
| April/2014 | 1.40 |
| May/2014 | 2.40 |
| June/2014 | 2.57 |
| Total: | 11.06 |

**K&F Beauty Supply**
**3439 N Watkins ST**
**Memphis, TN 38127**   Merchant# 8024582242

| | |
|---|---|
| Feb/2014 | 120.46 |
| March/2014 | 140.23 |
| April/2014 | 122.64 |
| May/2014 | 119.57 |
| June/2014 | 106.54 |
| Total: | 609.44 |

**Jackson Smart Wireless**     Merchant ID# 8024582416

**1330 Jackson Ave**

**Memphis, TN 38107**

| February/2014 | 7.47 |
|---|---|
| March/2014 | 7.88 |
| April/2014 | 5.42 |
| May/2014 | 4.77 |
| June/2014 | 3.57 |
| | |
| Total | 29.11 |



7300 Chapman Highway
Knoxville, TN 37920-6612
1.800.725.1243

August 8, 2014

SMART WIRELESS INC 2
1330 JACKSON AVE
MEMPHIS          TN   38107

Re:    SMART WIRELESS INC 2
       Elavon Merchant Account No. 8024582416

Dear SMART WIRELESS INC 2

Elavon has been evaluating its processing relationship with SMART WIRELESS INC 2
as it relates to credit card transaction processing services. Effective AUGUST 29, 2014
this merchant processing relationship is terminated and Elavon will no longer process
credit card transactions for    SMART WIRELESS INC 2    . In accordance with the
Merchant Processing Agreement, either party shall have the right to terminate the
agreement,"at any time upon written notice given to the other" and shall become effective
on the date specified by such notice.

Should you have questions regarding the above information, please contact CHARISSA .
the analyst managing your processing account, at 1.800.725.1243, extension 8509   .

Sincerely,

Melissa Campbell

Melissa Campbell, Asst. Manager
   cc:    Merchant File

*8024582416*

Ver 1.0.5.17.2012.LP.1157

## Exhibit
## D

The Plaintiff's July 10, 2014 demand letter
issued to the Defendant



# Snider & Horner

ATTORNEYS AT LAW
A Professional Limited Liability Company
Founded in 1996

CORPORATE GARDENS
9056 STONE WALK PLACE
GERMANTOWN, TN 38138-7824
TELEPHONE (901) 751-3777
FACSIMILE (901) 759-0041
WWW.KEVINSNIDER.COM
FACEBOOK.COM/KEVINSNIDERLAW

Kevin A. Snider, J.D., C.F.E.
*Founding Attorney* 1,2

Gail W. Horner
*Attorney* 3,1

Jessica Howard
*Attorney*

Phillip D. Waddell
*Of Counsel Attorney* 1,5

James Seth Waddell
*Of Counsel Attorney* 6

Joanna Kendall Waddell
*Of Counsel Attorney*
*Se habla español*

Christina Burdette, J.D., C.P.A.
*Of Counsel Attorney* 3,5,7

Matthew R. Wilson
*Office Administrator*

Angie G. DeVore
*Office Manager*

---

July 10, 2014

**VIA E-MAIL & U.S. MAIL**

Ms. Tangolia Nance
c/o Elavon, Inc.
7300 Chapman Highway
Knoxville, TN 37920

*Re: Merchant Agreement of E&S USA, Inc.*

Dear Ms. Nance:

Be advised that our offices have been retained by E&S USA, Inc. for representation in regard to a dispute against you and your company. Please direct any and all future correspondence and other form of communication directly to me at my office.

As you know, on or about January 8, 2014 my client signed an application and Agreement with your company to provide credit card merchant services on their behalf. At that time, it was agreed that there would be 1.6% rate with <u>no</u> authorization fees. In reliance upon these representations, my client entered into the Agreement with you. At that time, you agreed to provide my client with a copy of the full and Final Merchant Agreement once you had completed it.

Over the past several months, my client has been repeatedly requesting a copy of the Agreement which he finally received in the past week or two. At that time, my client noticed and first became aware that you are charging them an authorization or transaction fee of ten cents per transaction. This was never agreed to by my client and apparently the written into the Agreement after it was signed and may explain why it took several months to obtain a copy of it.

Obviously, we consider this a material breech of the Agreement and quite frankly this appears to also be fraud. Moreover, this goes against any and all Agreements and Representations made to my client surrounding this fee.

Based upon the above, consider this letter a written demand to immediately remove this fee from my client's account and refund all previous charges over the past several months from this. As noted, we would like to resolve this matter without having to engage in litigation but this problem needs to be corrected immediately.

We look forward to hearing from you in writing at your earliest convenience.

Sincerely,

SNIDER & HORNER, PLLC

Kevin A. Snider
Attorney at Law

CC: Mr. Khaled Eleiwa c/o K&F Beauty Supply

KAS/agd

## Exhibit
### E

N. Rogue's signed statement documenting
her July 10, 2014 conversation with
Ms. Nance

I, Nereida Roque, spoke to Tangelia Nance on July 10, 2014 at or about 3:13 PM. I asked her why were there .10 cent fees on the copies of the credit machine applications she emailed to us. She, herself, stated that at the time when we signed the applications, there was nothing in the blank. Also, she stated that when she turned in the applications, she had to have something in the boxes. She claimed that we are supposed to be charged.

Nereida Roque

Exhibit
F

The Plaintiff's July 21, 2014 follow up
letter issued to the Defendant



**ATTORNEYS AT LAW**
A Professional Limited Liability Company
Founded in 1996

CORPORATE GARDENS
9056 STONE WALK PLACE
GERMANTOWN, TN 38138-7824
TELEPHONE (901) 751-3777
FACSIMILE (901) 759-0041
WWW.KEVINSNIDER.COM
FACEBOOK.COM/KEVINSNIDERLAW



Kevin A. Snider, J.D., C.F.E.
*Founding Attorney* [1,3]

Gail W. Horner
*Attorney* [3,3]

Jessica Howard
*Attorney*

Phillip D. Waddell
*Of Counsel Attorney* [3,8]

James Seth Waddell
*Of Counsel Attorney* [6]

Joanna Kendall Waddell
*Of Counsel Attorney*
*Se habla español*

Christina Burdette, J.D., C.P.A.
*Of Counsel Attorney* [3,4,7]

Matthew R. Wilson
*Office Administrator*

Angie G. DeVore
*Office Manager*

1  Also Licensed as a Certified Fraud Examiner
2  Also Board Certified as a Civil Trial Specialist
   by the TN Commission on CLE and
   Specialization and the National Board of Trial
   Advocacy
3  Also Certified as a Rule 31 Listed General Civil
   Mediator
4  Also Certified as a Rule 31 Listed Family Mediator
5  Also Licensed in the State of Kentucky
6  Also Licensed in the State of Mississippi
7  Also Licensed as a Certified Public Accountant
8  Also Licensed in the State of Montana

July 21, 2014

President and/or General Counsel
Elavon, Inc.
7300 Chapman Highway
Knoxville, TN 37920



***Re: Merchant Agreement of E&S USA, Inc.***
***Merchant Numbers: 8024582291, 8024582242, 8024574975, 8024582416 and 8024575014***

To Whom It May Concern:

Be advised that our offices have been retained by E&S USA, Inc. for representation in regard to a dispute against your company. Please direct any and all future correspondence and other form of communication directly to me at my office.

As you know, on or about January 8, 2014 my client signed an application and agreement with your company to provide credit card merchant services for the above mentioned five (5) accounts. Very recently, my client became aware of the agreement being changed after it was executed by my client. To that end, enclosed you will find a copy of a letter that we sent to the sales person on July 10, 2014 for which we have not received any type of response. More importantly, my client's representative recently talked with this sales person who specifically confirmed to my client's representative that this fraud did in fact occur.

More troubling, Ms. Nance informed my client that she did in fact complete the allegations as outlined and described in my prior correspondence. In short, as I am sure you can appreciate, blatant fraud and one that my client intends to litigate if this matter is not immediately resolved.

For your reference, I am enclosing another copy of our letter to Ms. Nance dated July 10, 2014 please advise as to how you propose to resolve this situation.

Sincerely,

SNIDER & HORNER, PLLC

Kevin A. Snider
Attorney at Law

CC: Mr. Khaled Eleiwa c/o K&F Beauty Supply

KAS/agd

**Exhibit**
**G**

The Defendant's July 24, 2014 response
letter issued to the Plaintiff



Elavon
7300 Chapman Highway
Knoxville, TN 37920-6612

(865) 403-7398 Fax

July 24, 2014

Snider & Horner, PLLC
Attn: Mr. Kevin A. Snider, Esq.
9056 Stone Walk Place
Germantown, Tennessee 38138-7824

> Re:   K and F Wireless and Smart Wireless (The Merchants)
>       Merchant Identification Number: 8024582291, 8024574975, 8024575014,
>       8024582416, 8024582242

Dear Mr. Snider:

Please consider the foregoing correspondence to be an acknowledgment of your correspondence of July 10, 2014 which has been forwarded to me for response. Please note that by communicating with you as counsel for the above referenced entities, Elavon Inc. is not waiving any right, remedy, or other performance, claim or defense Elavon may have against the merchant or any of its principals or guarantors as described within the Merchant Application, the Terms of Service, or any other document governing the credit card transaction processing services giving rise to these circumstances.

The matters raised in your correspondence are being evaluated and a written response will be provided when said review is completed.

Please direct any communication regarding this merchant to my attention in writing at the above address. If you have any questions, or if I can be of further assistance, please do not hesitate to contact me at the address above in writing.

Very truly yours,

Timothy F. Frost
Assistant General Counsel

# Exhibit
## H

The Plaintiff's August 7, 2014 letter issued to the Defendant



**ATTORNEYS AT LAW**
A Professional Limited Liability Company
Founded in 1996

CORPORATE GARDENS
9056 STONE WALK PLACE
GERMANTOWN, TN 38138-7824
TELEPHONE (901) 751-3777
FACSIMILE (901) 759-0041
WWW.KEVINSNIDER.COM
FACEBOOK.COM/KEVINSNIDERLAW



Kevin A. Snider, J.D., C.F.E.
*Founding Attorney* [1,2]

Gail W. Horner
*Attorney* [3,4]

Jessica Howard
*Attorney*

Phillip D. Waddell
*Of Counsel Attorney* [5,8]

James Seth Waddell
*Of Counsel Attorney* [6]

Joanna Kendall Waddell
*Of Counsel Attorney*
*Se habla español*

Christina Burdette, J.D., C.P.A.
*Of Counsel Attorney* [3,6,7]

Matthew R. Wilson
*Office Administrator*

Angie G. DeVore
*Office Manager*

---

1   Also Licensed as a Certified Fraud Examiner
2   Also Board Certified as a Civil Trial Specialist
    by the TN Commission on CLE and
    Specialization and the National Board of Trial
    Advocacy
3   Also Certified as a Rule 31 Listed General Civil
    Mediator
4   Also Certified as a Rule 31 Listed Family Mediator
5   Also Licensed in the State of Kentucky
6   Also Licensed in the State of Mississippi
7   Also Licensed as a Certified Public Accountant
8   Also Licensed in the State of Montana

August 7, 2014

Mr. Timothy F. Frost, Esq.
Elavon
7300 Chapman Highway
Knoxville, TN 37920-6612

***Re: K & F Beauty Supply v. Elavon***
***Merchant Identification Number: 8024582291, 802457975, 8024575014,***
***8024582416, 8024582242***

Dear Mr. Frost:

As of the date of this letter, our office has not heard from you in regard to the above mentioned matter. As you know, you sent a letter to us dated July 24, 2014 stating that these matters are "being evaluated and a written response will be provided when said review is completed." As noted, we have not heard from you in regard to this matter and please advise as to when we can expect your "review" to be completed.

As should be obvious, my client has incurred substantial damages in this matter and continues to incur those damages on a <u>daily basis</u> as a result of this delay. Moreover, if this matter cannot be resolved in the <u>very immediate future</u>, we will have no choice but to recommend our client file suit against your client in this matter. Obviously, we certainly hope that taking such drastic action on our part will not be necessary but this matter needs to be resolved immediately.

Sincerely,

SNIDER & HORNER, PLLC

Kevin A. Snider
Attorney at Law

KAS/agd

## Exhibit
## I

The Defendant's second August 7, 2014 letter issued to the Plaintiff offering partial refunds and announcing the cancellation of the Plaintiff's five (5) merchant accounts with the Defendant



Elavon
7300 Chapman Highway
Knoxville, TN 37920-6612

(865) 403-7398 Fax

August 7, 2014

Snider & Horner, PLLC
Attn: Mr. Kevin A. Snider, Esq.
9056 Stone Walk Place
Germantown, Tennessee 38138-7824

> Re:   K and F Wireless and Smart Wireless (The Merchants)
>        Merchant Identification Numbers:   8024582291,   8024574975,
>        8024575014, 8024582416, 8024582242

Dear Mr. Snider:

Please consider the foregoing correspondence to be an acknowledgment of your correspondence of July 10, 2014 and July 21, 2014 which have been forwarded to me for response. Please note that by communicating with you as counsel for the above referenced entities, Elavon Inc. is not waiving any right, remedy, or other performance, claim or defense Elavon may have against the merchant or any of its principals or guarantors as described within the Merchant Application, the Terms of Service, or any other document governing the credit card transaction processing services giving rise to these circumstances.

Upon receipt of your correspondence, the above referenced accounts were reviewed and evaluated. Upon information and belief, several of the contracts at issue were signed by Mr. Khaled Eleiwa prior to the insertion of the Per Item or Per Authorization rate. Please find enclosed copies of the contracts at issue, correspondence from your client to Elavon, and related documentation.

A review of the records and files associated with the five accounts identified above indicates the following:

Account 8024575014 (Smart Wireless, Inc.) was established on January 9, 2014 utilizing a Merchant Application signed on January 8, 2014. The rates stated on Page 2 of the Application are Interchange Plus $.18 and $.05 Authorization Fee. A refund of $.35 has been initiated to the business bank account associated with this processing account as indicated on the enclosed spreadsheet and this fee has been removed from the account going forward.

Account 8024574975 (Smart Wireless) was established on January 9, 2014 utilizing a Merchant Application signed on January 8, 2014. The Per Item Fee was stricken on this contract prior to submission to Elavon and no Per Item fees were assessed to this account. No refund has been initiated to the business bank account associated with this processing account.

Account 8024582242 (K and F Beauty Supply) was established on January 10, 2014 utilizing a Merchant Application signed on January 8, 2014. The rates stated on Page 2 of the Application submitted to Elavon include a $.10 Authorization Fee. A refund of $30.30 has been initiated to the business bank account associated with this processing account as indicated on the enclosed spreadsheet and this fee has been removed from the account going forward.

Account 8024582291 (K and F Beauty Supply) was established on January 10, 2014 utilizing a Merchant Application signed on January 8, 2014. The rates stated on Page 2 of the Application submitted to Elavon include a $.10 Authorization Fee. A refund of $20.50 has been initiated to the business bank account associated with this processing account as indicated on the enclosed spreadsheet and this fee has been removed from the account going forward.

Account 8024582416 (K and F Beauty Supply) was established on January 10, 2014 utilizing a Merchant Application signed on January 8, 2014. The rates stated on Page 2 of the Application submitted to Elavon include a $.10 Authorization Fee. A refund of $1.80 has been initiated to the business bank account associated with this processing account as indicated on the enclosed spreadsheet and this fee has been removed from the account going forward.

An additional issue has also been identified. All five contracts allegedly bear the signature of Mr. Rezeq Eleiwa (Date of Birth February 1, 1944) as President and Personal Guarantor of the entities. However, available information indicates that the contracts were signed by Mr. Khaled Eleiwa. The execution of these contracts in the name of Mr. Rezeq Eleiwa by Mr. Khaled Eleiwa brings the validity and enforceability of these contracts into significant question. In light of the concerns raised by this set of circumstances, it is Elavon's determination that the five accounts referenced above will be closed effective August 29, 2014.

If you have any questions, or if I can be of further assistance, please do not hesitate to contact me at the address above in writing.

Very truly yours,

Timothy F. Frost
Assistant General Counsel

## Exhibit
## J

The Defendant's August 11, 2014 letter
documenting its statement that the Plaintiff's
merchant account was "closed in error" and was
subsequently reopened along with the Defendant's
copy of the November 2013 Terms of Service
that the Plaintiff had never seen before.



Elavon
7300 Chapman Highway
Knoxville, TN 37920-6612

(865) 403-7398 Fax

August 11, 2014

Snider & Horner, PLLC
Attn: Mr. Kevin A. Snider, Esq.
9056 Stone Walk Place
Germantown, Tennessee 38138-7824

Re:    K and F Wireless and Smart Wireless (The Merchants)
       Merchant   Identification   Numbers:   8024582291,   8024574975,
       8024575014, 8024582416, 8024582242

Dear Mr. Snider:

Please consider the foregoing correspondence to be an acknowledgment of your correspondence of August 11, 2011 transmitted via facsimile.    Please note that by communicating with you as counsel for the above referenced entities, Elavon Inc. is not waiving any right, remedy, or other performance, claim or defense Elavon may have against the merchant or any of its principals or guarantors as described within the Merchant Application, the Terms of Service, or any other document governing the credit card transaction processing services giving rise to these circumstances.

It is my understanding that one of the five accounts (8024582291) was inadvertently closed and then reopened.    Callers representing themselves as associated with the business location were advised that the account was closed by Security on August 8, 2014, August 9, 2014 and August 11, 2014.  A caller representing himself as an owner of the business contacted Elavon early this afternoon (EST) and was advised that the account was closed in error, the account was reopened, and all accounts would be closed on August 29, 2014.

It appears another account (8024582242) experienced terminal communication issues on August 8, 2014.  The caller from the business location who alerted Elavon to the issue at or about 4:30 P.M. (EST) on August 8, 2014 advised an Elavon representative that this issue was noticed after AT&T left the merchant location.  The matter was resolved on August 8, 2014 and functionality was confirmed with an agent or employee of the business location on August 9, 2014.

I would respectfully point out that none of the contracts bear any language indicating the use of a Power of Attorney but will attempt to verify the existence and presentation of

same and will advise you of my findings. I would also direct your attention to the enclosed portion of the Terms of Service. I will include a complete copy of the Terms of Service with the mailed copy of this letter.

If you have any questions, or if I can be of further assistance, please do not hesitate to contact me at the address above in writing.

Very truly yours,

Timothy F. Frost
Assistant General Counsel



# Terms of Service

**November 2013**

TOS201311                                          TERMS OF SERVICE

# TABLE OF CONTENTS

SECTION A – GENERAL PROVISIONS ...................................................................2

1. DEFINITIONS...........................................................................................................2

2. RULES OF CONSTRUCTION .................................................................................2

3. ACCEPTANCE OF PAYMENT DEVICES .............................................................2

4. TRANSACTIONS .....................................................................................................2

5. DEMAND DEPOSIT ACCOUNT (DDA) ................................................................3

6. SECURITY INTERESTS; RESERVE ACCOUNT; RECOUPMENT AND SET-OFF ......4

7. FEES; OTHER AMOUNTS OWED; TAXES .........................................................6

8. ACCURACY OF INFORMATION; INDEMNIFICATION; LIMITATION OF
    LIABILITY .............................................................................................................7

9. REPRESENTATIONS AND WARRANTIES .........................................................8

10. AUDIT AND INFORMATION ..............................................................................9

11. FRAUD MONITORING ........................................................................................9

12. BUSINESS CONTINUITY ..................................................................................10

13. PERSONAL GUARANTY ...................................................................................10

14. THIRD PARTIES ..................................................................................................10

15. TERM AND TERMINATION .............................................................................11

16. COMPLIANCE WITH LAWS AND PAYMENT NETWORK REGULATIONS;
    MATCH™ AND CONSORTIUM MERCHANT NEGATIVE FILE .....................12

17. USE OF TRADEMARKS; CONFIDENTIALITY; PASSWORDS .....................14

18. MISCELLANEOUS PROVISIONS.....................................................................16

19. PROVISIONS APPLICABLE TO MERCHANT'S ACCEPTANCE OF
    TRANSACTIONS IN CANADA ..........................................................................19

20. EQUIPMENT LEASING .....................................................................................27

21. ELECTRONIC GIFT CARDS .............................................................................33

22. BILLER DIRECT SERVICES .............................................................................36

SECTION B – ELECTRONIC CHECK SERVICES .................................................41

SECTION C – TOKENIZATION SERVICES ...........................................................43

SECTION D – GLOSSARY .......................................................................................45



# TERMS OF SERVICE

These Terms of Service (TOS) and the other portions of the Agreement govern the Merchant's participation in the Program. The TOS is incorporated into and made part of the Agreement and the signature by an authorized representative of the Merchant on the Merchant Application, or the transmission of a Transaction Receipt or other evidence of a Transaction, shall be the Merchant's acceptance of and agreement to abide by the terms and conditions contained in the Agreement. No strikeover of the preprinted text of the TOS shall be effective. Merchant acknowledges that it has received, understands, and agrees to be bound by the Agreement.

# SECTION A - GENERAL PROVISIONS

1. **DEFINITIONS.** Definitions used within this TOS are listed alphabetically in the "Glossary" in Section D.

2. **RULES OF CONSTRUCTION.** Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. Singular terms shall include the plural, and vice versa, unless the context otherwise requires. The words "hereof," "herein," and "hereunder," and words of similar import when used in the TOS shall refer to the TOS and not to any particular provision of the TOS. The word "day" shall mean "calendar day," unless specifically stated otherwise. In the event of a conflict between the terms of Section (A) – General Provisions, and any subsequent Section of the TOS, the terms of the subsequent Section shall prevail.

3. **ACCEPTANCE OF PAYMENT DEVICES.** Merchant shall determine in accordance with the Payment Network Regulations and the Agreement which types of Payment Devices it will agree to accept as a form of payment from its Customers. The terms and conditions for the acceptance of the applicable Payment Devices and Merchant's use of the Payment Device Processing Services are set forth in the Agreement and in the Merchant Operating Guide (the "MOG"), incorporated herein and located at our website https://www.merchantconnect.com/CWRWeb/pdf/MOG_Eng.pdf. Each schedule, exhibit, addendum or attachment to the Agreement shall be governed by the TOS and the applicable provisions of the MOG, as well as by the terms set forth in the Merchant Application.

4. **TRANSACTIONS.**

   a. **Merchant Compliance.** Merchant must comply with all the requirements under the Agreement. Merchant must also comply with the procedures set forth in the MOG and any other guides, manuals, or rules provided in writing to Merchant by Elavon from time to time.

   b. **Settlement of Transactions.**

      i. **Deposits.** Merchant agrees that the Agreement is a contract of financial accommodation within the meaning of the Bankruptcy Code, 11 U.S.C. Section 365, as amended from time to time. For purposes of Transactions in Canada, Merchant agrees that the Agreement is a contract for the advance of credit to Merchant within the meaning of Section 11.01(b) of the *Companies' Creditors Arrangement Act* (Canada) and within the meaning of Section 65.1(4)(b) of the *Bankruptcy and Insolvency Act* (Canada). Subject to this Section, Elavon and Member will deposit to the DDA all funds evidenced by Transaction Receipts complying with the terms of the Agreement and the Payment Network Regulations and will provide Merchant provisional credit for such funds (less recoupment of any Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement). Merchant acknowledges that its obligation to Elavon and Member for all amounts owed under the Agreement arises out of the same transaction as Elavon's and Member's obligation to deposit funds to the DDA and such amounts are owed in the ordinary course of business.

      ii. **Provisional Credit.** Merchant acknowledges that all credits for funds provided to it are provisional and subject to reversal in the event that Elavon and Member do not receive payment of corresponding settlement amounts from the Payment Networks. Merchant further acknowledges that all credits are subject to adjustments for inaccuracies and errors (including rejects) and Chargebacks in accordance with the Agreement and the Payment Network Regulations, whether or not a Transaction is charged back by the Issuer or Customer. Merchant authorizes Elavon or Member to initiate reversal or adjustment (debit or credit) entries and to initiate or suspend such



entries in accordance with the Agreement as may be necessary to grant or reverse provisional credit for any Transaction. Further, Elavon may delay Merchant-issued Customer credits for up to five (5) business days for accounting verification. Customer credits issued by Merchant to PIN-Debit Cards will not be subject to this delay. Member or Elavon may elect to grant conditional credit for individual or groups of Transaction Receipts. Final credit for Transaction Receipts will be granted within Member's and Elavon's sole discretion.

iii.   **Original Transaction Receipts.** Under no circumstances will Elavon or Member be responsible for processing returns, refunds, or adjustments related to Transactions not originally processed by Elavon and Member.

c.   **Processing Limits.** Elavon may impose a cap on the dollar amount of Transaction Receipts that it will process for Merchant as indicated on the Merchant Application as Merchant's annual volume or as otherwise established by Elavon. This limit may be changed by Elavon from time to time, without prior notice to Merchant. If Merchant exceeds the established limit, Elavon may suspend the processing of Transaction Receipts, and either return all Transaction Receipts evidencing funds over the cap to Merchant or hold those deposits in a separate account or Reserve Account.

d.   **Chargebacks.** Merchant is fully liable to Elavon and Member for all Transactions returned to Elavon or Member for whatever reason including all Chargebacks. Merchant will pay Elavon and Member for all Chargebacks. Merchant agrees to accept for Chargeback, and will be liable to Elavon and Member in the amount of any Transaction for which the Customer or Issuer disputes the validity of the Transaction for any reason. Merchant authorizes Elavon and Member to offset from funds due Merchant for Transaction activity or to debit the DDA, the Reserve Account, or any other account held at Member or at another financial institution for the amount of all Chargebacks including, as applicable, any currency fluctuations. Merchant will fully cooperate with Elavon and Member in complying with the Payment Network Regulations regarding all Chargebacks. Guarantors are personally liable to Elavon and Member for all Chargebacks.

5.   **DEMAND DEPOSIT ACCOUNT (DDA).**

a.   **DDA and ACH Authorization.** Merchant will establish and maintain with Member (or with another ACH participating financial institution acceptable to Member) one or more DDAs to facilitate payment for Transactions. Merchant will maintain sufficient funds in the DDA to accommodate all Transactions contemplated by the Agreement and all Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement. Merchant irrevocably authorizes Elavon, Member, and their respective authorized vendors and agents who provide services under the Agreement, to initiate ACH debit and credit entries to the DDA, the Reserve Account or any other account maintained by Merchant at any institution that is a receiving member of the ACH network, in order to make payments to or collect payments from Merchant due under the Agreement. The foregoing authorizations will remain in effect after termination of the Agreement until all of Merchant's obligations to Elavon and Member have been paid in full. Merchant also authorizes Elavon's or Member's vendors or agents to debit the DDA for any fees due to such vendors or agents under the Agreement. Merchant must obtain prior consent from Member and Elavon to change the DDA. If Merchant does not get that consent, Elavon or Member may immediately and without notice terminate the Agreement and may take any other action either of them deems necessary in their discretion. Elavon and Member have the right to rely upon written instructions submitted by Merchant requesting changes to the DDA. In the event Merchant changes the DDA, the ACH debit and credit authorization established hereunder will apply to the new account and Merchant shall provide Elavon and Member such information regarding the new DDA as they deem necessary to effect payments to and from the new DDA. It may take Elavon up to ten (10) business days after Elavon's receipt of a written notice from



Merchant to reflect in its system any change to Merchant's DDA. Merchant may request from Elavon written confirmation of Elavon's and Member's consent to change the DDA. If the DDA is maintained with Member, Member will deposit all funds evidenced by Transaction Receipts to the DDA, subject to Section (A)(4) of the TOS. Elavon and Member have the right to delay, within their discretion, crediting the DDA with funds evidenced by submitted Transaction Receipts. To the extent required, Merchant authorizes Member or Elavon to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant provisional credit for any entry. Member will make deposits to the DDA pursuant to the Agreement and the ACH authorization. To the extent required, Merchant authorizes and appoints Member to act as its agent to collect Transaction amounts from the Issuer, the Customer or the Customer's financial institution. Member, in its sole discretion or at Elavon's direction, may grant Merchant provisional credit for Transaction amounts in the process of collection, subject to receipt of final payment by Member and Elavon and subject to all Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement.

b.  **Asserted Errors.** It is the responsibility of Merchant to reconcile the statements regarding Transaction activity received from Elavon, any Payment Network, and any third party vendors with the statements Merchant receives for Merchant's DDA. Merchant must promptly examine all statements relating to the DDA and immediately notify Elavon and Member in writing of any errors in the statement Merchant received from Elavon. Merchant's written notice must include: (i) Merchant name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error; and (iv) an explanation of why Merchant believes an error exists and the cause of it, if known. That written notice must be received by Elavon within forty-five (45) days after the month end date on the statement containing the asserted error. If Merchant fails to provide such notice to Elavon within said forty-five (45) days, Elavon and Member shall not be liable to Merchant for any errors Merchant asserts at a later date. Merchant may not make any claim against Member or Elavon for any loss or expense relating to any asserted error for sixty (60) days immediately following Elavon's receipt of Merchant's written notice. During that sixty (60) day period, Elavon will be entitled to investigate the asserted error, and Merchant shall not incur any cost or expense in connection with the asserted error without notifying Elavon.

c.  **Depository Institution.** Merchant authorizes its depository institution to grant Elavon and/or Member access to any and all information or records regarding the DDA. Merchant authorizes Elavon and/or Member to direct the depository institution to hold funds in the DDA in an amount which Elavon and/or Member, in their respective discretion, either individually or collectively, deem sufficient to fully protect Elavon's and Member's rights under the Agreement or to block or restrict Merchant's or others' access to funds in the DDA (whether or not such funds are specifically related to any previous deposit for any Transaction Receipt). Merchant directs the depository institution to immediately comply with any such direction from Elavon or Member.

d.  **Indemnity.** Merchant will indemnify and hold harmless Elavon and Member for any action they take against the DDA or Reserve Account pursuant to the Agreement. Merchant will also indemnify and hold harmless the depository institution at which it maintains its DDA for acting in accordance with any instruction from Elavon and/or Member regarding the DDA.

6.  SECURITY INTERESTS; RESERVE ACCOUNT; RECOUPMENT AND SET-OFF.

a.  **Security Interests.**

i.   **Security Agreement.** The Agreement constitutes a security agreement under the Uniform Commercial Code. Merchant grants to Elavon and Member a security interest in and lien upon (and in Quebec, a hypothec on): (a) all funds at any time in the Reserve



Account or DDA, regardless of the source of such funds, and (b) all funds underlying present and future Transaction Receipts; and (c) any amount which may be due to Merchant under the Agreement, including, without limitation, all rights to receive any payments or credits under the Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to Elavon and Member, upon request, to secure its obligations under the Agreement. These security interests and liens (and hypothecs) will secure all of Merchant's obligations under the Agreement and any other agreements now existing or later entered into between Merchant and Elavon and/or Member including Merchant's obligation to pay any amounts due and owing to Member or Elavon. Elavon and Member may execute this security interest (and hypothecs), without notice or demand of any kind, by making an immediate withdrawal or by restricting Merchant's access to the Secured Assets.

ii.   **Perfection.** Upon request of Elavon or Member, Merchant will execute one (1) or more control agreements or other documents to evidence or perfect this security interest (and hypothec). Merchant represents and warrants that no other person or entity has a security interest (or hypothec) in the Secured Assets. With respect to such security interests and liens (and hypothecs), Elavon and Member will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from Elavon and Member written consent prior to granting a security interest (or hypothec) of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and Elavon and Member are not required to file a motion for relief from a bankruptcy action automatic stay to realize any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by Elavon or Member. Merchant authorizes and appoints Elavon as Merchant's attorney in fact to sign Merchant's name to any control agreement used for the perfection of any security interest or lien (or hypothec) granted hereunder.

b.   **Reserve Account.**

i.   **Establishment.** Elavon and/or Member may establish a Reserve Account at any time for the purpose of providing a source of funds to pay Member and Elavon for any and all amounts owed by Merchant. The Reserve Account shall be maintained with sums sufficient to satisfy Merchant's current and/or future obligations as determined by Member or Elavon. Member and Elavon shall have sole control of the Reserve Account. Member and/or Elavon may, at any time, require that the amount on deposit in the Reserve Account be increased.

ii.   **Funding.** Member and Elavon may fund the Reserve Account by any one or more of the following means.

aa.   Member and Elavon may require Merchant to deposit into the Reserve Account funds in an amount determined by Elavon;

bb.   Member and Elavon may debit the DDA in any amount; or

cc.   Member and Elavon may deposit into the Reserve Account funds they would otherwise be obligated to pay Merchant.

iii.   **Use of Funds in Reserve Account.** Member or Elavon may, without notice to Merchant, apply funds in the Reserve Account against any outstanding amounts Merchant owes or future amounts Merchant will owe under the Agreement or any other agreement between Merchant and Member or Elavon. Also, Member or Elavon may debit the Reserve Account to exercise their rights under the Agreement including, without limitation, their rights of set-off and recoupment to collect any amounts due to Member or Elavon. Further, Merchant agrees that Elavon or Member may be required to send funds in a Reserve Account to a third party in response to a tax levy or other court order.



TOS201311                                                                      TERMS OF SERVICE

    iv.    **Termination of Reserve Account.** Funds held in the Reserve Account shall remain in the Reserve Account until each of the following has occurred: (1) the Agreement has been terminated; and (2) Merchant has paid in full all amounts owing or that could ever be owed under the Agreement, including all Chargebacks, returns, adjustment, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement. In no event shall Merchant be entitled to a return of any funds remaining in the Reserve Account before two-hundred-seventy (270) days following the effective date of termination of the Agreement.

  c.  **Recoupment and Set-off.** Member and Elavon have the right of recoupment and set-off. This means that they may offset any outstanding or uncollected amounts owed to them from: (i) any amounts they would otherwise be obligated to deposit into the DDA; and (ii) any other amounts they may owe Merchant under the Agreement or any other agreement. Merchant acknowledges that in the event of a Bankruptcy Proceeding, in order for Merchant to provide adequate protection under Bankruptcy Code Section 362 or applicable law to Elavon and Member, and in order to ensure that Elavon and Member do not and are not obliged to advance credit to Merchant, Merchant must create or maintain the Reserve Account as required by Elavon and/or Member and either of them shall have the right to offset against the Reserve Account for any and all obligations Merchant may owe to Elavon and Member, without regard to whether the obligations relate to Transaction Receipts initiated or created before or after the initiation of the Bankruptcy Proceeding or the filing of the petition, motion, request for stay or other proceeding in connection with a Bankruptcy Proceeding.

  d.  **Remedies Cumulative.** The rights conferred upon Member and Elavon in this Section are not intended to be exclusive of each other or of any other rights and remedies of Member and Elavon under the Agreement, at law or in equity. Rather, each and every right of Member and Elavon under the Agreement, at law or in equity is cumulative and concurrent and in addition to every other right.

7.    **FEES; OTHER AMOUNTS OWED; TAXES.**

  a.  **Fees.** Merchant will pay Member and Elavon fees for services, supplies, and equipment in accordance with the Agreement and any additional application or setup form(s). Such fees will be calculated and debited from the DDA or the Reserve Account once each day or month for the previous day's or month's activity as applicable, or will be deducted from the funds due Merchant under the Agreement. In addition, Merchant will pay Elavon at its standard rates for research including, but not limited to, research required to respond to any third party or government subpoena, levy, or garnishment on Merchant's account. Elavon may adjust the fees in accordance with Section (A)(18)(p) below.

  b.  **Other Amounts Owed.** Merchant will immediately pay Elavon or Member any amount incurred by Elavon or Member attributable to the Agreement, including, without limitation, Chargebacks, returns, adjustments, fees, fines, penalties (including all fines and penalties assessed by the Payment Networks as a result of Merchant's Transaction processing), assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement. Elavon or Member may offset these amounts from funds otherwise owed by Elavon or Member to Merchant or may debit these amounts from Merchant's DDA or Reserve Account by ACH, and in the event such offset or ACH debit does not fully reimburse Elavon or Member for the amount owed, Merchant will immediately pay Elavon or Member such amount. Elavon will charge interest, as allowed by Law, on all uncollected items that are more than thirty (30) days past due.



c. **Taxes.** Merchant is also obligated to pay all taxes and other charges imposed by any governmental authority on the goods and services provided under the Agreement. If Merchant is a tax-exempt entity, Merchant will provide Elavon and Member with an appropriate certificate of tax exemption.

8. **ACCURACY OF INFORMATION; INDEMNIFICATION; LIMITATION OF LIABILITY.**

a. **Accuracy of Information.** Merchant represents and warrants to Member and Elavon that all information provided to Elavon in the Merchant Application, in the bid process if applicable, or otherwise in the Agreement is true and complete and properly reflects the business, financial condition and principal partners, owners, officers, or ownership of Merchant. Merchant must promptly notify Elavon in writing of any changes to such information, including, without limitation, any additional location or new business at which Merchant desires to accept Payment Devices, the identity of principals and/or owners, the form of business organization (i.e., sole proprietorship, partnership, etc.), type of goods and services provided, and how Transactions are completed (i.e., by telephone, mail, electronic commerce, or in person at Merchant's place of business). The notice must be received by Elavon at least ten (10) business days prior to the change. Merchant will provide any additional information requested by Elavon within a reasonable time. Elavon has the right to rely upon written instructions submitted by Merchant to request changes to the Merchant's business information. Merchant may request written confirmation of Elavon's consent to the changes to the Merchant's business information. Merchant will defend, indemnify, and hold harmless Member and Elavon for all losses and expenses incurred by Member or Elavon arising out of any such change, whether or not reported to Elavon, or Merchant's failure to provide requested information. Merchant will not submit Transactions for processing to Elavon or Member for any businesses, products, or methods of selling other than those set forth in the Merchant Application at the time Merchant applies for services without the prior written consent of Elavon. Elavon may immediately terminate the Agreement upon notification by Merchant of a change to the information in the Merchant Application. Merchant authorizes Elavon and Member to contact credit reporting agencies and Merchant's creditors to make inquiries and obtain reports regarding Merchant's credit standing upon Elavon's or Member's receipt of the Merchant Application.

b. **Indemnification.** Merchant will be liable for and indemnify, defend, and hold harmless Elavon, Member and their respective employees, officers, directors, and agents against all claims, including claims made by third parties, losses, damages, liabilities or expenses arising out of the Agreement and for all reasonable attorneys' fees and other costs and expenses paid or incurred by Member and/or Elavon in the enforcement of the Agreement, including those resulting from any Transaction processed under the Agreement or any breach by Merchant of the Agreement and those related to any Bankruptcy Proceeding.

c. **Limitation of Liability.** Merchant acknowledges that Elavon's and Member's fees for the Processing Services provided to Merchant by Elavon and Member are very small in relation to the funds advanced to Merchant for Transactions and consequently Elavon's and Member's willingness to provide these services is based on the liability limitations contained in the Agreement. Therefore, in addition to greater limitations on Elavon's or Member's liability that may be provided elsewhere, any liability of Elavon and Member under the Agreement, whether to Merchant or any other party, whatever the basis of the liability, will not exceed, in the aggregate, an amount equal to the fees paid by Merchant during the last three (3) months. In no event will Elavon, Member, or their agents, officers, directors, or employees be liable for indirect, exemplary, punitive, special, or consequential damages.

d. **Performance.** Elavon and Member will perform all services in accordance with the Agreement. Elavon makes no other warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty. **Elavon and Member disclaim all implied warranties, including those of merchantability and fitness for a particular purpose.** Neither Elavon nor Member shall be liable for any failure or delay in its performance



of the Agreement if such failure or delay arises for reasons beyond the control of Elavon or Member and without the fault or negligence of Elavon or Member.

9.   **REPRESENTATIONS AND WARRANTIES**. Merchant represents and warrants to Elavon and Member as of the time the Agreement is effective, and reaffirm to Elavon and Member each time a Transaction is effected during the Initial Term or any Renewal Term of the Agreement, the following:

a.   **Organization**. Merchant is a corporation, company, limited liability company, unlimited liability company, limited liability partnership, limited partnership, general partnership, business trust, association or sole proprietorship validly existing and organized in the United States, or validly existing and federally organized in Canada or in a province or territory of Canada, as applicable.

b.   **Corporate Power**. Merchant and the persons signing the Agreement have the power to execute and perform the Agreement. Merchant represents and warrants that the person executing the Agreement is duly authorized to bind Merchant and each affiliated entity identified in the Agreement to all provisions of the Agreement and that such person is authorized to execute any document and to take any action on behalf of Merchant which may be required by Elavon, now or in the future. Further, Merchant represents and warrants that signing and/or performing in accordance with the Agreement will not violate any Law, or conflict with any other agreement to which Merchant is subject.

c.   **No Litigation**. There is no action, suit, or proceeding pending, or to Merchant's knowledge, threatened which if decided adversely would impair Merchant's ability to carry on Merchant's business substantially as now conducted or which would adversely affect Merchant's financial condition or operations. Merchant has never (i) been placed on the MasterCard MATCH™ system (formerly known as the Combined Terminated Merchant File), (ii) been named to the Consortium Merchant Negative File maintained by Discover, or (iii) been placed on or named to any other negative or terminated merchant file of any other Payment Network, or, if Merchant has, Merchant has disclosed that fact to Elavon in writing.

d.   **Transactions**. All Transactions are bona fide. No Transaction involves the use of a Payment Device for any purpose other than the purchase of goods or services from Merchant or a return or adjustment related to such purchase. Merchant will not submit unlawful or illegal Transactions. Merchant has all power and authority to provide all Customer information, Cardholder Data and Transaction information that Merchant provides to Elavon and Member. No Transaction involves a Customer obtaining cash from Merchant unless allowed by the Payment Network Regulations and agreed to in writing with Elavon.

e.   **Compliance with Laws and Regulations**. Merchant will comply with all Laws and Payment Network Regulations.

f.   **Business Use**. Merchant is obtaining and using the Processing Services from Elavon for business purposes only and to facilitate lawful business Transactions between Merchant and Merchant's Customers. Merchant will not submit Transactions for processing to Elavon or Member for any businesses, materially different products, or methods of selling other than those set forth in the Merchant Application without the prior written consent of Elavon. Merchant also acknowledges that the DDA into which debits and credits are made is being used for lawful business purposes only.

g.   **Responsibility for Actions**. Merchant is responsible for any violations of the Agreement that result from the actions of or failure to act by Merchant's officers, directors, employees, agents, Value Added Servicers, business invitees, and those of any other Person who, with or without Merchant's consent or cooperation, obtains access to information related to Transactions from



Merchant or access to systems under Merchant's control.

**10.    AUDIT AND INFORMATION.**

a.  **Audit.** Merchant authorizes Elavon and Member to perform an audit of its business to confirm compliance with the Agreement. Merchant will obtain and submit a copy of an audit from a third party acceptable to Elavon of the financial, physical security, information security, and operational facets of Merchant's business at its expense when requested by Elavon or Member. Further, Merchant acknowledges and agrees that the Payment Networks have the right to audit Merchant's business to confirm compliance with the Payment Network Regulations.

b.  **Information.**

   i.   **Authorizations.** Merchant authorizes Elavon and Member to make, from time to time, any business and personal credit or other inquiries they consider necessary to review the Merchant Application or continue to provide services under the Agreement. Merchant also authorizes any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to Elavon.

   ii.  **Financial Information.** Upon the request of either Elavon or Member, Merchant will provide Elavon and Member audited financial statements prepared by an independent certified public accountant selected by Merchant. Merchant further agrees to provide to Elavon and Member such other information regarding Merchant's financial condition as Elavon and/or Member may request from time to time. Within one-hundred twenty (120) days after the end of each fiscal year, Merchant will furnish Elavon or Member, as requested, a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year.

   iii. **Merchant Information.** Merchant agrees that any Merchant financial information, Transaction Data, and other information regarding Merchant, its principles, affiliates, or agents that Merchant or Merchant principle provides to Elavon or Member on the Merchant Application or otherwise obtained by Elavon or Member in connection with the Agreement may be: (i) used by Elavon, Member, and their respective service providers, affiliates, agents, and referral partners, (a) in order to provide the Processing Services and related functions to Merchant and to respond to any further application for services, or (b) for administrative purposes and to maintain Merchant's account pursuant to this Agreement; (ii) disclosed and shared for reporting purposes to credit rating agencies, under the Payment Network Regulations, to Issuers and to the financial institution where the DDA is maintained; (iii) utilized to enhance or improve Elavon's products or services, generally; (iv) used or disclosed in the course of any actual or potential sale, reorganization or other change to Elavon's or Member's business; (v) collected, used and disclosed as required or permitted by Law (e.g., for tax reporting or in response to a subpoena); and (vi) retained for such periods of time as required by Elavon and Member to perform their obligations and exercise their rights under the Agreement. Elavon may prepare, use, and/or share with third parties, aggregated, non-personally identifiable information derived from Transaction Data of all of Elavon's customers or specific segments of Elavon's Customers.

c.  **Customer Identification.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Accordingly, Merchant must provide certain information and identifying documents to allow Elavon and Member to identify Merchant.

**11.    FRAUD MONITORING.** Merchant is solely responsible for monitoring its Transactions and the actions of its officers, directors, employees, agents, business invitees, third party vendors, including Value Added Servicers, and those of any other Person who, with or without Merchant's consent or



cooperation, obtains access to Merchant's Transactions, for fraudulent or other suspicious activity. Elavon and Member are under no duty to monitor Merchant's transactions for fraudulent or other suspicious activity.

12. **BUSINESS CONTINUITY**. Merchant is solely responsible for developing and maintaining a disaster recovery plan. Merchant should test the operation of such plan, or parts thereof, on a periodic basis to ensure its effectiveness in providing disaster recovery capability to Merchant. Merchant is solely responsible for all Transactions and Transaction Receipts until such time as the Transaction Receipts have been received and validated by Elavon. Merchant will maintain sufficient "backup" information and data (e.g., Transaction Receipts or detailed reporting) with respect to Transactions in order to reconstruct any information or data loss due to any system malfunction. Neither Elavon nor Member has a duty to recreate lost Transactions.

13. **PERSONAL GUARANTY**. As a primary inducement to Elavon and Member to enter into the Agreement and in consideration of the services and accommodations of any kind given or continued at any time and from time to time by Elavon or Member to or for the benefit of Merchant, the designated Guarantor(s), jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance by Merchant of each of its duties and obligations to Elavon and Member pursuant to the Agreement, as the same may be amended by either of them from time to time, with or without notice. No act or thing, except full payment and discharge of all of Merchant's duties and obligations to Elavon and Member, which but for this provision could act as a release or impairment of the liability of the Guarantor(s), shall in any way release, impair, or affect the liability of the Guarantor(s). The Guarantor(s) waives any and all defenses of Merchant pertaining to Merchant's duties and obligations to Elavon and Member, any evidence thereof, and any security therefore, except the defense of discharge by payment. Guarantor(s) understands further that Elavon and/or Member may proceed directly against Guarantor(s) without first exhausting their respective remedies against Merchant or any other person or entity responsible therefore or any security held by Elavon, Member, or Merchant. The Guarantor(s) waives: (i) notice of acceptance of this Personal Guaranty and of the creation and existence of the Merchant's duties and obligations to Elavon and Member; (ii) presentment, demand for payment, notice of dishonor, notice of non-payment, and protest of any instrument evidencing the Merchant's duties and obligations; (iii) all other demands and notices to the Guarantor(s) or any other person and all other actions to establish the liability of the Guarantor(s); and (iv) **the right to trial by jury in action in connection with this Personal Guaranty**. This Personal Guaranty will not be discharged or affected by the death of the Guarantor(s), will bind all heirs, administrators, representatives, and assigns, and may be enforced by or for the benefit of any successors in interest to Elavon or Member. Guarantor(s) understands that the inducement to Elavon and Member to enter into the Agreement and give or continue services and accommodations of any kind to or for the benefit of Merchant, is consideration for the Personal Guaranty and that each Personal Guaranty remains in full force and effect even if the Guarantor(s) receives no additional benefit from the Personal Guaranty.

14. **THIRD PARTIES**.

   a. **Products or Services**. Merchant may desire to use a Value Added Servicer to assist Merchant with its Transactions. Merchant shall not utilize any such third parties unless Merchant has disclosed such use to Elavon previously in writing, and unless such Value Added Servicer is fully compliant with all Laws and Payment Network Regulations. Any Value Added Servicer used by Merchant must be registered with the Payment Networks prior to the performance of any contracted services on behalf of Merchant. Further, as between the parties to the Agreement, Merchant will be bound by the acts and omissions of any Value Added Servicer and Merchant will be responsible for compliance by such Value Added Servicer with all Laws and Payment Network Regulations. Merchant will indemnify and hold harmless Elavon and Member from and against any loss, cost, or expense incurred in connection with or by reason of Merchant's use of any third parties, including Value Added Servicers. Neither Elavon nor Member is responsible for any Value Added Servicer, nor are they responsible for any Transaction until Elavon receives data for the Transaction in the format required by Elavon.

Elavon

b. **Use of POS Devices Provided by Others.** In addition to the foregoing, if Merchant uses a Value Added Servicer for the purposes of data capture and/or authorization, Merchant agrees: (i) that the third party providing such services will be Merchant's agent in the delivery of Transactions to Elavon and Member via a data processing system or network compatible with Elavon's; and (ii) to assume full responsibility and liability for any failure of that third party to comply with applicable Laws and the Payment Network Regulations or the Agreement. Neither Member nor Elavon will be responsible for any losses or additional fees incurred by Merchant as a result of any error by a third party agent or by a malfunction in a third party POS Device. Neither Elavon nor Member is responsible for any Transaction until Elavon receives data for the Transaction in the format required by Elavon.

15. **TERM AND TERMINATION.**

a. **Term.** Unless terminated as set forth below, the Agreement will remain in effect for a period of three (3) years ("Initial Term") following the date of acceptance of the Merchant Application by Elavon and Member, which date shall be the date upon which the Agreement becomes effective. Thereafter, the Agreement will renew for successive two (2) year terms ("Renewal Term") unless terminated as set forth below. If Merchant processes Transactions beyond the Initial Term or Renewal Term, then the terms of the Agreement shall govern such Transaction processing.

b. **Termination.**

   i. **Merchant.**

      aa. The Agreement may be terminated by Merchant effective at the end of the Initial Term or any Renewal Term by providing written notice of an intent not to renew to Elavon at least thirty (30) days prior to the expiration of the then current term.

      bb. The Agreement may be terminated by Merchant in the event of a material breach of the terms of the Agreement by Member or Elavon, provided Merchant gives Member and Elavon written notice of any alleged breach and such breach remains uncured for a period of thirty (30) days following receipt of written notice by the party Merchant claims to be in breach of the Agreement.

   ii. **Elavon or Member.**

      aa. The Agreement may be terminated by Elavon or Member at any time with or without cause during the Initial Term or any Renewal Term.

      bb. Elavon's and Member's rights of termination under the Agreement are cumulative. A specific right of termination in this Section shall not limit any other right of Elavon or Member to terminate the Agreement expressed elsewhere.

   iii. **Notice of Termination.** Notice of termination by Merchant, Elavon, or Member may be given orally or in writing, but if given orally, must be confirmed in writing as soon as practical. Merchant's termination request shall be completed on a form available from Elavon, but at a minimum, must include the name of the Merchant and Merchant Identification Number, and must be signed by the principal owner(s) of Merchant. Termination shall be effective on the date specified by the oral or written notice; provided, however Merchant agrees that closing Merchant's account with Elavon may take up to thirty (30) days following Elavon's receipt of written notice of termination. In those limited instances where Merchant's account is reinstated by Elavon following termination by either Merchant or Elavon in the Initial or any Renewal Term, all of Merchant's obligations under the Agreement are likewise reinstated and will renew for



successive two (2) year Renewal Terms effective on the date of reinstatement.

c.   **Action Upon Termination.**

    i.    **Accounts.** All Merchant's obligations regarding Transactions processed prior to termination will survive termination. Funds related to Transactions processed prior to termination may be placed in a Reserve Account until Merchant pays all amounts Merchant owes Elavon or Member or amounts for which Merchant is liable under the Agreement. Merchant must maintain enough funds in the DDA following termination to cover all Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks and other amounts due under the Agreement for a reasonable time, but in any event, not less than one-hundred-eighty (180) days from termination. If a Reserve Account is established by Elavon, then any balance remaining after Chargeback rights have expired and all other amounts owed by Merchant has been paid will be disbursed to Merchant.

    ii.    **Leased Equipment.** If Merchant's equipment is leased, Merchant is obligated to honor the terms and conditions of Section (A)(20) below. If Merchant's Leased Equipment is owned by Elavon, Merchant must return all equipment owned by Elavon within ten (10) business days after termination of the Agreement and immediately pay Elavon any amounts Merchant owes for such Leased Equipment.

    iii.    **Return to Elavon.** All Confidential Information, promotional materials, advertising displays, emblems, Transaction Receipts, Credit Transaction Receipts, and other forms supplied to Merchant and not purchased by Merchant or consumed in use will remain the property of Elavon and must be returned to Elavon or destroyed within ten (10) business days after termination of the Agreement. Merchant will be fully liable for any and all loss, cost, and expense suffered or incurred by Elavon arising out of any failure to return or destroy such materials following termination.

16.   **COMPLIANCE WITH LAWS AND PAYMENT NETWORK REGULATIONS; MATCH™ AND CONSORTIUM MERCHANT NEGATIVE FILE.**

a.   **Compliance with Laws and Payment Network Regulations.** Merchant agrees to comply with the Payment Network Regulations, including all requirements applicable to obtaining authorization for ACH debits from a consumer account, and with any policies and procedures provided by Member or Elavon. The Payment Network Regulations are incorporated into the Agreement by reference as if they were fully set forth in the Agreement. Merchant further agrees to comply with all Laws, including without limitation, Laws related to: (i) Payment Devices; (ii) electronic funds transfers; (iii) confidential treatment of information; and (iv) the Fair and Accurate Credit Transactions Act of 2003 (FACTA), including its requirements relating to the content of Transaction Receipts provided to Customers. Merchant will assist Member and Elavon in complying in a complete and timely manner with all Laws and Payment Network Regulations now or hereafter applicable to any Transaction or the Agreement. Merchant will execute and deliver to Member and Elavon all documents they may from time to time reasonably deem necessary to verify Merchant's compliance with this provision.

b.   **Privacy Laws in the United States (if applicable).** In addition to Section (A)(17)(b), Merchant must take all commercially reasonable steps to protect the confidentiality of Customer and Transaction information and shall establish and maintain physical, technical and administrative safeguards to prevent unauthorized access by third parties to such Customer and Transaction information and in a manner that complies with applicable Laws, including without limitation the federal Health Insurance Portability and Accountability Act, the federal Gramm-Leach-Bliley Act, FACTA or other applicable privacy laws.

c.   **Privacy Laws in Canada (if applicable).** Merchant represents, covenants and agrees that it is in compliance with all applicable privacy laws, including without limitation the Personal



Information Protection and Electronic Documents Act (Canada), and that any personal information of a Customer that may be communicated or disclosed to Elavon under or in connection with the Agreement or any services to be provided by Elavon to Merchant has been obtained in compliance with such laws and that Elavon will not be in breach of any such laws by receiving and using such information in connection with performing its obligations under or in connection with the Agreement or any services to be provided by Elavon to Merchant.

d.  **MATCH™ and Consortium Merchant Negative File.** Merchant acknowledges that Member and/or Elavon is required to report Merchant's business name and the name of Merchant's principals to the MATCH™ listing maintained by MasterCard and accessed and updated by Visa and American Express, to the Consortium Merchant Negative File maintained by Discover, if applicable, or to any other negative or terminated merchant file of any other Payment Network, if applicable, pursuant to the requirements of the Payment Network Regulations. Merchant specifically consents to the fulfillment of the obligations related to the listing by Elavon and Member, the listing itself and Merchant waives and holds harmless Elavon and Member from all claims and liabilities Merchant may have as a result of such reporting.

e.  **Security Program Compliance.** Merchant must comply with the requirements of the Payment Card Industry Data Security Standard (PCI DSS) including the Cardholder Information Security Program (CISP) of Visa, the Site Data Protection Program (SDP) of MasterCard, the Data Security DISC Program and the PCI DSS regulations of Discover Network, and the security programs of any other Payment Network regarding which Merchant accepts a Payment Device, as applicable, and any modifications to, or replacements of such programs that may occur from time to time (collectively, "Security Programs"). Merchant also shall ensure that all Value Added Servicers and third parties from whom Merchant procures third party POS Devices comply with the requirements of the Security Programs. Upon request, Elavon will provide Merchant with the respective website links to obtain the current requirements of the Visa, MasterCard, and Discover Network Security Programs. Merchant is responsible for Merchant's own actions or inactions, those of Merchant's officers, directors, shareholders, employees and agents, including any Value Added Servicer (collectively, "Merchant's Agents"). Merchant shall indemnify and hold Elavon and Member harmless from any liability, loss, cost, or expense resulting from the violation of any of the Security Program requirements by any of Merchant's Agents. Should Merchant participate in a program with any other Credit Card Association or Issuer, or accept a Payment Device of any other Payment Network that has a security program in place, Merchant must comply therewith and ensure that Merchant's officers, directors, shareholders, employees, and agents, including Value Added Servicers or third party POS Devices, also comply with the program requirements of such Payment Network.

f.  **Data Compromise.**

    i.  **Notice and Investigation.** Merchant acknowledges and agrees that Cardholder Data and bank account information obtained by Merchant in connection with any Transaction is the property of the financial institution that issued the Payment Device or holds the Customer's account. Merchant must notify Elavon and Member within twenty-four (24) hours (and if notice is given orally, it must be confirmed in writing within the same twenty-four hour period), if Merchant knows or suspects that Cardholder Data, Customer information, or Transaction information has been accessed or used without authorization from Merchant, Merchant's Agents or systems within Merchant's or its agent's control (a "Data Incident"). The notice must include: (a) a detailed written statement about the Data Incident including the contributing circumstances; (b) the form, number and range of compromised account information; (c) specific account numbers compromised; and (d) details about the ensuing investigation and Merchant's security personnel who may be contacted in connection with the Data Incident. Merchant must fully cooperate with the Payment Networks, Elavon and Member in the forensic investigation of the Data Incident. Within seventy-two (72) hours of becoming aware of the Data Incident, Merchant must engage the services of a data security firm acceptable to the Payment Networks and/or to Elavon and Member to assess the



TOS201311                                                                    TERMS OF SERVICE

vulnerability of the compromised data and related systems. Merchant must provide weekly written status reports to Elavon and Member until the forensic audit is complete. Merchant must promptly furnish updated lists of potential or known compromised account numbers and other documentation or information that the Payment Networks and/or Elavon and Member may request. In addition, Merchant must provide all audit reports to Elavon and Member, and such audits must be completed to the satisfaction of the Payment Networks and/or of Elavon and Member. If Merchant fails to supply the forensic audits or other information required by the Payment Networks and/or by Elavon and Member, Merchant will allow Elavon or Member to perform or have performed such audits at Merchant's expense.

ii.   **Preservation of Records.** In the event of a Data Incident, Merchant must take immediate steps to preserve all business records, logs and electronic evidence relating to the Data Incident. Merchant shall cooperate with Elavon and Member to rectify, correct and resolve any issues that may result from the Data Incident, including providing Elavon and Member with (and obtaining any necessary waivers for) all relevant information to verify Merchant's ability to prevent future data incidents in a manner consistent with the Agreement.

iii.  **Liability for Data Incident.** Without waiving any of Elavon's and Member's rights and remedies, Merchant is liable for all fraudulent transactions related to any Data Incident and all costs Elavon or Member incur as a result of such Data Incident, including any fees, fines, penalties, or assessments by the Payment Networks, claims from third parties, all costs related to the notification of Cardholders or Customers and cancellation, re-issuance of Payment Devices (including underlying accounts), forensic investigation, and PCI DSS review for a report of compliance.

g.   **Office of Foreign Assets Control Compliance.** Elavon and Member are entities governed by the Laws of the United States of America and as such, neither Elavon nor Member may provide any products or services to Merchant or its Customers that contravene the Laws of the United States of America, including, without limitation, the Laws promulgated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") or any successor thereto.

17.   **USE OF TRADEMARKS; CONFIDENTIALITY; PASSWORDS.**

a.   **Use of Trademarks.** Merchant will prominently display the promotional materials provided by Elavon in Merchant's place of business as may be required or requested by the Payment Networks. Merchant's use of Visa, MasterCard, and Discover Network marks, as well as marks of other Payment Networks, will fully comply with the Payment Network Regulations. Merchant's right to use all such marks will terminate upon termination of the Agreement or upon notice by a Payment Network to discontinue such use. Merchant's use of promotional materials, provided by Visa, MasterCard, Discover Network, and/or other Payment Networks will not indicate, directly or indirectly, that Visa, MasterCard, Discover Network, or such other Payment Networks endorse any goods or services other than their own and Merchant may not refer to Visa, MasterCard, Discover Network, or any other Payment Networks in stating eligibility for Merchant's products or services.

b.   **Confidentiality.**

i.   **Customer and Transaction Information.** Merchant shall, at all times protect the confidentiality of Customer and Transaction information in accordance with all applicable Laws and Payment Network Regulations. Merchant will not disclose Customer or Transaction information to any third party, except to an agent of Merchant approved by Elavon that is assisting in completing a Transaction, or as required by Laws or Payment Network Regulations. Merchant must maintain all systems and media containing

14                              SECTION A – GENERAL PROVISIONS                    

TOS201311                                                               TERMS OF SERVICE

Customer and Transaction information in a secure manner to prevent access by or disclosure to anyone other than Merchant's authorized personnel. Merchant must maintain Customer and Transaction information for such time periods as may be required by Laws and the Payment Network Regulations and thereafter destroy in a manner that will render the data unreadable all such media that Merchant no longer deems necessary or appropriate to maintain. Further, Merchant must take all steps reasonably necessary to ensure that Customer and Transaction information is not disclosed or otherwise misused. Merchant may not retain or store magnetic stripe or CVV2/CVC2/CID data after authorization for any purpose, including record keeping or additional authorization processing. After authorization, Merchant may only retain the Customer account number, name, and Card expiration date if Merchant has a reasonable business purpose to retain such information and is otherwise in compliance with the Agreement. Merchant may not print on any Transaction Receipt or other document that is given to the Customer, retained by the Merchant, or transferred to a third party, the entire contents of the magnetic stripe or the CVV2/CVC2/CID data elements. In accordance with Section (A)(16)(e), Merchant shall immediately notify Elavon if Merchant knows or suspects that any Customer or Transaction information has been accessed by unauthorized persons or has been used for any purpose not permitted herein whether such access or use occurred at: (i) the Merchant; (ii) a Value Added Servicer; (iii) Elavon or Member; or (iv) elsewhere.

ii.   **Bankruptcy.** In the event of failure or other suspension of Merchant's business operations, including bankruptcy or insolvency, Merchant must not sell, transfer, or disclose any materials that contain Customer or Transaction information to third parties, and Merchant must:

aa.   Return this information to Elavon; or

bb.   Provide acceptable proof of destruction of this information to the Elavon.

iii.   **Elavon or Member Confidential Information.** Merchant agrees to protect Elavon's and Member's Confidential Information from unauthorized disclosure, publication, or dissemination with the same standard of care and discretion it employs with similar information of its own, but in no event less than reasonable care, and shall not use, reproduce, distribute, disclose, or otherwise disseminate Elavon's or Member's Confidential Information, except in connection with the performance of its obligations under this Agreement. The obligations of non-disclosure provided hereunder shall continue during the term of the Agreement and (i) with respect to Confidential Information that does not constitute a trade secret, for a period of three (3) years thereafter and (ii) with respect to Confidential Information that rises to the level of a trade secret under applicable law, for such period of time thereafter as the information shall retain its status as a trade secret under applicable law, and no less than three (3) years thereafter.

c.   **Passwords.** If Merchant receives a password from Elavon to access any of Elavon's databases or services Merchant will: (i) keep the password confidential; (ii) not allow any other entity or person to use the password or gain access to Elavon's databases or services; (iii) be liable for all action taken by any user of the password; and (iv) promptly notify Elavon if Merchant believes the Elavon's databases or services or Merchant's information has been compromised by use of the password. If Merchant receives passwords from a third party, Merchant must protect such passwords in the manner required by such third party and indemnify, defend, and hold Elavon and Member harmless from any losses, costs, or expenses that arise from Merchant's use or misuse of such third party passwords.

d.   **Proprietary Interest.** Merchant has no interest whatsoever, including, without limitation, copyright interests, franchise interests, license interests, patent rights, property rights, or other interest in any services, software, or hardware provided by Elavon. Nothing in the Agreement shall be construed as granting Merchant any patent rights or patent license in any patent which



Elavon may obtain in respect to Elavon's services, software, or equipment. Merchant will make no attempt to duplicate or otherwise ascertain the components, circuit diagrams, logic diagrams, flow charts, source and object code, schematics or operation of, or otherwise attempt to reverse engineer any of Elavon's services, equipment, or software.

18.   **MISCELLANEOUS PROVISIONS.**

a.   **Entire Agreement**. The Agreement (including all attachments, exhibits, addenda and other documents incorporated by reference into the Agreement, attachments, exhibits or addenda), Payment Network Regulations, and any amendment or supplement to either, constitutes the entire agreement between the parties, and all prior or other representations, written or oral, are merged in and superseded by the Agreement; provided, however the Agreement shall not supersede any Personal Guaranty signed by a Guarantor, which Personal Guaranty shall be deemed to remain an agreement separate and distinct from the Agreement. In the event of a conflict between the documents comprising the Agreement, excluding any Personal Guaranty, the following order of priority will apply: (i) any amendment to the Agreement; (ii) the TOS; (iii) the Payment Network Regulations; (iv) the Merchant Application; (v) any Merchant Agreement or Merchant Processing Agreement; (vi) the Merchant Operating Guide; and (vii) any other guides or manuals provided to Merchant from time to time.

b.   **Governing Law in the United States (if applicable)**. The Agreement will be governed by and construed in accordance with the Laws of the State of Georgia with respect to Transactions occurring in the United States, except that Section (A)(18)(g) shall be governed by the Federal Arbitration Act. The parties agree that all performances and Transactions under the Agreement will be deemed to have occurred in the State of Georgia and that Merchant's entry into and performance of the Agreement will be deemed to be the transaction of business within the State of Georgia. Any challenge to the enforceability of the agreement to arbitrate contained in Section (A)(18)(g) of the Agreement, on any ground, shall be brought in either the Superior Court of Fulton County, Georgia or in the United States District Court for the Northern District of Georgia, and in no other court, and each of the parties to the Agreement consents to the exercise of personal jurisdiction by these courts and waives all objections based on a lack of personal jurisdiction, venue or the inconvenience of the forum. Merchant, hereby waives any and all right to trial by jury in any action or proceeding relating to the Agreement. Merchant represents that this waiver is knowingly, willingly and voluntarily given.

c.   **Jurisdiction and Venue; Governing Law in Canada (if applicable)**. All matters arising out of or related to the Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario with respect to Transactions occurring in Canada, except for the hypothec created pursuant to Section (A)(6)(a)(i) (the "Québec Hypothec") which will be governed by and construed in accordance with the laws of the Province of Québec and the federal laws of Canada applicable in the Province of Québec.  The parties agree that all performances and Transactions under the Agreement will be deemed to have occurred in the Province of Ontario and that Merchant's entry into and performance of the Agreement will be deemed to be the transaction of business within the Province of Ontario.  Any action or proceeding relating to or arising from the Agreement (other than collection actions by Elavon or Member relating to amounts owed by Merchant under the Agreement) must be brought, held, or otherwise occur exclusively in Toronto, Canada, and the parties hereby attorn to the exclusive jurisdiction of the courts of Ontario (or of the courts of Québec with respect to the Québec Hypothec). Merchant, Member and Elavon hereby jointly and severally waive any and all right to trial by jury in any action or proceeding relating to the Agreement. Merchant, Member and Elavon each represents to the other that this waiver is knowingly, willingly and voluntarily given.

d.   **Exclusivity**. During the Initial Term and any Renewal Term of the Agreement, Merchant will not enter into an agreement with any other entity that provides processing services similar to those provided by Elavon and Member as contemplated by the Agreement without Elavon's



written consent.

e.  **Construction.** Any alteration or strikeover in the text of the Agreement will have no binding effect and will not be deemed to amend the Agreement. The headings used in the TOS are inserted for convenience only and will not affect the interpretation of any provision. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party.

f.  **Assignability.** The Agreement may be assigned by Member or Elavon, but may not be assigned by Merchant, directly or by operation of law, without the prior written consent of Elavon. If Merchant, nevertheless, assigns the Agreement without Elavon's consent, the Agreement will be binding on the assignee as well as Merchant. If Merchant sells its business and the new owners incur Chargebacks, the original owner(s) and all original Guarantors will be held personally liable for all Chargebacks and any other liabilities of the new owners.

g.  **Arbitration.** All claims or controversies, or other matters in question, between the parties arising out of or related to the Agreement or the relationship between the parties that are not otherwise settled by agreement of parties will be submitted to and decided by arbitration held in Atlanta, Georgia in accordance with the rules of the American Arbitration Association as modified by the Agreement. The arbitration proceeding shall be conducted before one (1) neutral arbitrator, who shall be a member of the bar of the State of Georgia, actively engaged in the practice of law for at least ten (10) years. The arbitrator will have the authority to award any remedy or relief that a court in Georgia could order or grant, including, without limitation, specific performance, issuance of an injunction or imposition of sanctions for abuse or frustration of the arbitration process. The arbitrator shall have no authority to decide claims on a class action basis. An arbitration can only decide our or Merchant's claim and may not consolidate or join the claims of other persons who may have similar claims. Merchant may not assert a claim in arbitration on behalf of any third party or represent any class of claimants in an arbitration brought pursuant to the Agreement. The parties agree that anything communicated, exchanged, said, done, or occurring in the course of the arbitration, including any private caucus between the arbitrator and any party before or after any joint arbitration session, will be kept confidential. The parties agree that the underlying agreement between the parties involves interstate commerce and that, notwithstanding the choice of law provision in Section (A)(18)(b), any arbitration shall be governed by the Federal Arbitration Act.

h.  **Notices.** Any written notice to the Merchant under the Agreement will be deemed received upon the earlier of: (i) actual receipt; or (ii) five (5) business days after being deposited in the United States mail, or with a nationally recognized overnight carrier, and addressed to the last address shown on the records of Elavon. Any written notice to Elavon, shall be sent by U.S. mail or a nationally recognized overnight carrier to: 7300 Chapman Highway, Knoxville, TN 37920, and shall be deemed received only upon actual receipt.

i.  **Bankruptcy in the United States (if applicable).** Merchant will immediately notify Elavon of any Bankruptcy Proceeding, receivership, insolvency, or similar action or proceeding initiated by or against Merchant or any of its principals. Merchant will include Elavon on the list and matrix of creditors as filed with the Bankruptcy Court, whether or not a claim may exist at the time of filing. Failure to do so will be cause for immediate termination of the Agreement and shall allow the pursuit of any other action available to Elavon under applicable Payment Network Regulations or Laws. Merchant acknowledges that the Agreement constitutes a contract to extend credit or other financial accommodations to, or for the benefit of Merchant, and, as such, cannot be assumed or assigned in the event of Merchant's bankruptcy. Such financial accommodations include, but may not be limited to, the incurrence by Elavon from time to time of credit risk associated with funds transfers and Elavon's compliance with Payment Network Regulations relating to Chargebacks. Merchant further acknowledge that such financial accommodations constitute an integral part of the Agreement.



j.  **Bankruptcy in Canada (if applicable).** Merchant will immediately notify Elavon of any Bankruptcy Proceeding, receivership, insolvency, or similar action or proceeding initiated by or against Merchant or any of its principals. Merchant will include Elavon on the list and matrix of creditors as filed with any bankruptcy, commercial or civil court, whether or not a claim may exist at the time of filing. Failure to do so will be cause for immediate termination of the Agreement and shall allow the pursuit of any other action available to Elavon under applicable Payment Network Regulations or Laws. Merchant agrees that the Agreement is a contract for the advance of credit to Merchant within the meaning of Section 11.01(b) of the *Companies' Creditors Arrangement Act* (Canada) and within the meaning of Section 65.1(4)(b) of the *Bankruptcy and Insolvency Act* (Canada) and cannot be assigned by Merchant in the event of a Bankruptcy Proceeding relating to Merchant. Merchant hereby acknowledges but that for the agreement in the immediately preceding sentence, Member and Elavon would not have entered into the Agreement.

k.  **Attorneys' Fees.** Merchant will be liable for and will indemnify and reimburse Member and Elavon for all reasonable attorneys' fees and other costs and expenses paid or incurred by Member or Elavon: (i) in the enforcement of the Agreement; (ii) in collecting any amounts due from Merchant to Member or Elavon; (iii) resulting from any breach by Merchant of the Agreement; or (iv) in defending against any claim or cause of action brought by Merchant against Elavon or Member arising out of the Agreement.

l.  **Customer Contact.** Merchant authorizes Member and Elavon to contact its Customers or their Issuer if Member or Elavon determines that such contact is necessary to obtain information about any Transaction between Merchant and a Customer.

m.  **Telephone Recording.** Merchant authorizes Elavon to monitor and record telephone conversations at any time without further notice to the parties to such conversations. The decision to record any conversation shall be solely in Elavon's discretion.

n.  **Information Sharing.** Merchant understands and agrees that Elavon may disclose any information gathered by Elavon to (i) Elavon's "affiliates" (i.e., companies related to Elavon by common control or ownership) that offer financial products or services, including those identified in the Agreement and to Elavon's administrative or service units that perform such functions; (ii) to non-affiliated companies to assist Elavon in providing the products and services Merchant has requested; (iii) to credit rating agencies; and (iv) as required by the Payment Network Regulations or the Laws (e.g., for tax reporting purposes or in response to a subpoena).

o.  **Communication with Merchant.** Merchant agrees that Elavon and Member may provide Merchant with information about their services including, without limitation, information about new products and/or services by telephone, electronic mail, and/or facsimile.

p.  **Amendments.** Member and Elavon may propose amendments or additions to the Agreement. Member or Elavon will inform Merchant of a proposed change in a periodic statement or other notice. Merchant will be deemed to have agreed to the change if Merchant continues to present Transactions to Member and Elavon after thirty (30) days following the issuance of the notice. Notwithstanding any limitations set forth in the previous sentence, changes to fees authorized by the Agreement will be effective upon notice to Merchant, unless a later effective date is provided. Further, Elavon is entitled to pass through to Merchant any fee increases imposed upon Elavon by Visa, MasterCard, Discover Network, any other Payment Network, and any other third party including telecommunications vendors.

q.  **Severability and Waiver.** If any provision of the Agreement is found to be invalid, illegal or otherwise unenforceable by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions of the Agreement shall not in any way be affected or impaired thereby if the essential terms and conditions of the Agreement for each party remain valid, legal and enforceable. Neither the failure, the delay by Elavon or Member to exercise,



nor the partial exercise of any right under the Agreement will operate as a waiver or estoppel of such right, nor shall such amend the Agreement. All waivers requested by Merchant must be signed by Elavon.

r.   **Independent Contractors.** Elavon, Member, and Merchant will be deemed independent contractors and no one will be considered an agent, joint venturer, or partner of the other, unless and to the extent otherwise specifically provided herein. The Agreement has been entered into solely for the benefit of the parties hereto and is not intended to create an interest in any third party.

s.   **Survival.** All of Merchant's obligations to Elavon and Member shall survive termination of the Agreement, including, without limitation, Sections (A)(4)(a)-(d), (A)(5)(a)-(d), (A)(6)(a)-(d), (A)(7)(a)-(c), (A)(8)(a)-(d), (A)(9)(g), (A)(13), (A)(14), (A)(15), (A)(17)(a)-(d), (A)(18)(b), (A)(18)(g), and (A)(18)(k) of the TOS.

t.   **Counterparts; Facsimile Signatures; Delivery.** The Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same agreement. Delivery of the various documents and instruments comprising the Agreement may be accomplished by a facsimile transmission, and such a signed facsimile or copy shall constitute a signed original.

u.   **Force Majeure.** None of the parties hereto shall be considered in default in performance of its obligations to the extent such performance is delayed by force majeure affecting the party's ability to so perform. Force majeure shall include, but not be limited to, hostilities, restraint of rulers or peoples, revolution, civil commotion or riots, strike, lockout, epidemic, accident, fire, flood, earthquake, windstorm, explosion, lack of or failure of telecommunication facilities, regulation or ordinance, demand or requirement of any government or governmental agency, or any court, tribunal or arbitrator(s), having or claiming to have jurisdiction over the subject matter of the Agreement or over the parties hereto, or any act of God or any act of government or any cause whether of the same or different nature existing now or in the future which is beyond the reasonable control of the parties hereto.

v.   **Expenses.** Except as otherwise specifically provided in the Agreement, each party shall pay its own costs and expenses in connection with the Agreement and the transactions contemplated hereby, including all attorneys' fees, accounting fees and other expenses.

w.   **No Third Party Beneficiaries.** No provisions of the Agreement shall be construed to confer any rights or benefits on any Person not a party to the Agreement or a permitted assignee or successor of a party to the Agreement, unless such rights or benefits are expressly extended to third parties.

19.   **PROVISIONS APPLICABLE TO MERCHANT'S ACCEPTANCE OF TRANSACTIONS IN CANADA**

a.   **Pre-Authorized Debits (PADs).** Merchant authorizes Member, Elavon, and their respective vendors and agents to initiate debit and credit entries to the DDA, the Reserve Account, or any other account maintained by Merchant at any institution that is a member of the CPA, all in accordance with the Agreement. Merchant agrees that any withdrawal by Member, Elavon and their respective vendors and agents in accordance with the Agreement are PADs for business purposes, as defined under Rule H1 of the CPA. **Merchant hereby waives the right to receive advance notice from Member, Elavon and their respective vendors and agents of any and all such debits.** This authorization will remain in effect after termination of the Agreement and until all of Merchant's obligations to Elavon and Member have been paid in full. If Merchant changes the DDA, this PAD authorization will apply to the new account and Merchant shall provide Elavon and Member in writing such information regarding the new DDA as they deem necessary. It may take Elavon up to ten (10) business days after Elavon's receipt of a written notice from Merchant to reflect in its system any change to Merchant's DDA. If Merchant



changes the DDA, Merchant agrees that it is responsible for all costs incurred by Member and/or Elavon in connection with Merchant's decision to change the DDA. Merchant may revoke the PAD authorization upon thirty (30) days' prior written notice to Elavon, but any such revocation shall constitute a material breach of the Agreement. Merchant may obtain a sample cancellation form, as well as further information on Merchant's right to cancel a PAD authorization by contacting Merchant's financial institution or by visiting www.cdnpay.ca. Merchant has certain recourse rights if any debit does not comply with the Agreement. For example, Merchant has the right to receive reimbursement for any debit that is not authorized or is not consistent with this PAD Agreement. To obtain more information on Merchant's recourse rights, Merchant may contact its financial institution or visit www.cdnpay.ca.

b. **Amendments.** This Section applies to Merchants in Canada in lieu of Section (A)(18)(p) above. Member and Elavon may propose amendments or additions to the Agreement. Member or Elavon will inform Merchant of a proposed change in a periodic statement or other notice. Merchant will be deemed to have agreed to the change if Merchant continues to present Transactions to Member and Elavon after thirty (30) days following the issuance of the notice. Notwithstanding the previous sentence, changes to fees authorized by the Agreement will be effective upon notice to Merchant, unless a later effective date is provided; provided, that, with respect to Credit Card and Debit Card Transactions, changes to fees or the introduction of new fees authorized by the Agreement will be effective upon ninety (90) days notice to Merchant, unless a later effective date is provided. Further, Elavon is entitled to pass through to Merchant any fee increases imposed upon Elavon by Visa, MasterCard, Discover Network, any other Payment Network, and any other third party including telecommunications vendors; provided, that, with respect to Credit Card and Debit Card Transactions, any such fee increases will be effective upon ninety (90) days notice to Merchant.

c. **Termination.** In addition to Merchant's other termination rights in the Agreement, the Agreement may be terminated by Merchant without penalty in the event that Elavon or Member notifies Merchant of a fee increase or the introduction of a new fee; provided that Merchants may not terminate the Agreement in connection with new fees or fee increases made in accordance with pre-determined fee schedules. Merchant must notify Elavon and Member of its intent to terminate the Agreement within ninety (90) days of receiving notice of the new fee or fee increases from Elavon or Member.

d. **Personal Guaranty.** As a primary inducement to Elavon and Member to enter into the Agreement and in consideration of the services and accommodations of any kind given or continued at any time and from time to time by Elavon or Member to or for the benefit of Merchant, the designated Guarantor(s), jointly and severally, and in Quebec solidarily, unconditionally and irrevocably, guarantee the continuing full and faithful payment and performance by Merchant of all duties, debts, liabilities and obligations of Merchant to Elavon or Member, whether present or future, direct or indirect, absolute or contingent, matured or not, at any time owing or remaining unpaid by Merchant to Elavon or Member in any currency, and wherever incurred, and all interest, fees, commissions and legal and other costs, charges and expenses owing or remaining unpaid by Merchant to Elavon or Member in any currency pursuant to the Agreement, as the same may be amended by either of them from time to time, with or without notice (collectively, the "Obligations"). The Guarantor(s) also unconditionally agrees that, if Merchant does not unconditionally and irrevocably pay any Obligations when due and those Obligations are not recoverable from the Guarantor(s) for any reason under the guarantee set forth above, the Guarantor(s) shall indemnify Elavon and Member immediately on demand against any cost, loss, damage, expense or liability suffered by Elavon or Member as a result of Merchant's failure to do so. The liability of the Guarantor(s) hereunder is unlimited. No act or thing, except the indefeasible and full payment and discharge in cash of all of the Obligations, which but for this provision could act as a release or impairment of the liability of the Guarantor(s), shall in any way release, impair, or affect the liability of the Guarantor(s). The Guarantor(s) waives any and all defenses of Merchant pertaining to the Obligations, any evidence thereof, and any security therefore, except the defense of discharge of the Obligations



by full and indefeasible payment in cash. Guarantor's(s') liability to pay or perform the Obligations shall arise immediately after demand has been made in writing on Guarantor(s). Guarantor(s) understands further that Elavon and/or Member may proceed directly against Guarantor(s) without first exhausting their respective remedies against Merchant or any other person or entity responsible therefore or any security held by Elavon, Member, or Merchant. The Guarantor(s) waives: (i) notice of acceptance of this Personal Guarantee and of the creation and existence of the Obligations; (ii) presentment, demand for payment, notice of dishonor, notice of non-payment, and protest of any instrument evidencing the Obligations; (iii) all other demands and notices to the Guarantor(s) or any other person and all other actions to establish the liability of the Guarantor(s); (iv) without limiting in any way any other waivers of defenses set out herein, any and all defenses available at equity or common law to the fullest extent permitted under applicable law; and (v) **the right to trial by jury in action in connection with this Personal Guarantee.** Guarantor(s) agrees that this is a continuing guarantee and that Guarantor's(s') liability under this Personal Guarantee will not be discharged, affected or released by: (a) any variation, renewal, extension or replacement of the Agreement, other agreements or any security (including any other guarantees) held by Elavon or Member; (b) any extension of time or other indulgence given to Merchant or others under the Agreement or any security; (c) any delay or refusal by Elavon to require or enforce payment of the Obligations or any security; (d) the taking, non-perfecting, or giving up of any security or by any dealings with Merchant or others respecting the Obligations, the Agreement or any security;  (e) the death or legal incapacity of the Guarantor(s) or the dissolution, amalgamation, other fundamental change, death or legal incapacity, as the case may be, of Merchant; or (f) any event which results in Merchant not being under a legal obligation to make any payment or perform any obligation under the Agreement. Guarantor(s) renounces the benefit of discussion and division. This Personal Guarantee will bind all heirs, administrators, estate trustees, representatives, permitted successors, and assigns of Guarantor(s), and may be enforced by or for the benefit of any successors in interest to Elavon or Member. Guarantor(s) understands that the inducement to Elavon and Member to enter into the Agreement and give or continue services and accommodations of any kind to or for the benefit of Merchant, is consideration for the Personal Guarantee and that each Personal Guarantee remains in full force and effect even if the Guarantor(s) receives no additional benefit from the Personal Guarantee. **Guarantor hereby authorizes any credit reporting agency or bureau to furnish Elavon and Member upon request with a credit bureau report that relates to the Guarantor.** To the extent that any limitation period applies to any claim for payment of obligations or remedy for enforcement of obligations under this Personal Guarantee, each Guarantor agrees that: (a) any limitation period is expressly excluded and waived entirely if permitted by applicable law; (b) if a complete exclusion and waiver of any limitation period is not permitted by applicable law, any limitation period is extended to the maximum length permitted by applicable law; (c) any limitation period applying to this Personal Guarantee expressed to be payable on demand shall not begin before an express demand for payment of the relevant obligations is made in writing by Elavon or Member to the Guarantor; (d) any applicable limitation period shall begin afresh upon any payment or other acknowledgment by the Guarantor of its obligations; and (e) each of this Personal Guarantee and the Agreement is a "business agreement" as defined in the *Limitations Act, 2002* (Ontario) if that Act applies to it. This Personal Guarantee has been negotiated by the Guarantor or reviewed by the Guarantor with the benefit of independent legal counsel and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the construction or interpretation of this Personal Guarantee.

e.   **Language.** The parties hereby acknowledge that they have required the Agreement and all related documents to be drawn up in the English language. Les parties reconnaissent avoir demandé que le présent contrat ainsi que tous les documents qui s'y rattachent soient rédigés en langue anglaise.

f.   **Equipment Leasing in Canada.** If Lessee has elected to lease any Leased Equipment from Lessor, the terms and conditions set forth in Sections (A)(19)(g) through (w) below apply in lieu of Section (A)(20) below.

---



g.   **Non-Cancellable Lease.** This lease cannot be cancelled by Lessee during the term hereof. Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the Leased Equipment on terms and conditions set forth herein. The parties agree that the lease of the Leased Equipment in the lease is, for all purposes, a financial lease under a financial lease agreement (as such terms are used in the Bank Act (Canada) and the regulations thereunder). Lessee acknowledges acceptance and receipt of the Leased Equipment and certify that the Leased Equipment shall be used for business purposes only. **Lessee hereby authorizes any credit reporting agency or bureau to furnish to Lessor upon Lessor's request a credit bureau report that relates to Lessee.**

h.   **No Warranties by Lessor.** Lessor has made and makes no representations or warranties of any kind or nature, directly or indirectly, expressed or implied, as to any matter whatsoever, including the suitability of the Leased Equipment, its durability, its condition, and/or its quality. Lessee leases the Leased Equipment "as-is." Lessor disclaims any warranty of merchantability or fitness for use or purpose whether arising by operation of law or otherwise. Lessor shall not be liable to Lessee or others for any loss, damage or expense of any kind or nature caused directly or indirectly by any Leased Equipment however arising, or the use or maintenance thereof or the failure of operation thereof, or the repairs, service or adjustment thereto. No representation or warranty as to the Leased Equipment or any other matter by the supplier of the Leased Equipment (the "Vendor"), the manufacturer or others shall be binding on Lessor nor shall the breach of such relieve Lessee of, or in any way affect, any of Lessee's obligations to Lessor herein. If the Leased Equipment is not satisfactory for any reason, Lessee shall make any claim on account thereof solely against the Vendor and/or manufacturer and Lessee shall nevertheless perform all of Lessee's obligations under the lease. Lessee will not assert any claim whatsoever against Lessor for any loss whatsoever including without limitation any loss of anticipatory profits or any other indirect, special, or consequential damages. Lessor makes no warranty as to the treatment of the lease for accounting or tax purposes. Neither Vendor nor any agent of Vendor is an agent of Lessor or is authorized to waive or alter any term or condition of the lease.

i.   **Ordering Leased Equipment; Lessor's Right to Terminate.** Lessee has selected the Leased Equipment and the Vendor and requested that Lessor purchase the Leased Equipment from the Vendor and arrange for delivery to Lessee at Lessee's expense. If within forty-five (45) days from the date Lessor orders the Leased Equipment, it has not been delivered, installed and accepted by Lessee in form satisfactory to Lessor, Lessor may on ten (10) days written notice to Lessee terminate the lease and Lessor's obligations to Lessee.

j.   **Term and Payments.** The sum of all periodic monthly installment payments indicated herein or on any application shall constitute the aggregate payments under the lease. The term of the lease shall commence as of the date that the lease is accepted by Lessor (the "Commencement Date"), and shall continue until all of Lessee's obligations under the lease have been fully performed. The installment payments shall be payable monthly in advance, the first payment being due on the Commencement Date, or such later date as Lessor designates in writing, and subsequent payments shall be due on the same day of each successive month thereafter until all of the balance of the payments and any additional payments or expenses payable by Lessee under the lease have been paid in full. All payments shall be made to Lessor by pre-authorized debit as contemplated herein or at the address set forth herein or such other address as Lessor may designate in writing. Lessee hereby authorizes Lessor and its agents to withdraw without advance notice to Lessee, which notice Lessee waives, any amounts, including without limitation any and all taxes now due or imposed, owed by Lessee in conjunction with the lease, by initiating periodic debit entries to the DDA all in accordance with and subject to the terms of Section (A)(19)(a) above. Upon a Default (as defined below), Lessee authorizes debit of the DDA for the full amount due under the lease. Lessee agrees that any withdrawals authorized above are pre-authorized debits for business purposes, as defined under Rule H1 of the CPA. Lessee represents, warrants and guarantees that all persons whose signatures are required to sign on the DDA have signed the lease and that the DDA is a business purpose account. By providing and delivering this authorization to Lessor, this constitutes delivery to the financial



TOS201311                                                    TERMS OF SERVICE

institution that maintains the DDA. A lease payment (whether paid by debit or other means) that is not honored by Lessee's financial institution for any reason will be subject to a returned item service fee in the amount of $20 payable by Lessee to Lessor, the amount of which may be debited from the DDA. Should it be necessary to switch to statement billing from pre-authorized debits, Lessor is authorized to add a $10.00 per month service charge to the monthly payment amount as reimbursement for the added service and processing expenses. Lessee's obligation to make all payments hereunder shall be absolute and unconditional and is not subject to any abatement, set-off, compensation, defense or counterclaim for any reason whatsoever. If a security deposit is required, the same shall be held by Lessor to secure the faithful performance of the lease and returned or applied in accordance with the terms of the lease. If Lessee fails to make any monthly payment or other amount required herein to be paid to Lessor within five (5) days of when due, Lessee agrees to pay Lessor, in addition to the required payment, a late fee of 15% of the amount past due (but at least $7.50) for each late payment. Each month the past due payment remains unpaid, an additional late fee will be assessed. Payments are applied to late fees and service charges first and then to payments in respect of lease obligations. These amounts shall be payable in addition to all amounts payable by Lessee to Lessor as a result of exercise of any of the remedies herein provided. If Lessee requests and Lessor provides any services not set out herein, Lessee agrees to pay additional applicable fees. In addition to the payment of monthly rent, Lessee agrees to pay Lessor an annual fee in an amount not to exceed $50.00 for the administration, billing, reconciliation, and tracking of payments due under the lease, which may generate a profit to Lessor.

k.   **Assignment.** (a) Lessor may assign or transfer the lease or Lessor's interest in the Leased Equipment without notice to or consent by Lessee. Any assignee of Lessor shall have all of the rights, but none of the obligations, of Lessor under the lease and Lessee agrees that it will not assert against any assignee of Lessor any defense, counterclaim, set-off or compensation that Lessee may have against Lessor, (b) Lessee shall not assign all or any part of Lessee's rights or obligations under the lease or enter into any sublease of all or any part of the Leased Equipment without Lessor's prior written consent, (c) Lessee shall not create, incur, assume or suffer to exist any security interest, mortgage, lien, pledge, hypothec or other right, encumbrance or attachment of any kind whatsoever upon, affecting or with respect to the Leased Equipment or the lease or any of Lessor's interests thereunder.

l.   **Title; Quiet Enjoyment.** Lessor shall at all times retain title to the Leased Equipment. Lessor may at Lessee's expense, cause the lease or any document, statement or other instrument in respect to the lease showing Lessor's interest in the Leased Equipment, including without limitation Personal Property Security Act or Civil Code of Québec financing statements, to be filed, registered or recorded and/or refiled, reregistered and rerecorded. Lessee waives the right, where permitted by law, to receive a copy of any financing statement, financing change statement or verification statement. Lessee agrees to execute and deliver any document, statement or instrument requested by Lessor for such purpose, and agrees to reimburse Lessor for any expense arising therefrom. Lessee shall at Lessee's expense protect and defend Lessor's title against all persons claiming against or through Lessee, at all times keep the Leased Equipment free from legal process or encumbrance whatsoever, and shall give Lessor immediate notice thereof and shall indemnify Lessor from any loss caused thereby. Lessee agrees to procure for and deliver to Lessor, such estoppel certificates, landlord's or mortgagees' waiver or other similar documents as Lessor may request. Provided Lessee is not in default hereunder, Lessee may quietly use and enjoy the Leased Equipment subject to the terms hereof.

m.   **Care, Use and Location.** Lessee shall maintain the Leased Equipment in good operating condition, repair and appearance, and protect the same from deterioration other than normal wear and tear; shall use the Leased Equipment in the regular course of Lessee's business, within its normal operating capacity, without abuse, and shall comply with all laws, ordinances, regulations, requirements and rules with respect to the use, maintenance and operation of the Leased Equipment; shall use the Leased Equipment solely for business purposes; shall not make any modification, alteration or addition to the Leased Equipment without Lessor's prior written consent; shall not affix the Leased Equipment to real or immovable property as to change its



nature to a fixture; shall keep the Leased Equipment at the location(s) to which Lessor has agreed, and shall not move the Leased Equipment from such location(s) without Lessor's prior written consent. Under no circumstances does Lessor have any responsibility to install, promote, service, clean, maintain or repair the Leased Equipment, all of which is Lessee's responsibility.

n.   **Net Lease; Taxes.** Lessee intends the monthly payments hereunder to be net to Lessor, and Lessee agrees to pay all provincial, territorial and federal sales, goods and services, harmonized, use, excise, stamp, documentary and ad valorem taxes, license and registration fees, assessments, fines, penalties and similar charges imposed on the lease, possession or use of the Leased Equipment during the term of the lease; Lessee shall pay all taxes (except Lessor's net capital and income taxes) imposed on Lessor or Lessee with respect to the payments hereunder or the lease of the Leased Equipment; and, shall reimburse Lessor upon demand for any taxes paid by or advanced by Lessor. Lessor is entitled to the tax benefits available to an owner of the Leased Equipment, including without limitation, the right to claim tax depreciation, capital cost allowance or other deductions in respect of the capital cost thereof, investment tax credits and deductions for interest incurred by Lessor to finance the purchase of the Leased Equipment, and Lessee shall not take any tax filing position inconsistent with the foregoing.

o.   **Indemnity.** Lessee agrees to indemnify and save Lessor, Lessor's agents, servants, successors and assigns harmless from any and all liability, damage or loss, including without limitation reasonable legal fees, arising out of the ownership, selection, possession, leasing, operation, control, use, condition (including but not limited to latent and other defects, whether or not discoverable by Lessee), maintenance, delivery and return of the Leased Equipment. The indemnities and obligations herein provided shall continue in full force and effect notwithstanding the termination of the lease.

p.   **Insurance.** Lessee shall keep the Leased Equipment insured against all risks of loss or damage from any cause whatsoever for not less than the full replacement value thereof. The amount of such insurance shall be sufficient so that neither Lessor nor Lessee will be considered a co-insurer. Lessee shall carry public liability insurance, both personal injury and equipment damage, covering the Leased Equipment. All such insurance shall be in form and with insurers satisfactory to Lessor, and shall name Lessor and any assignee as first loss payee as its interest may appear with respect to equipment damage coverage and as additional insured with respect to public liability coverage. Lessee shall pay the premiums for such insurance and upon request deliver to Lessor satisfactory evidence of insurance coverage required hereunder. The proceeds of such insurance payable, as a result of loss or damage to any item of Leased Equipment, shall be applied to satisfy Lessee's obligation as set forth in Section (A)(19)(q) below. Lessee hereby irrevocably appoints Lessor as Lessee's attorney-in-fact, to make a claim for, receive payment of and execute and endorse all documents, cheques or drafts, received in payment for loss or damage under any such insurance policy. This appointment is coupled with an interest and is irrevocable.

q.   **Loss or Destruction of Leased Equipment.** Lessee shall notify Lessor immediately and shall bear the entire risk and be responsible for loss, theft, damage or destruction of the Leased Equipment from any cause whatsoever after taking possession of the Leased Equipment. In such event, Lessee shall at Lessee's expense (except to the extent of any proceeds of insurance provided by Lessee which shall have been received by Lessor as a result thereof), and at Lessor's option, shall either (a) repair such item, returning it to its previous condition, unless damaged beyond repair; or (b) pay Lessor all accrued and unpaid monthly payments and late charges payable hereunder, plus an amount (the "Loss Amount") equal to (i) the value of all monthly payments to become due during the remaining term of the lease, plus (ii) the amount of any purchase option or obligation with respect to the Leased Equipment or, if there is no such option or obligation, the fair market value of the Leased Equipment, as estimated by Lessor in Lessor's sole reasonable discretion; or (c) replace such item with a like item acceptable to Lessor, in good condition and of equivalent value, which shall be and become Lessor's property, shall be included within the term "Leased Equipment" as used herein and shall be leased from Lessor herewith for the balance of the full term of the lease.



r.   **Loss or Destruction Waiver.** Lessor may in Lessor's sole and absolute discretion waive Lessee's responsibility for loss or destruction of the Leased Equipment and for keeping the Leased Equipment fully insured during the lease term (a "Loss or Destruction Waiver"). Should Lessee fail to provide proof of insurance, Lessor may invoke the Loss or Destruction Waiver and charge a monthly fee at current rates in order that Lessor may fully insure the Leased Equipment. In the event of loss or destruction of the Leased Equipment, Lessor shall provide for its replacement with Leased Equipment of comparable value at that time, provided (i) Lessee took reasonable care in preventing the loss or destruction of the Leased Equipment and (ii) Lessee has paid in a timely manner the required monthly fee for the Loss or Destruction Waiver. Lessee shall cooperate with Lessor in making any claim with respect to the Leased Equipment.

s.   **Default.** If any one of the following events (each a "Default") shall occur, then to the extent permitted by applicable law, Lessor shall have the right to exercise any one or more remedies set forth herein: (i) Lessee fails to pay any payments hereunder, monthly or otherwise, when due; or (ii) Lessee fails to pay, when due, any indebtedness owed to Lessor or any of Lessor's affiliates arising independently of the lease, and such default shall continue for five (5) days; or (iii) Lessee fails to perform any of the terms, covenants, or conditions of the lease, other than as provided above, after ten (10) days written notice; or (iv) Lessee becomes insolvent or make an assignment for the benefit of creditors; or (v) a receiver, trustee or liquidator of Lessee or of all or a substantial part of Lessee's assets are appointed with or without Lessee's application or consent; or (vi) an application for a bankruptcy order is filed, or any other proceedings are commenced by or against Lessee, or Guarantor, under the Bankruptcy and Insolvency Act (Canada), or under any other bankruptcy, arrangement, dissolution, liquidation or insolvency law(s) providing for relief of debtors.

t.   **Remedies.** If a Default shall occur, Lessor may, at Lessor's option, at any time (i) declare immediately due and payable and recover from Lessee, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to all accrued and unpaid installment payments and late charges, taxes, and other fees, plus the Loss Amount; provided, however, that if a Default shall occur as described in any of Sections (A)(19)(s)(iv) through (vi) above, Lessor without any notice or action shall be deemed to have made such a declaration; (ii) automatically charge any or all of Lessee's credit cards or accounts, other lines-of-credit or the DDA or other bank accounts for all money amounts owed; (iii) to the extent permitted by applicable Law, without demand or legal process, enter into the premises where the Leased Equipment may be found and take possession of and remove the Leased Equipment, without liability for such retaking; (iv) hold, sell or otherwise dispose of any such Leased Equipment at a private or public sale; or (v) exercise any other remedies available under applicable Law. If Lessor takes possession of the Leased Equipment, Lessor shall give Lessee credit for any sums received by Lessor from the sale or rental of the Equipment after deduction of the expenses of sale or other disposition and Lessee shall remain liable to Lessor for any deficiency. Notwithstanding the foregoing, to the extent any software forming part of the Leased Equipment is nontransferable or its transfer restricted, Lessee agrees that Lessor and/or the licensor of such software shall have no duty to remarket such software or otherwise mitigate any damages relating to such software. Lessee shall also be liable for and shall pay to Lessor (i) all expenses incurred by Lessor in connection with the enforcement of any of Lessor's remedies including without limitation all collection expenses, that includes, but is not limited to, charges for collection letters and collection calls, charges of collection agencies, sheriffs, etc.; and all expenses of repossessing, storing, shipping, repairing and selling the Leased Equipment; and (ii) reasonable legal fees and court costs. Lessee and Lessor acknowledge the difficulty in establishing a value for the unexpired lease term and, owing to such difficulty, agree that the provisions of this paragraph represent an agreed measure of damages and are not to be deemed a forfeiture or penalty. All of Lessor's remedies hereunder are cumulative, are in addition to any other remedies provided for by law, and may, to the extent permitted by law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. No failure on Lessor's part to exercise and no delay in exercising any right to remedy shall operate as a waiver thereof

or modify the terms of the lease.

u. **END OF LEASE TERM. (I) UPON EXPIRATION OF THE LEASE TERM, LESSEE SHALL HAVE THE OPTION TO PURCHASE THE LEASED EQUIPMENT FOR AN AMOUNT EQUAL TO 10% OF THE AGGREGATE LEASE PAYMENTS ON 12 MONTH, 24 MONTH, 36 MONTH, 48 MONTH OR 60 MONTH LEASES. WRITTEN NOTICE OF THE EXERCISE OF THIS OPTION MUST BE SENT TO LESSOR AT LEAST THIRTY (30) DAYS PRIOR TO EXPIRATION OF THE LEASE TERM; (II) IF LESSEE DOES NOT ELECT TO PURCHASE THE LEASED EQUIPMENT, THEN UPON EXPIRATION OR EARLIER TERMINATION OF THE LEASE, LESSEE SHALL RETURN THE LEASED EQUIPMENT TO LESSOR IN GOOD OPERATING CONDITION AND REPAIR, SHIPPED BY PREPAID AND INSURED FREIGHT TO A LOCATION DESIGNATED BY LESSOR. IF THE LEASED EQUIPMENT IS RETURNED DAMAGED, INCOMPLETE OR SHOWS SIGNS OF EXCESSIVE WEAR, LESSEE AGREES TO PAY THE REPLACEMENT COST AND/OR THE REPAIR, REFURBISHING AND CLEANING COST IN AN AMOUNT DESIGNATED BY LESSOR WHICH IS PAYABLE WITHIN TEN (10) DAYS OF LESSOR'S DEMAND; (III) IF LESSEE DOES NOT ELECT TO PURCHASE OR RETURN THE LEASED EQUIPMENT AS PROVIDED IN (I) OR (II) ABOVE, THE LEASED EQUIPMENT SHALL CONTINUE TO BE HELD AND LEASED HEREUNDER AND THE LEASE SHALL BE EXTENDED INDEFINITELY AS TO TERM AT THE THEN CURRENT MONTHLY PAYMENT UNTIL LESSOR HAS RECEIVED PAYMENT AT LEAST EQUAL TO LESSOR'S FULL INVESTMENT IN THE LEASED EQUIPMENT, AS CALCULATED BY LESSOR, FOLLOWING WHICH, AND UPON NOTICE FROM LESSOR TO LESSEE, LESSEE SHALL BE DEEMED TO HAVE PURCHASED THE LEASED EQUIPMENT FROM LESSOR ON AN "AS IS, WHERE IS" BASIS, SUBJECT TO THE RIGHT OF EITHER LESSEE OR LESSOR TO TERMINATE THE LEASE UPON THIRTY (30) DAYS WRITTEN NOTICE, WHEREUPON LESSEE SHALL DELIVER THE LEASED EQUIPMENT TO LESSOR AS SET FORTH IN THIS PARAGRAPH; AND (IV) PROVIDED LESSEE HAS FULFILLED ALL OF LESSEE'S OBLIGATIONS HEREUNDER, LESSEE'S SECURITY DEPOSIT, IF ANY, (1) SHALL BE REFUNDED AT THE EXPIRATION OF THE LEASE WITHOUT INTEREST OR (2) AT LESSEE'S DIRECTION, SUCH SECURITY DEPOSIT MAY BE APPLIED TO THE PURCHASE OF THE LEASED EQUIPMENT BY LESSEE.**

v. **Privacy.** Each of Lessee and Guarantor consents and agrees that Lessor may (i) collect and use any personal information provided by Lessee or Guarantor or obtained under any provision of the lease for the purpose of furthering the objects of the lease and to respond to any further application for services by Lessee; (ii) **use such information to conduct credit checks from time to time with credit bureaus**; (iii) disclose such information and any information regarding late payments, missed payments or Defaults hereunder to Lessor's affiliates and third party service providers, payment networks, credit bureaus or agencies, financial institutions and similar parties for the purposes stated herein; (iv) use such information to investigate potentially fraudulent or questionable activities regarding the Leased Equipment or services for which the Leased Equipment is used; (v) use or disclose such information in the course of any actual or potential sale, reorganization, amalgamation or other change to Lessor's business or assignment under Section (A)(19)(k) above; (vi) collect, use and disclose such information when required or permitted by applicable law, regulation or legal process; and (vii) retain all such information for such periods of time as required by Lessor to perform Lessor's obligations and exercise Lessor's rights under the lease.

w. **Miscellaneous.** Lessee shall inform Lessor of any change in Lessee's name, address, billing address, telephone numbers, location of the Leased Equipment, or the DDA. If Lessee fails to comply with any provision of the lease, Lessor shall have the right, but not be obligated, to effect such compliance on Lessee's behalf upon ten (10) days prior written notice to Lessee. In such event, all monies expended by Lessor and all Lessor's expenses in effecting such compliance, shall be deemed to be additional obligations hereunder, and shall be paid by Lessee

Elavon

at the time of the next monthly payment hereunder. All notices under the lease shall be sufficient if given personally or mailed postage prepaid to the party intended at the respective address set forth herein, or at such other address as said party may provide in writing from time to time. The lease inures to the benefit of and is binding upon the personal representatives, successors, heirs and assigns of the parties hereto. Time is of the essence of the lease. Lessee and Lessor intend the lease to be a valid and subsisting legal instrument, and agree that no provision of the lease that may be deemed unenforceable in any jurisdiction shall in any way invalidate any other provision or provisions of the lease in that jurisdiction, all of which shall remain in full force and effect. References to any legislation, statutory instrument, regulation, rule or a section thereof, unless otherwise specified, is a reference to the legislation, statutory instrument, regulation, rule or section as amended, restated or re-enacted from time to time. The lease and the personal guarantee set forth herein shall be binding on Lessee and Guarantor when accepted in writing by Lessor and shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable in such Province, except in the event that the Leased Equipment is situated in the Province of Québec, in which case the lease shall be governed by the laws of the Province of Québec and the federal laws of Canada applicable in such Province. The limitation period in the lease is extended to the greater of six years or any longer period permitted by applicable law. For greater certainty, each of the parties hereto acknowledges that the lease is a "business agreement" as defined under Section 22 of the Limitations Act, 2002 (Ontario).

 x. **Security Agreement.** The following sentence is hereby added to the end of Section (A)(6)(a)(i): "The hypothec created pursuant to this Section (A)(6)(a)(i) is granted for the sum of $1,000,000 with interest at the rate of twenty-five percent (25.0%) per annum."

## 20. EQUIPMENT LEASING

If Merchant has elected to lease any Leased Equipment from Lessor, the following terms and conditions apply:

 a. **Non-Cancellable Lease. THE LEASE CANNOT BE CANCELLED BY LESSEE DURING THE TERM.** Lessor, its successors and assigns, does hereby lease to Lessee and Lessee hereby rents from Lessor the Leased Equipment, on terms and conditions set forth in this Section.

 b. **No Warranties by Lessor.** Lessee represents that Lessee has selected the Leased Equipment leased hereunder and Lessee acknowledges Lessor has made no representations or warranties of any kind or nature, directly or indirectly, expressed or implied, as to any matter whatsoever, including the suitability of the Leased Equipment, its durability, its condition, and/or its quality. Lessee leases the Leased Equipment "as-is." Lessor also disclaims any warranty of merchantability or fitness for use or purpose whether arising by operation of law or otherwise. Lessor and Lessor's assignee shall not be liable to Lessee or others for any loss, damage or expense of any kind or nature caused directly or indirectly by any Leased Equipment however arising, or the use or maintenance thereof or the failure of operation thereof, or the repairs, service or adjustment thereto. No representation or warranty as to the Leased Equipment or any other matter by the Leased Equipment supplier ("Vendor") named in the Merchant Application, or elsewhere in the Agreement, or others shall be binding on the Lessor nor shall the breach of such relieve Lessee of, or in any way affect, any of Lessee's obligations to Lessor herein.

If the Leased Equipment is not satisfactory for any reason, Lessee shall make any claim on account thereof solely against the Vendor and Lessee shall nevertheless pay Lessor all rent payable under the lease. Lessor agrees to assign to Lessee, solely for the purpose of making and prosecuting any such claim, any rights it may have against the Vendor for breach of warranty or representation respecting the Leased Equipment.



Regardless of cause, Lessee will not assert any claim whatsoever against Lessor for loss of anticipatory profits or any other indirect, special, or consequential damages. Lessor makes no warranty as to the treatment of the lease for accounting or tax purposes. NOTWITHSTAND-ING ANY FEES WHICH MAY BE PAID BY LESSOR TO VENDOR OR ANY AGENT OF VENDOR, LESSEE UNDERSTANDS AND AGREES THAT NEITHER VENDOR NOR ANY AGENT OF VENDOR IS AN AGENT OF LESSOR OR IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THE LEASE.

c.   **Authorization for Automatic Withdrawal of Monthly Payments.** Lessee hereby authorizes Lessor, or its designee, successor or assign to withdraw any amounts, including any and all taxes now due or imposed, owed by Lessee in connection with the Leased Equipment, by initiating debit entries to the DDA indicated on the Merchant Application or the Agreement, or such other DDA as the Lessee may from time to time use. In the event of default of Lessee's obligations hereunder, Lessee authorizes the debit of its DDA for the full amount due under the lease. Lessee agrees to contest transactions that might be invalid within ninety (90) days of the transaction date, or the transaction will be deemed valid. A rental payment (whether paid by debit or other means) that is not honored by Lessee's financial institution for any reason will be subject to a returned item service fee imposed by Lessor, the amount of which may be debited from Lessee's DDA. Should it be necessary to switch to statement billing, Lessor is authorized to add a $10.00 per month service charge to Lessee's monthly payment amount as reimbursement for the added service and processing expenses. In the event that Lessor withdraws funds erroneously from Lessee's DDA, Lessee authorizes Lessor to credit Lessee's DDA for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor and Lessee's financial institution have received written notice from Lessee of its termination in such time and in such manner as to afford Lessor and Lessee's financial institution a reasonable opportunity to act. **LESSEE REPRESENTS AND WARRANTS THAT ITS DDA HAS BEEN ESTABLISHED AS A BUSINESS-PURPOSE CHECKING ACCOUNT.**

d.   **Finance Lease.** Lessor and Lessee agree that the lease is a "Finance Lease" as defined by Section 11-2A-103(g) of the GA UCC. Lessee acknowledges either (i) that Lessee has reviewed and approved any written "Supply Contract" as defined by GA UCC Section 11-2A-103(y) covering the Leased Equipment purchased from the "Supplier" as defined by GA UCC Section 11-2A-103(x) thereof for lease to Lessee or (ii) that Lessor has informed or advised Lessee, in writing, either previously or by the lease of the following: (1) the identity of the Supplier; (2) that the Lessee may have rights under the Supply Contract; and (3) that the Lessee may contact the Supplier for a description of any such rights Lessee may have under the Supply Contract.

e.   **Ordering Equipment; Lessor's Right to Terminate.** Lessee requests Lessor to purchase the Leased Equipment from Vendor and arrange for delivery to Lessee at Lessee's expense. If within forty-five (45) days from the date Lessor orders the Leased Equipment, the same has not been delivered, installed and accepted by Lessee in form satisfactory to Lessor, Lessor may on ten (10) days written notice to Lessee terminate the lease and its obligations to Lessee.

f.   **Term and Rent.** The sum of all periodic installments of rent indicated in the Merchant Application or the Agreement shall constitute the aggregate rent reserved under the lease. The lease term shall commence as of the date that the lease is accepted by Lessor, (the "Commencement Date"), and shall continue until the obligations of the Lessee under the lease shall have been fully performed. The installments of rent shall be payable monthly in advance as stated above or on a schedule, the first such payment being due on the Commencement Date, or such later date as Lessor designates in writing, and subsequent payments shall be due on the same day of each successive month thereafter until the balance of the rent and any additional rent or expenses chargeable to Lessee under the lease shall have been paid in full. All payments of rent shall be made to Lessor at the address set forth in the Merchant Application or the Agreement or such other address as Lessor may designate in writing. Lessee's obligation to pay such rentals shall be absolute and unconditional and is not subject to any abatement, set-off,



defense of counterclaim for any reason whatsoever. Lessee hereby authorizes Lessor to insert into the lease the serial numbers and other identification data of the Leased Equipment when determined by Lessor and dates or other omitted factual matters and to correct any typographical or spelling errors. If a security deposit is indicated in the Merchant Application, or in any additional application and setup forms, the same shall be held by Lessor to secure the faithful performance of the terms of the lease and returned or applied in accordance with Section (A)(20)(q)(iv) below. In addition to the payment of monthly rent, Lessee agrees to pay Lessor an annual fee in an amount not to exceed $50.00 for the administration, billing, reconciliation, and tracking of payments due under the lease, which may generate a profit to Lessor.

g. **Assignment. (i) LESSOR MAY ASSIGN OR TRANSFER THE LEASE OR LESSOR'S INTEREST IN THE LEASED EQUIPMENT WITHOUT NOTICE TO LESSEE.** Any assignee of Lessor shall have all of the rights, but none of the obligations, of Lessor under the lease and Lessee agrees that it will not assert against any assignee of Lessor any defense, counterclaim or offset that Lessee may have against Lessor. Lessee acknowledges that any assignment or transfer by Lessor shall not materially change Lessee's duties or obligations under the lease nor materially increase the burdens or risks imposed on Lessee. Lessee agrees that Lessor may assign or transfer the lease or Lessor's interest in the Leased Equipment even if said assignment or transfer could be deemed to materially affect the interest of Lessee. **(ii) LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THE LEASE OR ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE LEASED EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.** (iii) Lessee shall not create, incur, assume or suffer to exist any mortgage, lien, pledge or other encumbrance or attachment of any kind whatsoever upon, affecting or with respect to the Leased Equipment or the lease or any of Lessor's interests thereunder.

h. **Title; Quiet Enjoyment.** Lessor shall at all times retain title to the Leased Equipment. All documents of title and evidence of delivery shall be delivered to Lessor. Lessee hereby authorizes Lessor, at Lessee's expense, to cause the lease or any statement or other instrument in respect to the lease showing the interest of Lessor in the Leased Equipment including Uniform Commercial Code Financing Statements, to be filed or recorded and/or refiled and rerecorded, and grants Lessor the right to execute Lessee's name thereto. Lessee agrees to execute and deliver any statement or instrument requested by Lessor for such purpose, and agrees to pay or reimburse Lessor for any filing, recording or stamp fees or taxes arising from the filing or recording of any such instrument or statement. Lessee shall at its expense, protect and defend Lessor's title against all persons claiming against or through Lessee, at all times keep the Leased Equipment free from legal process or encumbrance whatsoever and, shall give Lessor immediate notice thereof and shall indemnify Lessor from any loss caused thereby. Lessee agrees to procure for Lessor, such estoppel certificates, landlord's or mortgagees' waiver or other similar documents as Lessor may reasonably request. Provided Lessee is not in default hereunder, Lessee shall quietly use and enjoy the Leased Equipment subject to the terms hereof.

i. **Care, Use and Location.** Lessee shall maintain the Leased Equipment in good operating condition, repair and appearance, and protect the same from deterioration other than normal wear and tear; shall use the Leased Equipment in the regular course of its business, within its normal operating capacity, without abuse, and shall comply with all Laws with respect to the use, maintenance and operation of the Leased Equipment; shall use the Leased Equipment solely for business purposes; shall not make any modification, alteration or addition to the Leased Equipment, without the written consent of Lessor, which shall not be unreasonably withheld; shall not at any time so affix the Leased Equipment to realty as to change its nature to real equipment or to a fixture regardless of how attached or installed; shall keep the Leased Equipment at the location shown in the Merchant Application or the Agreement, and shall not remove the Leased Equipment without written consent of Lessor, which shall not be unreasonably withheld.



TOS201311                                                        TERMS OF SERVICE

j.  **Net Lease; Taxes.** Lessee intends the rental payments hereunder to be net to Lessor, and Lessee agrees to pay all sales, use, excise, personal equipment, stamp, documentary and ad valorem taxes, license and registration fees, assessment, fines, penalties and similar charges imposed on the ownership, possession or use of the Leased Equipment during the term of the lease; shall pay all taxes (except Lessor's federal or state net income taxes) imposed on Lessor or Lessee with respect to the rental payments hereunder or the ownership of the Leased Equipment; and, shall reimburse Lessor upon demand for any taxes paid by or advanced by Lessor. Lessee agrees that the reimbursement of equipment tax calculation is based on an average tax rate. Unless otherwise agreed to in writing, Lessee shall file personal equipment tax returns with respect to the Leased Equipment.

k.  **Indemnity.** Lessee shall and does hereby agree to indemnify and save Lessor, its agents, servants, successors, and assigns harmless from any and all liability, damage or loss, including reasonable attorney's fees, arising out of the ownership, selection, possession, leasing, operation, control, use, condition (including but not limited to latent and other defects, whether or not discoverable by Lessee), maintenance, delivery and return of the Leased Equipment. The indemnities and obligations herein provided shall continue in full force and effect notwithstanding the termination of the lease.

l.  **Insurance.** During the term of the lease, Lessee agrees to maintain, at Lessee's expense, (i) "Special Form" property insurance protecting the Leased Equipment for its replacement value, naming Lessor as a loss payee on a "Lender's Loss Payable" endorsement; and (ii) public liability insurance, in amounts acceptable to Lessor, naming Lessor as an additional insured (together, "Required Insurance"). Lessee must provide Lessor satisfactory written evidence of Required Insurance within thirty (30) days of the Commencement Date or any subsequent written request. If Lessee does not do so, Lessor may obtain insurance from an insurer of Lessor's choosing in such forms and amounts as Lessor deems reasonable to protect Lessor's interests ("Lease Insurance"). Lease Insurance covers the Leased Equipment and the Lessor; it does not name the Lessee as an insured and may not cover all of the Lessee's interest in the Leased Equipment. Lessee agrees to pay Lessor periodic charges for Lease Insurance ("Insurance Charges") that include: a premium that may be higher than if the Lessee maintained the Required Insurance separately; a finance charge of up to 1.5% per month on any premium advances made by the Lessor or Lessor's agents; and billing and processing fees; each of which may generate a profit to Lessor and Lessor's agents. Unless Lessee provides satisfactory evidence of Required Insurance by the Insurance Charge due date, Lessor will pay such Insurance Charge by debiting Lessee's DDA under the withdrawal provision of the lease. Lessor shall discontinue billing Insurance Charges upon receipt of satisfactory evidence of Required Insurance. Lessee agrees to arbitrate any dispute with Lessor or Lessor's agents regarding Lease Insurance or Insurance Charges under the rules of the American Arbitration Association in Atlanta, Georgia; provided however, such agreement does not authorize class arbitration.

m.  **Loss or Destruction of Leased Equipment.** Lessee shall bear the entire risk and be responsible for loss, theft, damage or destruction of the Leased Equipment from any cause whatsoever after taking possession of the Leased Equipment. Lessee shall notify Lessor immediately if the Leased Equipment is lost, destroyed, stolen or taken by any other person. In the event of loss, damage or destruction of any item of Leased Equipment, Lessee at its expense (except to the extent of any proceeds of insurance provided by Lessee which shall have been received by Lessor as a result of such loss, damage or destruction), and at Lessor's option, shall either (i) repair such item, returning it to its previous condition, unless damaged beyond repair; (ii) pay Lessor all accrued and unpaid rental payments and late charges, plus an amount (the "Loss Amount") equal to (1) the value of all rental payments to become due during the remaining term of the lease, plus (2) the amount of any purchase option or obligation with respect to the Leased Equipment or, if there is no such option or obligation, the fair market value of the Leased Equipment, as estimated by Lessor in its sole reasonable discretion; or (iii) replace such item with a like item acceptable to Lessor, in good condition and of equivalent value, which shall become equipment of Lessor, included within the term "Leased Equipment"

30                          SECTION A – GENERAL PROVISIONS                    Elavon

as used herein, and leased from Lessor herewith for the balance of the full term of the lease.

n.  **Loss or Destruction Waiver.** Lessor may waive Lessee's responsibility for loss or destruction of the Leased Equipment and for keeping the Leased Equipment fully insured during the lease term (a "Loss or Destruction Waiver"). Should Lessee fail to provide proof of insurance, Lessor may invoke the Loss or Destruction Waiver and charge a monthly fee at current rates in order that Lessor may fully insure the Leased Equipment. In the event of loss or destruction of the Leased Equipment, Lessor shall provide for its replacement with Leased Equipment of comparable value at that time provided (i) Lessee took reasonable care in preventing the loss or destruction of the Leased Equipment and (ii) Lessee has paid in a timely manner the required monthly amount for the Loss or Destruction Waiver. Lessee shall cooperate with Lessor in making any claim with respect to the Leased Equipment.

o.  **Event of Default.** If any one of the following events (each an "Event of Default") shall occur, then to the extent permitted by applicable Law, Lessor shall have the right to exercise any one or more remedies set forth in Section (A)(20)(p) below: (i) Lessee fails to pay any rental or any other payment hereunder when due; (ii) Lessee fails to pay, when due, any indebtedness of Lessee to Lessor arising independently of the lease, and such default shall continue for five (5) days; (iii) Lessee fails to perform any of the terms, covenants, or conditions of the lease, other than as provided above, after ten (10) days written notice; (iv) Lessee becomes insolvent or makes an assignment for the benefit of creditors; (v) a receiver, trustee, conservator, or liquidator of Lessee, of all or a substantial part of its assets, is appointed with or without the application or consent of Lessee; or (vi) a petition is filed by or against Lessee under the Bankruptcy Code of 1978, as amended, or under any other insolvency law(s), providing for relief of debtors.

p.  **Remedies.** If an Event of Default shall occur, Lessor may, at its option, at any time (i) declare immediately due and payable and recover from Lessee, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to all accrued and unpaid rental payments and late charges, taxes, and other fees, plus the Loss Amount; provided, however, that if an Event of Default shall occur as described in Section (A)(20)(o)(iv) through (vi) above, Lessor without any notice or action shall be deemed to have made such a declaration; (ii) automatically charge any or all of Lessee's credit cards or accounts, other lines of credit or the DDA or other bank accounts for all money amounts owed; (iii) to the extent permitted by applicable Law, without demand or legal process, enter into the premises where the Leased Equipment may be found and take possession of and remove the Leased Equipment, without liability for such retaking; (iv) Lessor may hold, sell or otherwise dispose of any such Leased Equipment at a private or public sale; or (v) exercise any other remedies available under applicable Law. In the event Lessor takes possession of the Leased Equipment, Lessor shall give Lessee credit for any sums received by Lessor from the sale or rental of the Leased Equipment after deduction of the expenses of sale or rental and Lessee shall remain liable to Lessor for any deficiency. Notwithstanding the foregoing, to the extent any software included with the Leased Equipment is nontransferable or its transfer restricted, Lessee agrees that Lessor and/or the licensor of such software shall have no duty to remarket or otherwise mitigate any damages relating to such software.

Lessee shall also be liable for and shall pay to Lessor (i) all expenses incurred by Lessor in connection with the enforcement of any of Lessor's remedies including all collection expenses, that includes, but is not limited to, charges for collection letters and collection calls, charges of collection agencies, sheriffs, etc.; and all expenses of repossessing, storing, shipping, repairing and selling the Leased Equipment; and (ii) reasonable attorney's fees and court costs. Lessor and Lessee acknowledge the difficulty in establishing a value for the unexpired lease term and, owing to such difficulty, agree that the provisions of this Section represent an agreed measure of damages and are not to be deemed a forfeiture or penalty. All remedies of Lessor hereunder are cumulative, are in addition to any other remedies provided for by Law, and may, to the extent permitted by Law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other



remedy. No failure on the part of the Lessor to exercise and no delay in exercising any right to remedy shall operate as a waiver thereof or modify the terms of the lease.

q.  **END OF LEASE TERM.** (i) UPON EXPIRATION OF THE LEASE TERM, LESSEE SHALL HAVE THE OPTION TO PURCHASE LEASED EQUIPMENT FOR ITS FAIR MARKET VALUE, SAID VALUE TO BE NOT LESS THAN 20% OF THE AGGREGATE LEASE PAYMENTS ON 12 MONTH LEASES, 15% OF AGGREGATE LEASE PAYMENTS ON 24 MONTH LEASES, 12% OF THE AGGREGATE PAYMENTS ON 36 MONTH LEASES, OR 10% OF THE AGGREGATE LEASE PAYMENTS ON 48 MONTH OR 60 MONTH LEASES. THE EXERCISE OF THIS OPTION MUST BE COMMUNICATED TO LESSOR IN WRITING AT LEAST THIRTY (30) DAYS PRIOR TO THE EXPIRATION OF THE LEASE TERM. THE LEASED EQUIPMENT IS SOLD "AS IS" "WHERE IS" "WITH ALL FAULTS." EXCEPT AS PROVIDED IN THE LEASE, LESSOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE LEASED EQUIPMENT PURCHASED. (ii) IN THE EVENT LESSEE DOES NOT ELECT TO PURCHASE THE LEASED EQUIPMENT, THEN UPON EXPIRATION OR EARLIER TERMINATION OF THE LEASE, LESSEE SHALL RETURN THE LEASED EQUIPMENT TO LESSOR IN GOOD OPERATING CONDITION AND REPAIR, SHIPPED BY PREPAID AND INSURED FREIGHT TO A LOCATION DESIGNATED BY LESSOR. IF, IN THE JUDGMENT OF LESSOR, THE LEASED EQUIPMENT IS RETURNED DAMAGED, INCOMPLETE, OR SHOWS SIGNS OF EXCESSIVE WEAR, LESSEE AGREES TO PAY THE REPLACEMENT COST AND/OR THE REPAIR AND REFURBISHING COST (INCLUDING CLEANING), FOR AN AMOUNT DESIGNATED BY LESSOR AND PAYABLE WITHIN TEN (10) DAYS OF LESSOR'S DEMAND. (iii) IF LESSEE DOES NOT ELECT TO PURCHASE OR RETURN THE LEASED EQUIPMENT UPON EXPIRATION OR TERMINATION OF THE LEASE AS PROVIDED IN (i) OR (ii) OF THIS SECTION, THE LEASED EQUIPMENT SHALL CONTINUE TO BE HELD AND LEASED HEREUNDER, AND THE LEASE SHALL BE EXTENDED INDEFINITELY AS TO TERM AT THE SAME MONTHLY RENTAL, SUBJECT TO THE RIGHT OF EITHER THE LESSEE OR THE LESSOR TO TERMINATE THE LEASE UPON THIRTY (30) DAYS WRITTEN NOTICE, WHEREUPON THE LESSEE SHALL FORTHWITH DELIVER THE LEASED EQUIPMENT TO LESSOR AS SET FORTH IN THIS SECTION.  (iv) PROVIDED LESSEE HAS FULFILLED ALL OF ITS OBLIGATIONS TO LESSOR HEREUNDER, LESSEE'S SECURITY DEPOSIT, IF ANY, AS INDICATED IN THE MERCHANT APPLICATION, OR IN ANY ADDITIONAL APPLICATION AND SETUP FORMS, (1) SHALL BE REFUNDED TO LESSEE AT THE EXPIRATION OF THE LEASE WITHOUT INTEREST OR (2) AT LESSEE'S DIRECTION, SUCH SECURITY DEPOSIT MAY BE APPLIED TO THE PURCHASE OF THE LEASED EQUIPMENT, IN WHICH EVENT THE LEASED EQUIPMENT NEED NOT BE RETURNED TO LESSOR.

r.  **Entire Agreement; Changes.** The lease contains the entire agreement between the parties and may not be altered, amended, modified, terminated or otherwise changed except in writing and signed by an executive officer of Lessor and by the Lessee.

s.  **Miscellaneous.**  If Lessee fails to pay any rent or other amount required herein to be paid to Lessor within five (5) days of when due, Lessee agrees to pay Lessor, in addition to the payment, a late charge of 15% of the amount past due (but at least $7.50) for each late payment. Each month the past due payment remains unpaid, an additional late fee in the amount defined will be assessed. Payments are applied to late fees and service charges first and then to the lease obligation. Amounts shall be payable in addition to all amounts payable by Lessee to Lessor as a result of exercise of any of the remedies herein provided. If Lessee requests any services not provided for herein, Lessee agrees to pay an applicable fee for delivery of such services. Lessee shall inform Lessor of any change in Lessee's name, address, billing address, telephone

Elavon

TOS201311                                                                              TERMS OF SERVICE

numbers, location of the Leased Equipment, or DDA. In the event Lessee fails to comply with any provision of the lease, Lessor shall have the right, but not be obligated, to affect such compliance on behalf of Lessee upon ten (10) days prior written notice to Lessee. In such event, all monies expended by, and all expenses of Lessor in effecting such compliance, shall be deemed to be additional rental, and shall be paid by Lessee at the time of the next monthly payment of rent. All notices under the lease shall be sufficient if given personally or mailed postage prepaid to the party intended at the respective address set forth herein, or at such other address as said party may provide in writing from time to time. The lease inures to the benefit of and is binding upon the personal representatives, successors and assigns of the parties hereto. Time is of the essence of the lease.  Lessor and Lessee intend the lease to be a valid and subsisting legal instrument, and agree that no provision of the lease that may be deemed unenforceable shall in any way invalidate any other provision or provisions of the lease, all of which shall remain in full force and effect. The lease shall be binding when accepted in writing by Lessor and shall be governed by the laws of the State of Georgia, provided however, in the event the lease or any provision hereof is not enforceable under the laws of the State of Georgia then the laws of the state where the Leased Equipment is located shall govern.  Lessee consents and submits to the jurisdiction of the federal and state courts located in the State of Georgia and within Fulton County (the "Courts"), and expressly agree to such forum for the bringing of any suit, action or other proceeding arising out of the Lessee's obligations hereunder, and expressly waive any objection to venue in any such Courts and waive any right to a trial by jury so that trial shall be by and only to the Court. Lessee agrees that any process served for any court action or proceeding shall be valid if mailed by certified mail, return receipt requested.

t.   **Important Information about Credit Reporting.** Lessor may report information about this account to credit bureaus. Late payments, missed payments, or other defaults on this account may be reflected in the credit report of Lessee and/or Guarantor.

21.   **ELECTRONIC GIFT CARDS**

a.   **Electronic Gift Card Services**. The following terms and conditions apply to Elavon's provision of Electronic Gift Card Services to Merchant:

i.   **Merchant Responsibilities**.

aa.   Merchant will comply with the Agreement and with all applicable provisions of the MOG in connection with Merchant's receipt and use of the EGC Services.

bb.   Merchant acknowledges and agrees that it is Merchant's sole responsibility to comply with any and all applicable Laws governing the issuance, sale, distribution, use, and acceptance of Electronic Gift Cards (including all laws relating to purchase, service and dormancy fees, laws relating to expiration dates, and laws governing the treatment of unused or unclaimed funds or other property). Further, Merchant agrees to comply in a complete and timely manner with any such Laws, including but not limited to all escheatment, unclaimed property, money transmission and consumer protection laws, now or hereafter applicable to the issuance, sale, distribution, use or acceptance of Electronic Gift Cards.

cc.   Until such time as Cardholder Data and Transaction data has been received and validated by Elavon, Merchant will maintain sufficient "backup" information and data (e.g. Transaction Receipts or detailed reporting) with respect to Electronic Gift Cards sold to reconstruct any information or data loss due to any system malfunction or error in transmission.

dd.   Elavon must participate in all Electronic Gift Card Transactions.  In the event that a third party must also participate in such a Transaction, Merchant will only use such third parties as have been approved by Elavon for such purposes.



ee. All Electronic Gift Cards must be printed by Elavon or an Elavon-approved vendor.

ff. Merchant agrees to comply with the Graphic Specifications and Procedures provided by Elavon and incorporated herein by reference as such may be amended from time to time by Elavon in its sole discretion.

gg. Merchant shall pay the fees for the ECG Services as set forth in the Merchant Application, and in any additional application and setup forms. In addition to any other applicable fees, Merchant is responsible for all card production and delivery costs.

ii. **Direct Settlement.** Merchant authorizes Elavon to initiate credit and debit entries among Merchant's individual chain locations for any Transactions that change the balance of an Electronic Gift Card. In the event Elavon is unable to accomplish a credit or debit entry to reflect the effect of a Transaction, Merchant further authorizes Elavon to credit and/or debit the designated Master Account or Primary Merchant. Merchant also understands that Elavon may, in its sole discretion, offset any debits against the related credit Transactions of the applicable chain or merchant location. Merchant also agrees to notify Elavon in writing of any asserted errors within forty-five (45) days of the statement date on which the asserted error first appeared and understands that any failure to do so will preclude further claims or assertion of the error. Both the Merchant and the individual chain locations agree to pay related direct settlement fees.

iii. **Warranties/Liability.**

aa. Elavon is not responsible for lost, stolen or fraudulent Electronic Gift Cards.

bb. Elavon makes no warranty, express or implied, with respect to the products or Processing Services provided hereunder including, without limitation, any express or implied warranty regarding merchantability, fitness for purpose or compliance of the Processing Services or Electronic Gift Cards with any applicable Laws governing the issuance, sale, distribution, use, and acceptance of Electronic Gift Cards. This includes but is not limited to all escheatment, unclaimed property, money transmission and consumer protection Laws.

iv. **Post Termination.** Following termination, Merchant will pay Elavon a transfer fee based in part on, but not limited to, the number of issued Electronic Gift Cards that must be converted to another processor and the data specifications required.

v. **Additional Fees.** Merchant agrees to pay Elavon for Electronic Gift Card production once Merchant has approved the Electronic Gift Card design proof. Merchant accepts full responsibility for all Electronic Gift Card production costs. Merchant acknowledges that one proof per Electronic Gift Card order is included in the cost of Electronic Gift Card production and Merchant agrees to pay thirty-five dollars ($35) for additional proofs. If any order is cancelled prior to Electronic Gift Card production, Merchant agrees to pay Elavon a one hundred dollar ($100) cancellation fee.

vi. **Additional Locations.** Locations, including chain locations, added to this processing relationship will be boarded on Elavon's system pursuant to the paperwork submitted by Merchant to Elavon. However, in the event of an error or omission of fees payable by Merchant on the submitted paperwork, the Processing Services fees and other monthly fees applied to the locations during the initial set up or subsequent negotiations will be applied to such locations.

vii. **Closing Locations.** In the event that a particular location closes or changes its MID,



Merchant agrees that Elavon may bill the Primary Merchant for any fees associated with subsequent Transactions processed on Electronic Gift Cards activated by the closed MID. This would apply to any system generated Transactions including, but not limited to, deduction and points conversion Transactions. Monthly fees billed for Loyalty Cards/members activated at the closed location may also be billed to the Primary Merchant.

b.  **WebSuite Services.**  The following terms and conditions apply to Elavon's provision of WebSuite Services to Merchant:

   i.   **Processing Services.**  Merchant acknowledges that Elavon and Member will engage third party service providers to assist with the performance of the WebSuite Services.

   ii.  **Merchant Responsibilities.**

      aa.  Merchant will comply with the Agreement and with all applicable provisions of the MOG in connection with Merchant's receipt and use of the WebSuite Services, including, as applicable, provisions regarding the acceptance of Payment Devices and the use of EGC Services.

      bb.  Merchant shall pay the fees for the WebSuite Services as set forth in the Agreement. In addition, for orders placed using a Payment Device, Merchant shall pay the applicable processing fee for such Payment Device, as set forth in the Agreement. Elavon is entitled to pass through to Merchant any fee increases or new fees imposed upon Elavon by any Payment Network and any other third party vendor used by Elavon or Member to provide the WebSuite Services.

      cc.  Merchant must timely provide to Elavon specifications for the customization of Merchant's WebSuite site, including Customer options, web and e-mail content. Merchant modifications subsequent to the initial submission are subject to change fees.

      dd.  To the extent that Merchant posts any Electronic Gift Card information to the Merchant's WebSuite site, Elavon and Member are not responsible for any such information.

      ee.  Merchant acknowledges that Elavon and Member are not responsible for incomplete or inaccurate payment information that may be provided by any Customer in connection with the WebSuite Services.  Merchant further acknowledges that additional Transaction verification and fraud prevention data elements and processes may be available through a particular Payment Network, including address verification, to reduce Transaction risk and that Elavon and Member shall only be responsible for implementing any such Transaction risk controls as are specifically requested in writing by Merchant.  The use of such Transaction risk controls does not constitute a guarantee of payment or prevent a Transaction from being disputed or subject to Chargeback.

      ff.  Merchant acknowledges that Elavon or Member may provide sample terms of use, privacy policy, and other content and disclosure for use on WebSuite site. Merchant agrees that is has an opportunity to review such sample disclosure and revise or replace such sample disclosure with language of Merchant's choice. Merchant's use of the WebSuite site confirms that Merchant has had an opportunity to review the sample disclosures and agrees to be solely responsible for all content and disclosures on the WebSuite site.

      gg.  Merchant is fully responsible for all Retrieval Requests and Chargebacks under the Payment Network Regulations in connection with Transactions processed using the WebSuite Services. Upon receipt of a Retrieval Request or documentation related to a



Chargeback from a Payment Network, Elavon and Member will forward such request or documentation to Merchant. Merchant is responsible for responding, as appropriate, to each Retrieval Request or Chargeback.

iii. **Electronic Gift Card Order Fulfillment.** Elavon will fulfill all WebSuite Electronic Gift Card orders, and include with each order a Merchant-approved standardized letter customized with the order detail. All orders will be shipped pursuant to the method directed by the Customer.

iv. **Electronic Gift Card Loss Protection Program.** Merchant shall determine which data elements it will require its Customers to provide to establish an account or register an Electronic Gift Card on Merchant's WebSuite site. Merchant is responsible for notifying its Customers that in order to take advantage of the Electronic Gift Card loss protection program, the Electronic Gift Card must be registered prior to the loss. Once a registered Electronic Gift Card is reported lost or stolen via the WebSuite site, Elavon will notify Merchant and freeze the unused balance of the Electronic Gift Card. Merchant is responsible for transferring the unused balance to a new Electronic Gift Card, sending a replacement Electronic Gift Card to the Customer, and notifying Elavon of the replacement Electronic Gift Card via the WebSuite site.

v. **Reloading of Electronic Gift Cards.** Merchant shall determine all Electronic Gift Card reloading options available to its Customers. While the WebSuite Services permit the anonymous reloading of Electronic Gift Cards, Elavon recommends that Merchant require its Customers to register the Electronic Gift Card in order to reload value onto the Electronic Gift Card.

vi. **Customer Information.** The WebSuite Services will permit Merchant to have access to Customer information and other data that Merchant determines is required to establish an account or register an Electronic Gift Card. Merchant is responsible for maintaining the appropriate safeguards to protect such Customer information, and to properly disclose the use of such information and its privacy policies on Merchant's WebSuite site or website. Merchant must maintain the confidentiality of all Transaction and Cardholder Data as set forth in the Agreement.

vii. **E-Certificates.** Merchant may choose to use the E-Certificate module, which delivers a "virtual gift card" electronically. The terms applicable to Electronic Gift Cards herein equally apply to E-Certificates.

## 22. BILLER DIRECT SERVICES

The following terms and conditions apply to Elavon's provision of Biller Direct Services to Merchant:

a. **General Provisions.**

i. **Acceptance of Payment Devices.** In connection with its sale of goods or services or its receipt of bill payments, Merchant desires to accept Payment Devices in an online environment through the Elavon-sponsored Biller Direct Services. Elavon offers two types of Biller Direct Services: Bill Payment Portal (BPP) and Enterprise Billing Solutions (EBS). Merchant has selected its desired Biller Direct Services, including the desired fee funding model, if applicable, on the Biller Direct Services Enrollment Form, and in any additional application and setup forms. The terms and conditions for Merchant's use of the Biller Direct Services are set forth in the Agreement and in the MOG and the ECS MOG.

ii. **TRANSACTIONS.**

aa. **Merchant Compliance.** Merchant must comply with all requirements under Laws



(including, without limitation, the Electronic Signatures in Global and National Commerce Act), Payment Network Regulations and the Agreement in connection with the Biller Direct Services. Merchant must also comply with the applicable procedures set forth in the MOG, the ECS MOG, and any other guides, manuals, or rules provided in writing by Elavon or Member from time to time. For purposes of the Biller Direct Services only, Merchant will not receive Payment Device Transaction information and therefore Merchant is not obligated to comply with the requirements governing Merchant's receipt and handling of payment information from Customers.

bb. **Transaction Requirements.** Before Elavon and Member will process a Transaction on Merchant's behalf, the Customer must affirmatively agree to engage in the Transaction through the Biller Direct Services web site or via the telephone, as applicable.

    1. **Customer Authentication.** In addition to satisfying the applicable requirements set forth in the Agreement, the MOG, the ECS MOG (as applicable) and any other guides, manuals or materials provided to Merchant by Elavon or Member, Merchant must provide to Elavon and Member such Customer information as may reasonably be required for Elavon and Member to perform their obligations under the Agreement. Elavon and Member will authenticate the identity of each Customer, on Merchant's behalf, based solely on the Customer information provided by Merchant to Elavon and using the authentication criteria as directed by Merchant. Merchant agrees that Elavon and Member are entitled to rely on the accuracy of the Customer information provided by Merchant and that Elavon and Member shall only be responsible for authenticating each Customer as and to the extent directed by Merchant in writing. Merchant shall be responsible for, and shall indemnify Elavon and Member against, any losses that may result from: (a) errors in the authentication of a Customer or in the processing of Transactions that result from incorrect Customer information provided to Elavon or Member; and (b) inaccurate or incomplete authentication of a Customer that does not result from Elavon or Member's errors or omissions. Merchant grants Elavon and Member and their designated agents access to and use of Customer information and such other data as is reasonably necessary for Elavon and Member to perform their obligations under the Agreement. Merchant's provision of such Customer information to Elavon and Member will not breach any agreement to which Merchant is a party or violate Laws.

    2. **Transaction Risk.** Elavon and Member will attempt to collect from each Customer the payment-related information necessary for Elavon and Member to process a payment Transaction from the Customer to Merchant in connection with the Biller Direct Services. Merchant acknowledges that Elavon and Member are not responsible for incomplete or inaccurate payment information that may be provided by any Customer in connection with the Biller Direct Services. Merchant further acknowledges that additional Transaction verification and fraud prevention data elements and processes may be available through a particular Payment Network, including address verification, to reduce Transaction risk and that Elavon and Member shall only be responsible for implementing any such Transaction risk controls as are specifically requested in writing by Merchant. The use of such Transaction risk controls does not constitute a guarantee of payment or prevent a Transaction from being disputed or subject to Chargeback. Regardless of any additional Transaction risk mitigation options elected by Merchant, Merchant shall remain responsible for monitoring Customer account activity for suspicious or fraudulent activity, as more fully described in Section (A)(22)(a)(iv) hereof.



cc. **Transaction Controls.** Merchant will notify Elavon of any material change or anticipated material change in daily dollar activity or type of Transaction processing in connection with the Biller Direct Services, and Merchant will obtain Elavon's consent to any such change. Elavon and Member are not responsible for any losses or expenses incurred by Elavon, Member or Merchant arising out of any material change or anticipated material change in Transaction activity that is not promptly reported to Elavon and Member by Merchant.

dd. **Processing Limits.** Elavon or Member may impose a cap on the aggregate dollar amount or individual dollar amount of Transactions that it will process for Merchant as established by Elavon or Member from time to time. This limit may be changed by Elavon or Member, from time to time, in its sole discretion, without prior notice to Merchant. If Merchant exceeds the established limit, Elavon may suspend the processing of Transactions in excess of the cap or may process Transactions in excess of the cap but hold the excess funds in a separate account or Reserve Account.

ee. **Recurring Transactions.** For recurring Transactions (e.g., recurring or preauthorized payment of insurance premiums or subscriptions), the Customer must consent to the initiation of the recurring charges using the Customer's designated Payment Device. Recurring Transactions will not be processed by Elavon after Elavon receives: (i) a cancellation notice from the Customer provided through the Biller Direct Services interface; (ii) a notice from Merchant through the Biller Direct Services interface that authority to accept recurring Transactions has been revoked; or (iii) a response from the issuer of a Payment Device that the Payment Device is not to be honored. Merchant must immediately notify Elavon if any Customer advises Merchant that the Customer wishes to revoke its recurring payments authorization by cancelling the recurring payment instruction through the Biller Direct Services interface. Any such notices described in this paragraph that are not fully processed through the Biller Direct Services interface prior to 5:00 p.m. Eastern time one (1) business day before the day a Transaction is scheduled to be processed will not affect such Transaction but will be effective for subsequent Transactions.

ff. **Retrieval Requests and Chargebacks.** Merchant is fully responsible for all Retrieval Requests and Chargebacks under the Payment Network Requirements in connection with Transactions processed using the Biller Direct Services. Upon receipt of a Retrieval Request or documentation related to a Chargeback from a Credit Card Association, an ECS Association or an EFT Network, as applicable, Elavon and Member will forward such request or documentation to Merchant. Merchant is responsible for responding, as appropriate, to each Retrieval Request or Chargeback, including by retrieving a copy of the relevant Transaction Receipt from the Biller Direct Services interface. In addition, Merchant will cooperate with Elavon and Member in complying with the Payment Network Requirements regarding Retrieval Requests and Chargebacks.

iii. **Biller Direct Services; Fees; Other Amounts Owed; Taxes.** Elavon and Member will provide Merchant with the Biller Direct Services in accordance with the Agreement. Merchant will compensate Elavon and Member for the Biller Direct Services as indicated on the Biller Direct Services Enrollment Form, and in any additional application and setup forms.

iv. **Fraud Controls and Responsibility for Fraud.** Elavon may suspend processing of Transactions or decline to process one or more individual Transactions if, based upon fraud detection and prevention controls or other security or Transaction verification or validation procedures, Elavon reasonably believes that such Transactions submitted to Elavon are the result of fraud or error. Merchant agrees that Elavon may, within its sole discretion, suspend the disbursement of funds related to any Transaction for any reasonable period of



time required to investigate suspicious or unusual Transaction or deposit activity and that Elavon and Member will have no liability for any losses Merchant may attribute to any suspension of funds disbursement. Notwithstanding the foregoing, Merchant shall be responsible for all fraudulent Transactions unless such fraud results from Elavon's failure to authenticate a purported Customer as required under the Agreement using information provided to Elavon by Merchant under Section (A)(22)(a)(ii)(bb) hereof. Elavon undertakes monitoring of certain Transactions on a systematic basis utilizing fraud and risk parameters in order to minimize Elavon's own financial exposure and such monitoring may result in a financial benefit for Merchant. Perpetrators of fraudulent Transactions may be referred to law enforcement officials.

v.   **Suspension of Biller Direct Services.** Elavon reserves the right to suspend Merchant's or a Customer's access to the Biller Direct Services or to temporarily restrict any use thereof, in whole or in part, if, in Elavon's sole judgment, there is a security, credit or legal risk that may interfere with the continued provision of such Biller Direct Services. Elavon also reserves the right to permanently terminate a Customer's access to the Biller Direct Services upon notice to Merchant if, in Elavon's reasonable discretion, such Customer is misusing the Biller Direct Services or is engaged in suspicious or possible illegal activity. Elavon reserves the right to refuse any Transaction where Elavon believes, in its reasonable discretion, that the Transaction involves a material probability of fraud, credit, or legal risk. Merchant shall cooperate in resolving any claims or errors alleged by a Customer and in investigating any claims of fraud consistent with Laws and Payment Network Regulations.

vi.  **Amendments.** Elavon is entitled to pass through to Merchant any fee increases or new fees imposed upon Elavon by any Payment Network and any other third party vendor used by Elavon or Member to provide the Biller Direct Services.

b.   **Payment Card Services Provisions.**

i.   **General Description.** This Section sets forth additional terms and conditions of the Biller Direct Services applicable to the processing of Transactions conducted using Payment Cards, as more fully described below. Elavon and Member will process Payment Card Transactions only if Merchant has elected Processing Services with respect to Payment Cards on the Biller Direct Services Enrollment Form, and in any additional application and setup forms, and subject to the terms and conditions set forth in Section (A)(22)(a) above and this Section (A)(22)(b).

ii.  **Authorization.**

aa.  **Transaction Authorization.** Elavon will attempt to obtain an Authorization Code before completing a Transaction. Elavon will only process Transactions that receive a positive Authorization.

bb.  **Effect.** An Authorization Code does not: (i) guarantee Merchant final payment for a Transaction; (ii) guarantee that the Transaction will not be disputed later by the Cardholder as all Transactions are subject to Chargeback; or (iii) protect Merchant in the event of a Chargeback regarding unauthorized Transactions or disputes involving the quality of goods or services. Authorization Codes will not waive any provision of the Agreement or otherwise validate a fraudulent Transaction.

iii. **Credits.**

aa.  **Credit Transaction Receipt.** If Merchant agrees to grant a Cardholder a refund of a Credit Card, Debit Card, or Prepaid Card Transaction processed by Elavon and Member, Merchant must request a Credit Transaction Receipt through the Biller Direct Services interface and must issue the credit using the Credit Transaction Receipt.



Merchant may not issue cash or a check as a refund for any previous Transactions processed on a Credit Card, Debit Card, or Prepaid Card. Elavon and Member will debit the DDA for the total face amount of each Credit Transaction Receipt processed by Elavon. Elavon and Member will not process a Credit Transaction Receipt relating to any Transaction Receipt not originally processed by Elavon, and Elavon and Member will not process a Credit Transaction Receipt that exceeds the amount of the original Transaction Receipt.

iv.   **Interchange.** Elavon and Member bear no responsibility for the interchange category or pricing, including discount rate, fees and surcharges, applied by the Credit Card Associations, EFT Networks or otherwise owed by Merchant with respect to any Transaction processed using the Biller Direct Services, except to the extent that Merchant is obligated to pay greater Interchange with respect to a Transaction solely on account of Elavon's failure to comply with the Transaction processing requirements agreed to between Merchant and Elavon.

c.   **Electronic Check and Automated Clearing House Services Provisions.**

i.   **General Description.** This Section sets forth additional terms and conditions of the Biller Direct Services applicable to processing of Transactions originated and presented for clearing and payment via the ACH Network in accordance with the ECS Rules, as more fully described below. Elavon and Member will process ECS and ACH Transactions only if Merchant has elected ACH / ECS on the Biller Direct Services Enrollment Form, and in any additional application and setup forms. Processing of ECS and ACH Transactions shall be subject to the terms and conditions set forth in Section (A)(22)(a) above and this Section (A)(22)(c).

ii.   **Electronic Check and Automated Clearing House Services Generally.** All costs and fees related to the Electronic Check and Automated Clearing House Services chosen by Merchant are as provided in the Merchant Application, except as otherwise provided in the Biller Direct Services Enrollment Form, and in any additional application and setup forms. The Customer must provide authorization to Elavon prior to Elavon initiating an ACH debit to the Customer's account, in accordance with the ECS MOG. Elavon will make a record of the Customer's authorization for the ACH debit. Elavon will either retain the original or a duplicate record of the Customer's authorization for the period required by the applicable ECS Rules, and will make a copy of such record available to Merchant for a fee as indicated on the Biller Direct Services Enrollment Form, and in any additional application and setup forms.

iii.   **Additional Representations and Warranties.** Merchant represents and warrants, with respect to all ECS and ACH Transactions accepted and processed by Elavon and Member under the Agreement, that (i) for prearranged payment and deposit (PPD) entries or recurring debit entries, the Customer has duly authorized the debiting of the Customer's account in writing in accordance with applicable law and ECS Rules, (ii) the business transaction represents an obligation of the Customer who is initiating the ECS or ACH Transaction, and (iii) the ECS or ACH Transaction is for amounts actually owed by Customer to Merchant (including tax) and does not involve any element of credit.



# SECTION B – ELECTRONIC CHECK SERVICES

If Merchant has selected Electronic Check Services, Merchant shall be subject to this Section B in addition to the terms and conditions of Section A of this TOS. The terms and conditions for ECS are set forth in the Agreement and the ECS Merchant Operating Guide (the "ECS MOG"), incorporated herein and located at our website https://www.merchantconnect.com/CWRWeb/ElectronicCheckService.do. In the course of its acceptance and use of ECS, Merchant represents, warrants and covenants the following:

1.  Merchant shall comply with and be bound by (a) the ECS Rules, including the ACH Rules, the ECS MOG and the ECS Primer, and (b) Laws, including, but not limited to, the Check Clearing for the 21st Century Act and Regulation CC, Article 3 and Article 4 of the Uniform Commercial Code as in effect in the applicable state(s), the Electronic Fund Transfer Act and Regulation E, and the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act.

2.  Merchant shall pay the fees for ECS as set forth in the Merchant Application, and in any additional application and setup forms.

3.  In the event Merchant accepts for ECS certain types of Customer payments that are ineligible as specified in the ECS MOG for any reason, such Transaction is subject to Chargeback. Merchant may be liable for the face value of the Transaction and any actual damages related to or arising out of processing a Transaction that has been charged back.

4.  Merchant shall cause a Check Reader/Imager to be readily available for use at all Merchant locations where Merchant will accept Paper Checks for ECS processing.

5.  Merchant must use commercially reasonable procedures to verify the identity of each Customer that submits a payment.

6.  Merchant shall be solely responsible for providing Customers with notifications and disclosures in connection with ECS, including, but not limited to, posting all point of sale signage and distributing all Customer takeaways and all notices and disclosures required to be provided under the ECS Rules and Laws.

7.  Merchant may use the ECS only in connection with the presentment and acceptance of certain types of Customer payments in payment for goods or services sold by Merchant, or in payment for an obligation owed to Merchant, and only in compliance with the ECS Rules. Merchant shall be the sole user of the ECS, and Merchant may not resell or otherwise transfer any portion of ECS (or any associated information) in whole or in part to any other Person.

8.  Merchant represents and warrants, with respect to all ECS Transactions submitted for processing by Elavon, that (i) the Customer has duly authorized the debiting of the Customer's account for the amount of the ECS Transaction in accordance with Laws and ECS Rules, (ii) the Transaction represents an obligation of the Person who is submitting a Customer payment, and (iii) the ECS Transaction is for merchandise actually sold or rented, for services actually rendered, or for the actual amount due and owing from the Customer to Merchant, in each case for the actual price of such merchandise or services (including tax) or for the actual amount due and owing to Merchant. Merchant represents and warrants that no portion of any ECS Transaction involves any element of Merchant's extension of credit.

9.  Merchant may not use ECS for merchandise returns or refunds, as ECS does not support this function. Merchandise returns or refunds must be handled outside ECS by direct negotiation between Merchant and the Customer.

10. Merchant is responsible to Elavon for any Transaction charged back by Elavon or its agent in accordance with the Agreement, including the ECS MOG, and for any fines, penalties or assessments incurred as a result of Merchant's non-compliance with Laws or the ECS Rules. Merchant agrees to immediately pay to Elavon or its agent (by means of debit or set-off initiated by Elavon or its agent, submission of payment by Merchant, or otherwise, at the sole option of Elavon),



an amount equal to the amount of any ECS Transaction that is stopped, not settled, or charged back, as well as any related fees and charges.

11. Merchant must fully cooperate with all parties in the resolution of Customer disputes, as well as Chargebacks, returns, adjustments, representments, and errors in accordance with the ECS Rules and Laws.

12. Merchant is responsible for and will ensure that all information, including MICR data and payment amounts, are accurately captured from a Paper Check in accordance with the applicable ECS Rules, and that all such information is accurately reflected in the related Item Merchant sends to Elavon for processing through ECS. Merchant will not submit for clearing or settlement any physical Paper Check unless and until Elavon and Member have processed and settled a Chargeback to Merchant with respect to any Items created from such Paper Check.

13. Merchant will not disclose to third parties any information related to ECS Transactions including, but not limited to, Customer DDA information, driver's license number, telephone number, or social security number except as specified in the Agreement, including the ECS MOG. Merchant shall keep all such information confidential and secure, in accordance with the Agreement and Laws.

14. Merchant does not have the right to use ECS data for any purpose other than to support the ECS itself.

15. Merchant must treat all ECS documents, including, but not limited to, the Agreement, including the ECS Rules, the ECS MOG and ECS collateral material or related guides, as confidential and proprietary information and must protect it with the same degree of care as Merchant would protect its own confidential and proprietary information and as further specified in the Agreement.

16. Merchant's Agreement and use of the ECS may be terminated immediately by Elavon for failure to comply with the terms of the TOS, the Agreement or Laws.

# SECTION C – TOKENIZATION SERVICES

If Merchant has selected Tokenization Services, Merchant shall be subject to this Section C in addition to the terms and conditions of Section A of this TOS. The terms and conditions for Tokenization Services are set forth in the Agreement and the MOG, incorporated herein. In the course of its acceptance and use of the Tokenization Services, Merchant hereby agrees to the following terms and conditions governing the Tokenization Services:

1. For the payment of fees for the Tokenization Services, Elavon shall provide Tokenization Services to Merchant, which shall consist of a tokenization feature pursuant to which Elavon will provide Merchant with randomized numerical tokens (each a "Token") in substitution for Credit Card and Debit Card account numbers (each such number, a "Card Account Number"; such services, the "Tokenization Services"). More specifically, under the Tokenization Services, when a Card Account Number associated with a Transaction is transmitted from Merchant to Elavon, Elavon will:

    a. generate a Token;

    b. associate the Token with the Card Account Number; and

    c. send the Token, instead of Card Account Number, back to Merchant in the Transaction authorization response message.

2. The Card Account Number associated with each Token under the Tokenization Services will be available to the Merchant until three (3) years after the expiration or termination of the Agreement (the "Token Validity Period"). During the Token Validity Period, the Token, rather than the associated Card Account Number, may be submitted by Merchant to Elavon to process additional Transactions to the Credit Card or Debit Card associated with such Token across all Merchant locations. Merchant acknowledges that the Tokens will be formatted in Elavon's reasonable discretion and may not be compatible with other Merchant systems, equipment, communications devices, databases and/or services.

3. Merchant shall cause the appropriate hardware, including POS Devices and any hardware provided by or on behalf of Elavon from time to time, to be readily available for use at all Merchant locations that are the recipients or users of the Tokenization Services (the "Hardware").

4. Merchant acknowledges that Elavon does not store Credit Card or Debit Card expiration dates. In order to use a Token to process a Transaction, Merchant must provide the Token (in lieu of a Card Account Number) together with the expiration date for the original Credit Card or Debit Card.

5. Merchant may request a reversal of the Tokenization process as follows:

    a. To reverse the Tokenization process on an individual Token basis, Merchant may access an Elavon web portal and, with appropriate authentication credentials, retrieve the Card Account Number associated with any Token.

    b. To reverse the Tokenization process on a bulk basis (i.e., in excess of 100 Tokens at a time); an officer of Merchant must make a request in writing to Elavon and provide Elavon with the Tokens for which Merchant wishes to reverse the Tokenization process. Elavon will provide Merchant with an encrypted file containing the Card Account Numbers associated with such Tokens within thirty (30) days of receiving the request.

6. DISCLAIMER OF WARRANTIES. WITH RESPECT TO THE TOKENIZATION SERVICES, THE HARDWARE, AND LICENSED PRODUCTS (INCLUDING ANY SOFTWARE), IF ANY, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT OR ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE. THE TOKENIZATION SERVICES, HARDWARE AND LICENSED PRODUCTS (INCLUDING ANY SOFTWARE), IF ANY, PROVIDED TO MERCHANT ARE PROVIDED "AS IS". MERCHANT ACKNOWLEDGES AND AGREES THAT IT IS NOT RELYING ON ANY STATEMENT, PROMISE, OR



REPRESENTATION, EITHER ORAL OR WRITTEN, MADE BY OFFICERS, SALES PERSONNEL, OR AGENTS OF ELAVON OR MEMBER, EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, INCLUDING THIS SECTION C, WHICH WOULD SUPPLEMENT, EXPLAIN, INTERPRET, MODIFY OR EXPAND THE TERMS AND CONDITIONS OF THIS AGREEMENT, THIS SECTION C, OR ANY SALES LITERATURE OR WRITTEN PROPOSALS. MERCHANT ACKNOWLEDGES AND UNDERSTANDS THAT NO EXPRESS WARRANTY WITH RESPECT TO THE TOKENIZATION SERVICES, THE HARDWARE AND LICENSED PRODUCTS (INCLUDING ANY SOFTWARE), IF ANY, IS CONTAINED OR CREATED IN ANY ORAL STATEMENT OR IN ANY WRITING OTHER THAN THE EXPRESS WRITTEN PROVISIONS OF THIS SECTION C.

7.  LIABILITY. Except as otherwise expressly provided herein, in no event shall Elavon be liable hereunder for (a) any loss of profits or other economic loss of whatever nature, or any indirect, special, consequential, incidental or other similar damages arising out of any claim of whatever nature relating to the Tokenization Services provided pursuant to this Agreement or to any obligations, acts, events, or occurrences pursuant to, preliminary to or incidental to the Tokenization Services provided pursuant to this Agreement, or (b) any liabilities of Merchant to third parties resulting from any failure of Elavon, any Hardware or any software, documentation or other related materials (whether provided by Elavon or a third party) to perform as required under the terms of this Section C to the Agreement. In no event shall Elavon's licensors, contractors, service providers or third party beneficiaries have any indemnification obligations or be liable pursuant to this Section C for any damages, including, without limitation, any indirect, special, consequential, incidental or other similar damages arising out of any claim of whatever nature relating to the Tokenization Services provided pursuant to this Agreement or to any obligations, acts, events, or occurrences pursuant to, preliminary to or incidental to the Tokenization Services provided pursuant to this Agreement.

# SECTION D: GLOSSARY

**ABA Routing Number:** The ABA number that uniquely identifies the bank on which a check is drawn.

**ACH:** Automated Clearing House.

**ACH Network:** The funds transfer system governed by the ACH Rules. The ACH Network allows participating depository financial institutions to clear interbank entries electronically. A Merchant's DDA is debited and credited via ACH.

**ACH Rules:** The NACHA Operating Rules and Operating Guidelines, which govern the interregional exchange and settlement of ACH transactions.

**Agreement:** The TOS, including the Merchant Application, the Merchant Operating Guide, the Electronic Check Service Merchant Operating Guide (if applicable), any Merchant Agreement or Merchant Processing Agreement, and any other guides or manuals provided to Merchant from time to time, and all additions to, amendments and modifications of, and all replacements to any of them, as applicable.

**American Express:** The American Express Company or Amex Bank of Canada and, to the extent applicable in Canada, The American Express Company.

**Authorization Code:** The code sent by the Issuer in response to an Authorization request that indicates whether the Transaction is approved. Responses may include: "Approved," "Declined," "Declined Pick-Up," or "Referral" ("Call Auth").

**Automated Clearing House (ACH):** The funds transfer system governed by the rules of NACHA. ACH allows financial institutions to clear interbank entries electronically.

**Bankruptcy Proceeding:** With respect to a Person means (i) that the Person or any subsidiary of such Person shall: (a) commence a voluntary case under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect); (b) file a petition seeking to take advantage of any other applicable laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts or any other similar conservatorship or receivership proceeding instituted or administered by any regulatory agency or body; (c) consent to or fail to contest, in a timely and appropriate manner, any petition filed against it in an involuntary case under such bankruptcy laws or other applicable laws or consent to an Involuntary Bankruptcy Proceeding; (d) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator, or similar entity of such Person or of all or any substantial part of its assets, domestic or foreign; (e) admit in writing its inability to pay its debts as they become due; (f) make a general assignment for the benefit of creditors; (g) make a conveyance fraudulent as to creditors under any applicable law; or (h) take any action for the purpose of effecting any of the foregoing; or (ii) that a case or other proceeding shall be commenced against the Person or any subsidiary of such Person in any court of competent jurisdiction, or through any regulatory agency or body, seeking: (a) relief under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect) or under any other applicable laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition, or adjustment of debts; or (b) the appointment of a trustee, receiver, custodian, liquidator or the like of such Person or of all or any substantial part of the assets, domestic or foreign, of such Person or any other similar conservatorship or receivership proceeding instituted or administered by any regulatory agency or body.

**Biller Direct Services:** The services offered by Elavon described herein pursuant to which Transactions are presented for authorization, clearing and settlement in accordance with the Agreement.



**Canadian Payments Association (CPA):** The national association that establishes standards, rules, and procedures and maintains a funds transfer system to enable depository financial institutions to exchange electronic payments.

**Cardholder:** (i) The individual in whose name a Payment Device has been issued; and (ii) any individual who possesses and uses a Payment Device and who purports to be the person in whose name the Payment Device was issued or whose signature appears on the Payment Device as an authorized user.

**Cardholder Data:** One or more of the following data elements pertaining to a Cardholder's account: card number, Cardholder name (if applicable), card account activity, Cardholder account balance, and/or such other data applicable to the Merchant's card program.

**Cardholder Information Security Program (CISP):** Visa's data security regulations to protect Cardholder account data and other data security best practices. The exact requirements for CISP can be found at www.visa.com/cisp.

**Chargeback:** A Transaction disputed by a Customer or Issuer pursuant to the Payment Network Regulations. For purposes of Section B, "Chargeback" means (i) a sales Transaction disputed by a Customer or an Item not in compliance with Conversion with Guarantee warranty provisions or ECS Rules; (ii) for all Service Levels other than Conversion with Guarantee, the face amount of any Item that is returned to the Drawee Bank or an ECS Association to Elavon unpaid and that is ineligible for resubmission to the Drawee Bank or the ECS Association, including any Item returned for non-sufficient or uncollected funds after the third presentment; and (iii) for all Service Levels, an Item that is not in compliance with Merchant's obligations, representations and warranties under the Agreement or the TOS.

**Check Reader/Imager:** A device certified by Elavon that electronically captures the MICR line and/or an image of the Paper Check.

**Confidential Information:** All information or items proprietary to Elavon or Member, of which the Merchant obtains knowledge or access as a result of the Merchant's relationship with Elavon and Member, including, but not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): scientific, technical, or business information, product makeup lists, ideas, concepts, designs, drawings, techniques, plans, calculations, system designs, formulae, algorithms, programs, software (source and object code), hardware, manuals, test procedures and results, identity and description of computerized records, identity and description of suppliers, customer lists, processes, procedures, trade secrets, "know-how," marketing techniques and material, marketing and development plans, price lists, pricing policies, and all other financial information.

**Credit Card:** A card or device associated with a revolving line of credit that may be used to purchase goods and services from Merchant or to pay an amount due to Merchant or to obtain cash advances. A "Credit Card" includes any of the following cards or devices that are associated with a line of credit extended to the Person to whom the card or device is issued: (i) a Visa card or other card or device bearing the symbol(s) of Visa U.S.A., Inc. or Visa International, Inc. (including Visa Gold cards); (ii) a MasterCard card or other card or device bearing the symbol(s) of MasterCard International Incorporated (including MasterCard Gold cards); (iii) a Discover Network card or other card or device bearing the symbol(s) of Discover Network; or (iv) any card or device bearing the symbol of any other Credit Card Association.

**Credit Card Associations:** (i) Visa U.S.A., Inc.; (ii) MasterCard International Incorporated; (iii) American Express; (iv) Discover Network; (v) Diners; (vi) JCB; (vii) UnionPay; and (viii) any other organization or association that hereafter contracts with Elavon and/or Member to authorize, capture, and/or settle Transactions effected with Credit Cards issued or sponsored by such organization or association, and any successor organization or association to any of the foregoing.

**Credit Card Rules:** All applicable rules and operating regulations of the Credit Card Associations, and all rules, operating regulations, and guidelines for Credit Card Transactions issued by Elavon from time to time, including, without limitation, all amendments, changes and revisions made thereto from time to time.



**Credit Transaction Receipt:** A document, in paper or electronic form, evidencing a Merchant's refund or price adjustment to be credited to the Cardholder's account and debited from the Merchant's DDA. This is also known as a credit slip or credit voucher.

**Customer:** A client of Merchant who elects to conduct a payment Transaction with Merchant through presentation of a Payment Device (including a Cardholder).

**Debit Card:** A card or device bearing the symbol(s) of one or more EFT Networks or Credit Card Associations, which may be used to purchase goods and services from Merchant or to pay an amount due to Merchant by an electronic debit to the Cardholder's designated deposit account. A "Debit Card" includes (i) a card or device that bears the symbol of a Credit Card Association and may be used to conduct signature-based, offline debit Transactions; and (ii) a card or device that bears the symbol of an EFT Network and can be used to conduct PIN-based, online debit Transactions.

**Debit Card Rules:** All applicable rules and operating regulations of the EFT Networks, and all rules, operating regulations, and guidelines for Debit Card Transactions issued by Elavon from time to time, including, without limitation, all amendments, changes, and revisions made thereto from time to time.

**Demand Deposit Account (DDA):** The commercial checking account at a financial institution acceptable to Elavon and Member designated by Merchant to facilitate payment for Transactions, Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement. In the instance of a Debit Card or ATM Card, this refers to the Cardholder's deposit account.

**Diners:** Diners Club International Ltd.

**Discover:** DFS Services LLC.

**Discover Network:** Discover Network, Inc.

**Drawee Bank:** The financial institution where a Customer maintains a checking account on which a Paper Check that serves as the source document to generate an Item at the POS Device or payment for a Transaction is drawn.

**EFT Networks:** (i) Interlink Network Inc., Maestro U.S.A., Inc., STAR Networks, Inc., NYCE Payments Network, LLC, PULSE Network LLC, ACCEL/Exchange Network, Alaska Option Services Corporation, Armed Forces Financial Network, Credit Union 24, Inc., NETS, Inc., and SHAZAM, Inc.; (ii) (i) Interac and the Interac Direct Payment service; and (iii) any other organization or association that hereafter authorizes the Elavon and/or Member to authorize, capture, and/or settle Transactions effected with Debit Cards, and any successor organization or association to any of the foregoing.

**Elavon:** As applicable, Elavon, Inc., a Georgia corporation, Elavon Canada Company, a company validly existing and organized in Nova Scotia, and any affiliate or subsidiary of Elavon, Inc. that provides Processing Services to a Merchant related to Transactions. Elavon is a registered member service provider of each Member. Elavon may also be referred to as "Servicer" in the Agreement, the MOG or other documents provided to Merchant in connection with the Processing Services.

**Electronic Check Service (ECS) Association:** NACHA, any regional ACH association or network, and any other organization or association used by Elavon and/or Member in connection with the ECS that is hereafter designated as an ECS Association by Elavon from time to time.

**Electronic Check Service (ECS) Primer:** The detailed information relating to ECS processes and implementation provided by Elavon to Merchant, which must be used by Merchant in conjunction with the technical specifications and certification requirements provided by Elavon to promote integrated point of sale system connectivity and integration between Merchant and Elavon.



**Electronic Check Service Rules (ECS Rules):** All applicable rules and operating regulations of or applicable to the ECS Associations (including the ACH Rules) and the ECS MOG, in each case including without limitation, all amendments, changes, and revisions made thereto from time to time.

**Electronic Check Service (ECS) Transaction:** Any purchase, reversal/void, decline, Chargeback, or representment/resubmit pursuant to the Electronic Check Service Rules.

**Electronic Gift Card (EGC):** A special card purchased by a Customer or provided by Merchant to a Customer that is redeemable for merchandise, services or other Transactions, and includes any electronic gift card, gift certificate, Loyalty Card or Stored Value Card, as may be applicable, and/or as offered by Merchant to Customers from time to time.

**Electronic Gift Card Services:** The Processing Services provided by Elavon to Merchants with respect to Electronic Gift Cards offered by such Merchants, as more fully described herein and the MOG.

**GA UCC:** Georgia Uniform Commercial Code.

**Graphic Specifications and Procedures:** The requirements, specifications and procedures applicable to standard and custom Electronic Gift Cards, including all artwork appearing or permitted to appear on Electronic Gift Cards, as may be provided by Elavon to Merchant from time to time.

**Guarantor:** A Person that executes a Personal Guaranty for the benefit of Elavon and Member.

**Interac:** Interac Association.

**Interac Direct Payment:** The service provided by Interac to permit Customers to pay for goods and services by debiting money directly from their accounts using a POS Device equipped with a PIN pad with PIN verification.

**Issuer:** The financial institution or other entity that issued the Credit Card or Debit Card to the Cardholder.

**JCB:** JCB International Co., Ltd.

**Laws:** All applicable local, state, and federal statutes, regulations, ordinances, rules, and other binding law in effect from time to time.

**Leased Equipment:** The equipment and/or software and related license agreement(s) described in the Merchant Application or the Agreement with all replacement parts, repairs, additions and accessories included therein and/or affixed thereto.

**Lessee:** Merchant, when applicable.

**Lessor:** Elavon dba LADCO Leasing.

**Loyalty Card:** A device used to hold a currency and/or points value in a stored value program (also referred to as a "Stored Value Card").

**Master Account:** The account (e.g. funds pool) that is used to hold the value of Electronic Gift Cards that have been issued among a group or chain of merchants, alternatively, this may refer to the back-up account used to offset electronic payment, ACH or Canadian Payments Association rejects, if applicable.

**MasterCard:** MasterCard International Incorporated.

**MasterCard Merchant Agreement:** The Merchant Agreement that is a part of the Agreement and is between Merchant, the Member of MasterCard and Elavon, if as part of the Program Merchant has requested the ability to accept MasterCard Credit Cards. The Member of MasterCard is a party to the MasterCard Merchant Agreement for purposes of compliance with the MasterCard Credit Card Rules while Elavon is a member service provider of MasterCard and as such is also a party to the MasterCard Merchant



Agreement. The Member of Visa is not a party to the MasterCard Merchant Agreement and shall have no liability with respect to any matters relating to or arising out of the MasterCard Merchant Agreement, including any actions of Elavon or the Member of MasterCard thereunder. The MasterCard Merchant Agreement is contained within the Agreement and is identical to the Visa Merchant Agreement except as set out herein

**Member:** A financial institution designated by Elavon that is a principal, sponsoring affiliate or other member of Visa, MasterCard or other member of the applicable Payment Network. References to "Member" in the MasterCard Merchant Agreement shall refer to the Member of MasterCard and references to "Member" in the Visa Merchant Agreement shall refer to the Member of Visa. For purposes of Transactions in Canada only, as of the date of distribution of the TOS, the Visa Member is U.S. Bank National Association, acting through its Canadian branch, the MasterCard Member is Elavon Canada Company, and the Discover Network Member is Elavon Canada Company. The Member may be changed by Elavon at any time and the Merchant will be provided notice of same.

**Merchant:** The business entity indicated on the Merchant Application that provides goods and/or services to Customers, or that accepts payments from Customers.

**Merchant Agreement (Merchant Processing Agreement):** Any agreement that Merchant has entered into for Processing Services, which agreement is either with Elavon or another entity that, directly or indirectly, transferred its rights under such agreement to Elavon.

**Merchant Application:** The Merchant Application and any additional document containing information regarding Merchant's business that is submitted to Elavon and Member in connection with Merchant's application for Processing Services, including any additional location form(s) and any documents submitted by Merchant as a part of the bid process, if applicable.

**Merchant Operating Guide (MOG):** The operating manual provided by Elavon to its Merchant that prescribes rules and procedures governing the Transactions. The Merchant Operating Guide may be amended from time to time by Elavon in its sole discretion, which amendments will be effective upon notice to Merchant.

**MICR:** The magnetic ink character read line encoded on a Paper Check that contains information about the Customer's checking account, including the ABA Routing Number and checking account number.

**NACHA – The Electronic Payments Association:** The national association that establishes standards, rules, business practices, and procedures governing the ACH Network, including the ACH Rules.

**OFAC –** The United States Department of the Treasury's Office of Foreign Assets Control.

**Paper Check:** A Customer's paper check presented to Merchant for payment to the Merchant, which check will serve as the source document for Items.

**Payment Card Industry Data Security Standard (PCI DSS):** The data security regulations, including maintaining Cardholder account data in a secure environment, and other data security best practices endorsed by the major card associations including Visa, MasterCard and Discover, as such may be amended from time to time. Visa requires that Merchants and their agents comply with CISP, MasterCard requires that Merchants and their agents comply with SDP and the PCI DSS regulations of Discover Network.

**Payment Device:** Any device used for the purpose of obtaining credit or debiting a designated account including a Credit Card, Debit Card, and any other financial transaction device, including an Electronic Gift Card, check (whether converted into electronic form or used as a source document for an electronic fund transfer), EBT Card, stored value card, "smart" card, or other device created to be used for the purpose of obtaining credit or debiting a designated account, that is now or hereafter effected through Transactions with Merchants.



**Payment Network:** Any Credit Card Association, EFT Network, Electronic Check Service Association, governmental agency or authority, and any other entity or association that issues or sponsors a Payment Device.

**Payment Network Regulations:** Individually and collectively, as the context may dictate, the Credit Card Rules, the Debit Card Rules, and or the Electronic Check Service Rules.

**Person:** Any individual, firm, corporation, business trust, partnership, governmental agency or authority, or other entity and shall include any successor (by merger or otherwise) of such entity.

**Personal Guaranty:** Any written guaranty of Merchant's duties and obligations to Elavon and Member by a Person that is given in connection with the Agreement including, without limitation, as part of this TOS, the Merchant Application, any Merchant Agreement or Merchant Processing Agreement, or any other document signed by the Person in favor of Elavon and Member.

**PIN:** A number that must be entered by a Cardholder in order to complete certain types of Transactions (e.g., online debit, EBT).

**POS Device:** A terminal, software, or other point-of-sale device at a Merchant location that conforms with the requirements established from time to time by Elavon and the applicable Payment Network.

**Prepaid Card:** A card having available funds paid for in advance by the Cardholder.

**Primary Merchant:** The Merchant Identification Number (MID)/location originally enrolled for Electronic Gift Cards and set up to be billed for the card orders placed or designated as the corporate or headquarter location.

**Processing Services:** The Payment Device processing services and other related products and services received by Merchant pursuant to the Agreement.

**Program:** The Payment Device processing services and other related products and services received by Merchant pursuant to the Agreement.

**Reserve Account:** The account established pursuant to Section (A)(6).

**Retrieval Request:** A request initiated by a Cardholder or Issuer that requires the Merchant to produce a legible copy of the Cardholder's signed Transaction Receipt within a specified period of time.

**Servicer:** See "Elavon."

**Site Data Protection Program (SDP):** MasterCard's data security regulations to protect Cardholder account data and other data security best practices. The exact requirements for SDP can be found at https://sdp.mastercardintl.com.

**Stored Value Card:** A device used to hold a currency and/or the points value in a stored value program (also referred to as a "Loyalty Card").

**Terms of Service (TOS):** These Terms of Service and all additions to, amendments, and modifications of, and all replacements to the TOS, as applicable.

**Tokenization Services:** Those services described in paragraph 1 of Section C of this Agreement.

**Transaction:** Any action by a Customer using a Payment Device and a Merchant that results in activity on the Cardholder's account (e.g., payment, purchase, refund, return, or debit).

**Transaction Receipt:** The paper or electronic record evidencing the purchase of goods or services from, or payment to, a Merchant by a Customer using a Payment Device.



TERMS OF SERVICE

**UnionPay:** China UnionPay Co., Ltd.

**Value Added Servicer:** Any entity that stores, processes, transmits or accesses Payment Device data or Transaction data on behalf of Merchant or that provides software to Merchant for transaction processing, storage, or transmission.

**Visa:** As applicable, Visa U.S.A., Inc. and Visa Canada, Inc.

**Visa Merchant Agreement:** The Merchant Agreement that it a part of the Agreement and is between Merchant, the Member of Visa and Elavon, if as part of the Program Merchant has requested the ability to accept Visa Credit Cards. The Member of Visa is a party to the Visa Merchant Agreement for purposes of compliance with the Visa Credit Card Rules while Elavon is a registered independent sales organization of Visa and as such is also a party to the Visa Merchant Agreement. The Member of MasterCard is not a party to the Visa Merchant Agreement and shall have no liability with respect to any matters relating to or arising out of the Visa Merchant Agreement, including any actions of Elavon or the Member of Visa thereunder. The Visa Merchant Agreement is contained within the Agreement and is identical to the MasterCard Merchant Agreement except as set out herein.

**WebSuite Services:** An electronic commerce solution provided by Elavon's third party service providers that permits Customers to purchase or add value to Electronic Gift Cards through Merchant's WebSuite site. Customers submit payment for the Electronic Gift Card via a Payment Device via the Processing Services.



## Exhibit
## K

The Defendant's August 19, 2014 letter announcing the closure of the subject five (5) merchant accounts based on the alleged lack of proof of Mr. Khaled Eleiwa's Power of Attorney to sign on behalf of Mr. Rezeq Eleiwa for the Plaintiff and/or to run the Plaintiff



Elavon
7300 Chapman Highway
Knoxville, TN 37920-6612

(865) 403-7398 Fax

August 19, 2014

Snider & Horner, PLLC
Attn: Mr. Kevin A. Snider, Esq.
9056 Stone Walk Place
Germantown, Tennessee 38138-7824

Re:   K and F Wireless and Smart Wireless (The Merchants)
      Merchant   Identification   Numbers:   8024582291,   8024574975,
      8024575014, 8024582416, 8024582242

Dear Mr. Snider:

Please consider the foregoing correspondence to be an acknowledgment of your correspondence of August 11, 2011 transmitted via facsimile. Please note that by communicating with you as counsel for the above referenced entities, Elavon Inc. is not waiving any right, remedy, or other performance, claim or defense Elavon may have against the merchant or any of its principals or guarantors as described within the Merchant Application, the Terms of Service, or any other document governing the credit card transaction processing services giving rise to these circumstances.

I have verified with the sales representative who met with Mr. Khaled Eleiwa was not advised of the existence of or presented with a copy of a Power of Attorney document. As I mentioned previously, the contracts that were executed by Mr. Khaled Eleiwa in the name of Mr. Rezeq Eleiwa bear no indications that the signatures were provided under the authority of a Power of Attorney. As discussed previously, this creates significant issues with these contracts and the underlying accounts will be closed effective August 29, 2014. It appears that accounts 8024582416 and 8024582242 are the only accounts recently utilized to present transactions to Elavon for processing.

If you have any questions, or if I can be of further assistance, please do not hesitate to contact me at the address above in writing.

Very truly yours,

Timothy F. Frost
Assistant General Counsel

```
┌─────────────────────┐
│  Exhibit            │
│       L             │
│   _____       │
└─────────────────────┘
```

S. Rogue's signed statement documenting
the redrafting of the parties' contract and
providing Ms. Nanee a copy of IDs and the
Power of Attorney authorizing Mr. Khaled
Eleiwa to operate the Plaintiff on Mr.
Rezeq Eleiwa's behalf.

I, Sarahi Roque, am one of Khaled Eleiwa's assistant and I testify that I was present while Tangelia Nance, a representative from Elavon, was in our office drawing up and filling out credit card applications. She had to make two (2) applications because the first application that was made was in my boss's name, Khaled Eleiwa. When it was time for my boss to sign the documents, he asked if he had to sign his name or his father's name, his father is the owner of the company but he runs it. She asked him who was the real owner of the company and my boss replied, "My dad is but I have power of attorney" she then said that she was going to have to re-do the applications with his father's name, Rezeq Eleiwa, and he would have to provide her with a copy of power of attorney and a copy of his ID and he would need to sign his father's name. After she finished drawing up a new application with the owner's name, my coworker and I provided Tangelia with the documents she needed, a copy of the power of attorney and a copy of the owner's ID.

Sarahi Roque



Mr. Thead's signed statement documenting the redrafting of the parties' contract and providing Mr. Nance a copy of IDs and the Power of Attorney authorizing Mr. Khaled Eleiwa to operate the Plaintiff on Mr. Rezeg Eleiwa's behalf.

To whom it may concern;

I, Eddie Thead, am writing this letter to verify that I was indeed present when Tangelia
Nance, an Elavon representative, was in our office preparing the credit card applications
for our company. She did two applications for each store because the first one she put in
Khaled Eleiwa's name and she actually had to redo a different app in his father's name
,Rezeq Eleiwa. Rezeq Eleiwa is actually the owner of the company but his son, Khaled
Eleiwa, runs the company for him. His dad made him "POWER OF ATTORNEY" of the whole
company so he is authorized to act on his father's behalf. When it was time to sign the
application, Khaled Eleiwa did explain all the business information to Tangelia Nance, and
she said that it was fine but she would need a copy of the POWER OF ATTORNEY, and both
ID's for Khaled Eleiwa and his father, Rezeq Eleiwa. My co-worker and I immediately made
copies of the POWER OF ATTORNEY and BOTH ID's and handed them to her in her hand
before she left our office.

Sincerely,

Eddie Thead



# DURABLE GENERAL POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**, that I, _Rezen Eleiwa_, of Shelby County, Tennessee, have made, constituted and appointed, and by these presents do make, constitute and appoint, **KHALED ELEIWA**, as my true and lawful attorney in fact, for me, and in my name, place and stead, to act in, manage and conduct all of my affairs and estate and to do all things necessary to the accomplishment of said purpose, including but not limited to the authority and powers hereinafter granted.

This Durable General Power of Attorney is intended to comply with the requirements of T.C.A. 34-6 Part 1. Moreover, my said attorney in fact is specifically vested with the powers and authority permitted by law under and pursuant to T.C.A. 34-6-109, and any amendments thereto, in addition to the powers enumerated herein.

A recent federal regulation known as the Health Insurance Portability and Accountability Act (HIPAA) regarding disclosure of individually identifiable health information neccessitated the addition of a special release and consent authority to all healthcare providers before medical information will be released to agents of the patient.

I instruct that my agent(s) be treated as I want to be treated with respect to my rights regarding the use and disclosure of my individually identifiable health information or other medical records. This release authority applies to any information governed by the Health Insurance Portability and Accountability Act, 42 USC 1320d and 45 CFR 160-164.

Any physician, healthcare professional, dentist, health plan, hospital, clinic, laboratory, pharmacy or other health care provider, any insurance company, the Medical Information Bureau Inc. or other health care clearing house that has provided treatment or services shall give, disclose and release to my designated Agent, without restriction, identifiable health information and medical records regarding any past, present or future medical or mental health condition, to include all information relating to the diagnoses treatment of HIV/AIDS, sexually transmitted diseases, mental illness and drug or alcohol abuse.

Any psychologist, psychiatrist, licensed therapist or other healthcare provider involved with diagnoses or therapy or other treatment of me which pertains to my mental health shall give disclose and release to my designated agent any and all individually identifiable health information and medical records involving any past present or future mental health condition. This specific authorization includes but is not limited to psychotherapy notes defined by HIPAA as "notes recorded in any medium by a mental health professional documenting or analyzing the contents of conversation during a private counseling session", as well as medication prescription and monitoring, counseling session start and stop times, modalities and frequencies of treatment, results of clinical tests, and any summary of diagnosis, functional status, treatment plans, symptoms, prognosis or progress. My agent shall have the same rights of access to these notes as I am entitled to under the provisions of HIPAA and under applicable state law.

*Page 1 of 4* ___RE___ *(Initial)*

In interpreting this document, the definition of "Agent" shall be all persons named as Fiduciaries, Surrogates, Guardians, Conservators or Personal Representatives in this legal document.

The authority given my agent in this legal consent form shall supersede any prior agreements that I may have made with my health care providers to restrict access or disclosure of my individually identifiable health information. The authority given my agent has no expiration date and shall expire only in the event that I revoke the authority in writing and deliver it to my health care provider.

In order to induce the disclosing party to disclose the aforesaid private and/or protected confidential information, I forever release and hold harmless said disclosing party who relies on this instrument from any liability under confidentiality rules arising from HIPAA as a consequence of said disclosure.

Severe criminal penalties of a $50,000 fine and up to one year in prison can be imposed on any covered provider who knowingly releases patient information improperly. The foregoing Release Authority is a necessary step to satisfy all covered providers that they are disclosing information in compliance with the HIPAA laws and regulations, and with complete legal authority from the undersigned who will hold harmless any medical practitioner or hospital, which releases medical information pursuant to this consent document.

To sign my name as maker, or endorser, to any and all checks, drafts, promissory notes, certificates of stock and other instruments of a financial character, to endorse negotiable papers in my name, to draw checks upon any and all accounts which I may have in any bank, savings and loan association or other type of financial institution to deposit to and withdraw from any and all such accounts, and to enter any safe deposit box, which I may have in any bank or other institution.

To ask, demand, sue for, collect, recover, and receive all sums of money, debts, rents, accounts, claims, legacies, bequests, interest, dividends, annuities, insurance and demands whatsoever which are now, or may hereafter come due, owing, payable or belonging to me, and to sue all lawful ways and means for the collection and recovery thereof.

To surrender any life insurance policy of any kind, or character, or insurance policy or policies at anytime, at or before its maturity, and to receive and receipt for the surrender value of any, or all, of such policies and all dividends, or surplus, arising thereunder, and to assign any or all of said policies as security, for a loan or liens, in such sum or sums as the respective insurance companies may be willing to loan thereon, and to execute any and all instruments necessary or required to effectuate same; to execute all receipt, releases or other sufficient discharges for the same for me and in my name.

To enter into, make, sign, execute, acknowledge, deliver and perform any contract, agreement, or undertaking which may, in the opinion of my said attorney in fact, be necessary or proper for my welfare and best interests and that of my property and estate or any part thereof.

*Page 2 of 4* __KE__ *(Initial)*

To sell, rent, lease, encumber, mortgage or otherwise deal with all real property owned by me and to execute in my name, all instruments including but not limited to deeds and conveyances, necessary and incident thereof.

To prosecute, settle or sue upon any and all claims, demands and rights of action whatsoever, which I now have, or hereafter may have, against any person or organization, and to execute, in my name, all releases or other instruments necessary and incident thereto.

To execute and perform all other acts, deeds, and things whatsoever which, in the opinion of my said attorney in fact, ought to be done, executed or performed for my welfare and best interests and that of my property and estate.

The power herein granted to my said attorney in fact, to draw checks or drafts upon any and all accounts which I may have in any bank, savings, and loan association, or other type of financial institution shall be effective until such institution receives in writing, ample notice that the herein Power of Attorney has been terminated, by operation of law or otherwise. I expressly agree, for myself and my legal representatives, to indemnify and hold harmless the said institution for the payment of any funds withdrawn by my said attorney in fact after termination of this power, but before actual notice thereof is received by said institution in the manner set forth above.

The banking institution, purchaser, or any other party having dealings and/or business transactions with my said attorney in fact in relation to or in connection with my affairs, shall not be under any duty or obligation to inquire as to their right to exercise the powers which I have granted and conferred upon by virtue of this Power of Attorney, nor shall any party, as aforesaid, be obligated or have any duty to see to the proper application of any funds or any other assets that I may own that may be paid over to the aforesaid attorney in fact.

I hereby ratify and confirm all things so done by my said attorney in fact, as herein provided, as fully and to the same extent as if by me personally done and performed.

Whenever pronouns occur herein, they shall be construed to their proper gender and number according to the context of this instrument.

I hereby nominate my said attorney in fact as my conservator, guardian of my estate and/or person, for consideration by the Court should a Court of competent jurisdiction determine that the appointment of such fiduciary is required for the protection of my estate and/or person.

*Page 3 of 4* R F ___ (Initial)

I hereby reserve the full right and power of substitution and revocation.

IN WITNESS WHEREOF, I have hereunto set my hand, this ___25___ day of
_____March_____, 20_11_.

STATE OF TENNESSEE
COUNTY OF SHELBY

On this __25__ day of _____March_____, 20_11_, before me personally appeared
_____Bezeq Eleina_____ to me known (or proved to me on the
basis of satisfactory evidence) to be the person described in and who executed the foregoing
instrument, and acknowledged that he executed the same as his free act and deed.

WITNESS my hand and Notarial Seal at office the day and year above written.

_____
NOTARY PUBLIC

My commission expires: __1/30/2013__

Page 4 of 4 ___ (Initial)